**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ExWorks Capital, LLC and | ) | Case No. ___**20-cv-7033**___ |
| World Trade Finance, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | (Circuit Court of Cook County, |
| | ) | Illinois, County Department, |
| v. | ) | Chancery Division, Civil Action No. |
| | ) | 2020-CH-06538) |
| Randolph Abrahams, | ) | |
| Luke LaHaie, | ) | |
| RedRidge Finance Group, LLC, | ) | |
| RedRidge Lender Services, LLC, | ) | |
| ACAP SME, LLC, and | ) | |
| ACAP Fund GP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## NOTICE OF REMOVAL

Defendants Luke LaHaie, ACAP SME, LLC, and ACAP Fund GP, LLC (collectively,

"ACAP"), pursuant to 28 U.S.C. §§ 1441 and 1446, hereby give notice of the removal of this

action to this Court from the Circuit Court of Cook County, Illinois, County Department, Chancery

Division (the "Circuit Court").[1]  This removal is based upon the existence of a federal question.

*See* U.S.C. §§ 1331 and 1441(a).  In support of removal, Defendants state as follows:

### INTRODUCTION

Plaintiffs' lawsuit seeks to enjoin Defendants from acquiring The Loan Source, Inc.

("TLS") and engaging in Paycheck Protection Program ("PPP") loan-servicing work for and

through TLS.  TLS is one of only 14 companies that hold Small Business Lending Company

---

[1] By filing this Notice of Removal, Defendants do not waive any defenses that may be available.

("SBLC") licenses, and one of a limited number of U.S. Small Business Administration ("SBA")-licensed companies facilitating the provision of loans under the PPP, which is a federal program established by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) to help certain businesses continue paying their workers. The PPP is implemented by the SBA, which regulates, supervises, and examines companies it has approved to hold an SBLC and those it permits to engage in making, purchasing, and servicing PPP loans.[2] TLS and ACAP thus service PPP loans only pursuant to a grant of authority from the SBA.

TLS is the number-three borrower of federal funds under the PPP program, with ACAP currently servicing approximately 30,000 of TLS's PPP loans to small businesses.[3] If granted, Plaintiffs' requested injunction would catastrophically affect 30,000 small businesses and the liquidity for present and future PPP loans created by the secondary market and impair the internal workings and decision-making process of a federal agency. Plaintiffs' proposed injunction thus is the functional equivalent of an injunction against the SBA, which the SBA enabling statute clearly prohibits: "[N]o … injunction … shall be issued against the [SBA] Administrator or his property."[4] Numerous federal courts have held that a plaintiff cannot enjoin an SBA license that it could not enjoin directly, simply by omitting the SBA as a defendant.[5] Plaintiffs' claims therefore arise under federal law within the meaning of 28 U.S.C. § 1331.

---

[2] SOP 50 10 5(J), subpart A, Chapter 2(I)(A)(1)

[3] *See* Declaration of Luke LaHaie ("LaHaie Decl.") (**Exhibit 1**) ¶ 4-5.

[4] 15 U.S.C. § 634(b)(1).

[5] *See Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 n.6 (5th Cir. 1994) ("[A]ll injunctive relief directed at the SBA is absolutely prohibited.") (quotation marks omitted); *see also Valley Constr. Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir. 1983) ("The Small Business Act, 15 U.S.C. § 634(b)(1), precludes injunctive relief against the SBA."); *In re Hidalgo Cnty. Emergency Serv. Found.*, 962 F.3d 838, 841 (5th Cir. 2020) (vacating preliminary injunction improvidently enjoining the SBA

## THE STATE COURT ACTION

1.　　On October 29, 2020, Plaintiffs filed a Complaint against Defendants in the Circuit Court, which was assigned Case No. 2020-CH-06538.

2.　　On November 3, 2020, ACAP executed Notices and Acknowledgments of Receipt of Summons and Complaint.  Thus, this removal is timely filed within thirty days of service.

3.　　On November 6, 2020, Plaintiffs filed a Motion for a Preliminary Injunction, requesting that Defendants be enjoined from acquiring The Loan Source, Inc. ("TLS") and from engaging in PPP loan servicing work for and through TLS during the pendency of this litigation.

## JURISDICTION

4.　　Based on the following, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents a federal question.

5.　　The U.S. Supreme Court has long recognized that federal-question jurisdiction "will lie over some state-law claims that implicate significant federal issues."[6] "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."[7]

---

Administrator from mandating that the SBA handle a PPP application without considering the applicant's ongoing bankruptcy).

[6] *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 308 (2005); *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1086 (9th Cir. 2009) ("[A] federal court may have such jurisdiction if a state-law claim necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally-approved balance of federal and state judicial responsibilities.") (internal quotations and citations omitted); *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) ("[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues.") (internal citations and quotations omitted).

[7] *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016).

6.      There is significant federal interest to be served in this case because Plaintiffs'
requested injunction would enjoin a major portion of the federal PPP loan program, with disastrous
effects.[8]  ACAP and TLS service PPP loans only pursuant to a grant of authority from the SBA.
Based on that authority and subject to constant regulation by the SBA, ACAP and TLS currently
service around 30,000 PPP loans to small businesses, with over $300 million lent to small
businesses in Illinois and the surrounding states.[9]  The Federal Reserve has provided TLS with
over $4 billion in federal funds to support these 30,000 PPP loans, making it one of the largest
borrowers of PPP funds from the Federal Reserve.[10]

7.      The PPP loan portfolio that ACAP services in connection with its partnership with
TLS consists almost exclusively of loans that TLS has purchased on the secondary market from
originating banks, which has created indispensable liquidity to the PPP program nationwide.[11]
Enjoining Defendants from servicing PPP loans would stifle the secondary market.  Considering
that "the PPP was enacted to extend relief to small businesses experiencing economic hardship as
a result of the public-health measures being taken to minimize the public's exposure to the

---

[8] The PPP is "a multibillion dollar federal loan program designed to provide emergency relief to
small businesses in the midst of the COVID-19 pandemic." *Tradeways, Ltd. v. U.S. Dep't of the
Treasury*, No. CV ELH-20-1324, 2020 WL 3447767, at *1 (D. Md. June 24, 2020).  The PPP is
"implemented under section 7(a) of the Small Business Act, 15 U.S.C. § 636, which is
administered by the Small Business Administration." *In re Hidalgo Cnty. Emergency Serv.
Found.*, 962 F.3d 838, 840 (5th Cir. 2020).  "The SBA's loan programs, including the PPP,
represent the exercise of Congress' authority vested by the Spending Clause." *Am. Ass'n of
Political Consultants v. U.S. Small Bus. Admin.*, No. CV 20-970, 2020 WL 1935525, at *3 (D.D.C.
Apr. 21, 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020).

[9] *See* LaHaie Decl. ¶ 4.

[10] *Id.* ¶ 5.

[11] *Id.* ¶ 6.

COVID-19 virus,"[12] an injunction that would prevent 30,000 small businesses from receiving the help they need during these unprecedented times, which would be contrary to Congress' and SBA's intent and would have a catastrophic effect on the SBA and PPP.

8.  Plaintiffs also seek to enjoin Defendants from acquiring TLS, which is one of only 14 companies that hold an SBLC.[13]  As Plaintiffs acknowledge, "the only way to acquire an SBLC is to buy a company that holds one … after receiving SBA written approval."[14]  The SBA is a federal agency that exclusively regulates, supervises, and examines SBLCs.[15]

9.  Plaintiffs' requested injunction is the functional equivalent of an improper injunction against the SBA.[16]  The SBA enabling statute expressly prohibits injunctions against the SBA, as federal courts have repeatedly recognized.[17]  Since the only way to acquire an SBLC

---

[12] *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.,* 458 F. Supp. 3d 1044, 1053 (E.D. Wis. 2020), *appeal dismissed*, No. 20-1729, 2020 WL 6481792 (7th Cir. Aug. 5, 2020).

[13] Compl. ¶ 338 (requesting "an order enjoining defendants ACAP, Abrahams, and LaHaie from acquiring The Loan Source").

[14] Mem. Supp. Pl.'s Mot. Prelim. Inj. at 12-13.

[15] SOP 50 10 5(J), subpart A, Chapter 2(I)(A)(1)

[16] An action can "affect the exercise of powers by an agency without being aimed directly at that agency." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 615 (D.C. Cir. 2017) (internal citations and quotations omitted).

[17] 15 U.S.C. 634(b)(1) ("[N]o … injunction … shall be issued against the [SBA] Administrator or his property."); *see also Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 n.6 (5th Cir. 1994) ("this [c]ircuit has concluded that all injunctive relief directed at the SBA is absolutely prohibited") (quotation marks omitted); *see also Valley Constr. Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir. 1983) ("The Small Business Act, 15 U.S.C. § 634(b)(1), precludes injunctive relief against the SBA."); *In re Hidalgo Cnty. Emergency Serv. Found.*, 962 F.3d 838, 841 (5th Cir. 2020) ("The issue at hand is … the ability of a court to enjoin the [SBA] Administrator…. Because, under well-established Fifth Circuit law, the bankruptcy court exceeded its authority when it issued an injunction against the SBA Administrator, we vacate its preliminary injunction.").

is to purchase an existing SBLC and the SBA must approve any such purchase,[18] enjoining the sale of TLS would directly interfere with the SBA's authority and operations.

10.     While Plaintiffs omitted the SBA as party defendant, that maneuver is not an end-run around the statutory proscription against enjoining the SBA. Courts have repeatedly held that plaintiffs cannot accomplish indirectly (by seeking to enjoin the consequence of an SBA decision, rather than the decision itself) what the SBA enabling statute forbids them from doing directly.[19] Accordingly, ACAP intends to follow this removal with a motion to dismiss the claim for injunctive relief. If the motion is granted, the remainder of the complaint, which does not raise a federal question, can be returned to state court, pursuant to 28 U.S.C. § 1367(c)(3).

11.     In fact, the SBA recently invited Defendants to withdraw their application until this lawsuit is resolved because of the threatened injunction.[20] As such, this litigation has already begun to interfere with SBA's internal operations and decision-making powers. Therefore, there

---

[18] *See* 13 CFR § 120.475 (prohibiting any change of ownership or control without the SBA's prior written approval).

[19] *See Valley Constr. Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir. 1983) ("The district court found that injunctive relief would be improper because a necessary party to the suit is the SBA, which administers the overall § 8(a) minority enterprise set-aside program. The Small Business Act, 15 U.S.C. § 634(b)(1), precludes injunctive relief against the SBA. We concur with the reasoning of the district court and will not allow the contractors to obtain indirectly (against the Army) what they cannot obtain directly (against the SBA)."); *see also Jets Servs., Inc. v. Hoffman*, 420 F. Supp. 1300, 1309 (M.D. Fla. 1976) ("It is clear, therefore, that in seeking injunctive relief against the Army defendants plaintiff seeks to circumvent the plain policy behind the Congressional bar against enjoining SBA activities. Plaintiff seeks to accomplish indirectly, by enjoining the Army defendants, what it is expressly prohibited from doing directly: enjoining the activity of SBA officials.").

[20] *See* letter from TLS to the SBA (Nov. 23, 2020) (**Exhibit 2**) ("[T]he withdrawal is being made at this time for administrative efficiency reasons due to recent litigation filed against the proposed Buyer …. SBA has advised us that the pendency of this litigation will be an adverse factor in the SBA's evaluation of the application and has therefore recommended that the application be withdrawn at this time.").

are significant federal issues implicated as the SBA and the federal government have a strong interest in the limited ownership of SBLCs.

12.     Considering the substantial federal interest implicated here, this Court may exercise jurisdiction without disturbing any congressionally approved balance of federal and state judicial responsibilities as state courts are not the traditional forum to, in essence, enjoin the SBA and control the manner in which a federal agency performs its federal duties.

## VENUE

13.     Venue is proper in this Court because this case was originally filed in Cook County, Illinois.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

14.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendants in this action are attached hereto a **Composite Exhibit 3**.

15.     In accordance with 28 U.S.C. § 1446(d), a copy of this Notice will be served upon Plaintiffs and filed with the Clerk of the Circuit Court.

16.     Pursuant to 28 U.S.C § 1446(b)(2)(A), all defendants who have been properly joined and served, join in or consent to the removal of this action.

## CONCLUSION

WHEREFORE, having fulfilled all statutory requirements, ACAP removes this action to this Court from the Circuit Court of Cook County, Illinois, and requests that this Court assume full jurisdiction over this matter as provided by law.

Dated: November 27, 2020

Respectfully submitted,

**LUKE LAHAIE, ACAP SME, LLC and ACAP FUND GP, LLC**

By: */s/ Michael J. Grant*
Michael Grant
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St. 7th Floor
Chicago, Illinois 60604
(312) 762-9464
Illinois Bar No. 6275028
mgrant@tdrlawfirm.com

Of counsel:
Tein Malone PLLC

By: */s/ Michael R. Tein*
Michael R. Tein, Esq.
3480 Main Highway
Coconut Grove, FL 33133
tein@teinmalone.com
305.442.1101
*Pro hac vice motion forthcoming*

## CERTIFICATE OF SERVICE

I, Michael Grant, counsel for Defendants Luke LaHaie, ACAP SME, LLC, and ACAP, Fund GP, LLC, hereby certify that I caused a copy of the foregoing Notice of Removal to be served by e-mail on November 27, 2020, on:

**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
353 N. Clark Street, 12th Floor
Chicago, IL 60654
zfardon@kslaw.com
potlewski@kslaw.com
*Attorneys for Plaintiffs*

**KATTEN MUCHIN ROSENMAN LLP**
Michael J. Diver
Sarah Weber
525 W. Monroe Street
Chicago, IL 60661-3693
michael.diver@katten.com
sarah.weber@katten.com
*Attorneys for Randolph Abrahams, RedRidge Finance Group, LLC and RedRidge Lender Services, LLC*

/s/ Michael Grant

# **EXHIBIT 1**

## DECLARATION OF LUKE LAHAIE

I, Luke LaHaie, being over 18 and otherwise competent to testify, state the following based on my personal knowledge:

1. I am the Chief Investment Officer of ACAP Fund GP, LLC and its wholly owned subsidiary, ACAP SME LLC (together, "ACAP").

2. In March 2020, the U.S. Treasury Department announced the Paycheck Protection Program (PPP) through which small businesses could seek loans (some of which would be eligible for forgiveness) in order to keep their businesses afloat during COVID-19-related shutdowns and business reductions. The PPP program is administered by the United States Small Business Administration (SBA).

3. In May 2020, ACAP entered into agreements with Northeast Bank (NEB), a Maine public company, and The Loan Source, Inc. (TLS), a Small Business Lending Company licensed by the SBA in a structure where Northeast Bank would act as correspondent bank for TLS to borrow funds from the Federal Reserve's Paycheck Protection Program Liquidity Facility (PPPLF), TLS would purchase PPP loans from banks using borrowings from PPPLF, and ACAP would service the loans purchased by TLS. The Lender Service Provider Agreement between TLS and ACAP required SBA approval, pursuant to 13 CFR 103.5 and SBA SOP 50 10 5(K). On May 20, 2020, the SBA approved it (**Ex. A** hereto).

4. Today, the structure between ACAP, TLS and Northeast Bank holds and services ~30,000 PPP loans to small businesses in every state. In total, these loans exceed $4 billion in principal, with over $300 million lent to small businesses in Illinois and the surrounding states.

5. These $4 billion in loans are financed by the U.S. Treasury under the Payment Protection Program Lending Facility (PPPLF). I understand that TLS is the third-largest borrower under the PPPLF and the largest non-bank borrower.

6. The PPP loan portfolio serviced by ACAP in connection with this relationship includes loans TLS has purchased on the secondary market from originating banks, which has created indispensable liquidity to the PPP program nationwide.

7. In servicing our approximately 30,000 PPP loans to small businesses, our functions include the following:

a. Document and monitor every loan, invoice monthly, collect and credit payments;

b. Compliance with anti-money-laundering and anti-fraud laws;

c. Remittance of repayment proceeds to the Federal Reserve Bank;

d. Process forgiveness applications, including substantial daily assistance to borrowers in that process; and

e. Continuous communication with the SBA and federal regulating agencies regarding borrowers and their loans.

8. If ACAP is enjoined from servicing PPP loans, there will be a catastrophic impact on the PPP program. To begin with, TLS cannot purchase loans on the secondary market without relying upon ACAP's ability to service them. We presently have a pipeline of PPP portfolio purchases potentially exceeding several billion dollars. TLS's exit from purchasing loans means that many financial institutions will have to maintain massive volumes of PPP loans on their balance sheets and continue to service them, placing unprecedented strain on their operations and their PPP borrowers.

9. Aside from stifling the secondary market, enjoining us from servicing our current portfolio will strand over 30,000 small businesses throughout the country, leaving them without the ability to repay, adjust or interface with their PPP loans or participate in the forgiveness program. Each small business seeking forgiveness will lose access to its forgiveness application. For many such borrowers, failure to timely repay or discharge their PPP loans will violate covenants with other business lenders, likely causing waterfall defaults.

10. If we are enjoined, SBA will be forced to find a suitable replacement to service our portfolio. This will be virtually impossible in the present business environment. There are a limited number of companies that can logistically manage a portfolio like ours and even fewer companies approved to process loans for the SBA. Presently, ACAP has over 100 highly trained employees and contractors working full-time exclusively on servicing. To assist our employees, we have engineered and deployed sophisticated proprietary systems, which we continuously refine and improve. In contrast, I understand that the SBA department of ExWorks Capital LLC and World Trade Finance LLC consist of two people.

11. Even in the unlikely scenario that the SBA ultimately can find a suitable SBA-licensed replacement servicer with the available capacity to take over our massive portfolio -- transition, training and

2

compatibility issues will undoubtedly result in protracted delays and inevitable errors, which in turn will cause unnecessary interest charges and countless defaults. In the meantime, the injunction will create insurmountable logistical obstacles for the U.S. Treasury to recoup and repurpose the $ 4 billion it has lent to TLS under the PPPLF.

12. Finally, many members of Congress have expressed support for an additional round of PPP lending in Q1 2021. Thousands of our borrowers -- and the many thousands of families who depend on those businesses -- need this assistance in order to stay in business. If we are enjoined, it will cause an impossible administrative morass that will irreparably disrupt their ability to participate timely in a future PPP round.

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Executed November 27, 2020.

_/s Luke LaHaie_____
**LUKE LAHAIE**

3

# **<u>EXHIBIT A</u>**

*LENDER SERVICE PROVIDER AGREEMENT*

**THIS LENDER SERVICE PROVIDER AGREEMENT** (this "Agreement") is made and entered into on the 13th day of May, 2020 (the "Effective Date")**,** by and between **The Loan Source, Inc.,** a Delaware Corporation ("Lender")  and **ACAP SME, LLC**, a Delaware limited liability company ("Service Provider").

*RECITALS:*

**WHEREAS,** Lender is a Small Business Lending Company pursuant to 13 C.F.R. § 120.470 et seq., which engages in the origination, marketing, underwriting, and funding of loans, as well as the servicing, management and liquidation of the subsequently resulting loan portfolios, funded and created under the U.S. Small Business Administration ("SBA") 7(a) Loan Program and the SBA Paycheck Protection Program ("PPP"); and

**WHEREAS,** Lender has the ability to independently evaluate, process, close, service, liquidate, and litigate commercial loans; and

**WHEREAS**, Service Provider is experienced in, and provides consulting and other services to, lenders that market, underwrite, and fund loans and manage the subsequently resulting loan portfolios under the SBA 7(a) Loan Program and PPP; and

**WHEREAS**, Lender desires to acquire staff services from Service Provider to carry out certain functions rather than hiring employees directly for those same staff functions, as it believes that this will be more economical and will result in a higher level of service and expertise to provide better delivery to the small business concerns which Lender desires to assist; and

**WHEREAS**, Lender and Service Provider desire to establish an independent contractor relationship whereby, for the mutual benefit of Lender and Service Provider, Service Provider provides guidance, assistance and services to Lender in the underwriting, marketing, processing and funding of loans, as well as the servicing, management and liquidation of subsequently resulting loan portfolios under the SBA Paycheck Protection Program; and

**WHEREAS**, Lender specifically acknowledges that, notwithstanding any other provision of this Agreement seemingly to the contrary, Lender shall at all times during the term of this Agreement, and after the expiration or earlier termination thereof, have (i) day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating and litigating its SBA loan portfolio, (ii) ultimate responsibility for all loan decisions, including approvals, underwriting, closings, disbursements, due diligence and loan servicing and liquidation actions, as required by SBA policy, and that such responsibility must be carried out independently of any control by Service Provider, and (iii) full responsibility for all entries and certifications made by Service Provider on Lender's behalf into the SBA's E-Tran system.

**NOW THEREFORE**, in consideration of the mutual covenants, promises, and undertakings contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1) **Recitals Incorporated.**   The foregoing recitals are hereby incorporated into this Agreement.

2) **Term.** The term of this Agreement shall be for an initial period of six (6) months from the Effective Date, and shall automatically renew for additional periods of six (6) months each, unless earlier terminated or if notice of non-renewal is timely provided in accordance with the provisions of Section 8, below.

3) **Independent Contractor/Service Provider Relationship**.

   a)      Service Provider's relationship to Lender shall at all times be that of independent

contractor, to provide a range of services more particularly described in Section 5 of this Agreement. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Lender and Service Provider.

b) Service Provider will utilize its own employees and will choose and control the methods and procedures to be used in the performance of Service Provider's obligations pursuant to the terms and provisions of this Agreement, hiring and firing its employees, paying its employees or other workers, and choosing the time when work is to be done, except as otherwise expressly set forth in this Agreement. Unless required by Lender to perform its obligations under this Agreement at Lender's offices, Service Provider shall furnish its own office facilities and transportation for the conduct of its obligations under this Agreement at its own expense.

c) Notwithstanding the foregoing or any provision of this Agreement to the contrary, Lender and Service Provider agree that Lender, and not Service Provider, shall retain the full responsibility for all aspects of its 7(a) and PPP loan operation, including, but not limited to, approvals, closings, disbursements, servicing, actions, due diligence liquidating and litigating Lender's SBA loan portfolio. Service provider only provides assistance to the Lender.

4) **Applicant Fees**. Service Provider shall not charge any fees to any loan applicant for the services provided hereunder or in connection therewith.

5) **Scope of Work and Compensation; Lender Obligations.** Service Provider shall provide Lender with the services described below for PPP loans identified under the terms of this Agreement (the "Included Loans"), for the compensation set forth herein.

a) [Reserved]

b) [Reserved]

c) Servicing, Liquidation, and Administration Services.

i) Service Provider shall at all times during the Term of this Agreement provide the following services relating to the servicing, liquidation, and administration of Lender's SBA loan portfolio for the Included Loans:

(a) integrate the loan documents and loan data into the appropriate servicing database;

(b) establish a loan data tracking and borrower-communication system;

(c) provide software set-up to integrate Lender and the loan into the servicing portfolio module;

(d) provide full-time help desk support for Lender's technical issues and questions;

(e) provide technical assistance to Lender on generally accepted accounting principles for the accounting for each component of the loan transaction;

(f) perform servicing file reviews for Lender;

(g) assist Lender with the pledge of the Included Loans to the PPP Loan Facility from

the Federal Reserve Bank (the "PPPLF"), including assistance with identifying an appropriate Correspondent Bank required for access to the PPPLF, and providing technical guidance (including identification of trust agents to act as document custodians and escrow agents) to assist lender with the coordination of pledging Included Loans to the PPPLF. Lender agrees that during the term of this Agreement, Service Provider shall be Lender's exclusive agent for accessing the PPPLF;

(h) obtain necessary documentation from loan applicant and submit to SBA for loan forgiveness on behalf of loan applicant and lender;

(i) document all servicing actions for review and approval by Lender through Lender's designated approval process and, if required by Lender, for review and approval by experienced SBA legal counsel chosen by Lender in Lender's sole discretion;

(j) obtain SBA approval (as may be required by then-applicable SBA regulations) for all servicing actions, including but not limited to loan modifications;

(k) assist Lender with the preparation and submission to the SBA and the FTA of all reporting documentation with respect to the Included Loans, as required by then-applicable SBA regulations;

(l) assist Lender in obtaining, and provide guidance to Lender in reviewing, annual financial statements and tax information from all borrowers of Included Loans, to the extent required;

(m) process all payments made by borrowers with respect to Included Loans;

(n) assist Lender with follow-up regarding all past-due Included Loan accounts, including the provision of all required notices and notifications to the SBA in connection therewith;

(o) consult with Lender, Lender's legal counsel and the SBA regarding the compliance with SBA's then-current policies and regulations of any initial workout, litigation and/or or liquidation plan, or any liquidation action or collection efforts, as applicable, proposed with respect to any Included Loan;

(p) consult with Lender regarding SBA guaranty purchase issues relating to Included Loans; and

(q) upon borrower default, or if a loan otherwise passes into collection or liquidation, take any and all appropriate actions, in compliance with then-current SBA policy and regulations and prudent lending standards, to reasonably increase the likelihood of the repayment of the obligation by the delinquent or defaulting obligor, and provide Lender with a written report or reports of such actions in a mutually agreed upon format.

The foregoing services are referred to herein as the "Servicing, Liquidation and Administration Services".

d)    Compensation.

(1) In no event shall Service Provider be entitled to any split of secondary market premiums.

(2)  As compensation for, and in consideration of Service Provider providing the Servicing, Liquidation and Administrative Services, Lender shall pay to Service Provider a fee for services actually performed with respect to each Included Loan in the amount of seventy-five percent (75%) of the Net Interest Margin (defined as the interest rate of each Included Loan less any financing costs related to the Included Loan less a Funding Fee of ten basis points (0.10%), which Funding Fee shall be retained by Lender) on the loan amount, per annum, of each Included Loan, plus seventy-five percent (75%) of the Net Purchase Profit (defined as the Purchaser Origination Fee, less any third-party commissions paid related to the purchase of the Included Loans realized by Lender on the purchase of Included Loans, plus seventy-five (75%) of any other SBA fees (excluding any PPP Forgiveness Payments), if any ("Other Fees") paid to Lender in regards to Included Loans. Once the Lender has received the Deposit amount referenced in the Stock Purchase Agreement of even date herewith, the Service Provider percentage will increase to 100% for Net Interest Margin, Net Purchase Profit and Other Fees. The fee for the Net Interest Margin shall be payable monthly on the 1st day of each month, beginning in the month following the month in which the first Included Loan is funded. The fees for the Net Purchase Profit and Other Fees shall be paid to Service Provider on the same day that the Lender receives the Net Purchase Profit or the Other Fees. The fees for the Net Interest Margin, the Net Purchase Profit and Other Fees shall continue to be paid to Service Provider throughout the Term of this Agreement, and any subsequent extensions or renewals hereof, until the earlier to occur of (i) the expiration (beyond all applicable renewal periods) or earlier termination of this Agreement, or (ii) the maturity date of the Included Loan for which such Servicing Fee is due.

(3)  All payments from a borrower must be held in an account in the Lender's name. Service Provider may be permitted to access the account in order to process borrowers' payments. If the guaranteed portion of the loan has been sold on the secondary market, the account must be properly titled in accordance with SBA Form 1086. Service Provider may not commingle any funds from multiple lenders and hereby agrees to hold a separate account for each lender client.

e)  In the event that Service Provider determines that the services of third-party specialists, such as legal counsel, are required to fully protect Lender's interests in connection with liquidation actions and guaranty purchase situations, Service Provider shall recommend, and in consultation with Lender, shall coordinate the retention of such specialists.

f)  Service Provider shall not receive any fees, nor shall Service Provider have any obligations, with respect to Lender's loan portfolio existing as of the date of execution of this Agreement, (each an "Excluded Loan" and, collectively, the "Excluded Loans"); provided, however, that if Lender requests in writing that Service Provider provide the services described in Section 5(c) above with respect to any Excluded Loan, and Service Provider agrees in writing to provide such Services with respect to such Excluded Loan, then such Excluded Loan shall be considered an Included Loan for all purposes of this Agreement and all obligations of the parties hereto, including Lender's obligation to pay fees as set forth in this Agreement, shall be applicable thereto.

g)  This Agreement shall apply to work produced from all locations from which Lender conducts business

h)  Service Provider hereby agrees to perform all work within the scope of this Agreement with due diligence and within reasonable time periods to be agreed upon by Lender and Service Provider.

i)  Lender shall provide Service Provider with written notice of any material adverse change

in the status or financial condition of any obligor or of any other material information related to any Included Loan (the "Material Information") within ten (10) business days of learning such information. Lender hereby represents and warrants that this obligation to provide the Material Information to Service Provider is included in its obligation to retain the day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating and litigating its SBA loan portfolio.

j)  ***Lender hereby authorizes Service Provider, at all times during the Term of this Agreement, to input data into SBA's Capital Access Financial System ("CAFS"), including SBAOne and E-Tran, the SBA's electronic platform for exchanging data with the SBA, in connection with the provision of Service Provider's Processing Services, Secondary Market Services and Servicing, Liquidation and Administration Services. Service Provider shall be authorized to input data on behalf of lender at the origination, servicing, and/or liquidation levels at E-Tran location ID # 188567. Lender acknowledges that it is fully responsible for all entries and certifications made by Service Provider on Lender's behalf into the SBA's CAFS, including SBAOne and the E-Tran system.***

6)  **Costs and Expenses; Collection Expense Account**.

a)  Each party hereto and its accountants shall have the rights, not more than once per year, to examine and audit the other party's books and records relating to all amounts due to Service Provider pursuant to the terms and provisions of this Agreement, at such place reasonably designated by the non-requesting party, during normal business hours, upon at least fifteen (15) days prior written notice to the non-requesting party. As a condition to a party's examination and/or audit, the parties agree that the requesting party shall: (a) send to the other party promptly after receipt, a copy of any audit or report generated with respect to an examination conducted hereunder; and (b) to keep any information obtained by the requesting party or its agents strictly confidential, except that the requesting party and its accountants may divulge such information to the requesting party's employees, accountants, and attorneys, or as it may be required to be disclosed by law or by a court of competent jurisdiction. If such audit shall reveal that additional sums should have been paid, or amounts were overpaid to Service Provider, then an adjustment shall be made in the amount thereof within thirty (30) days of the date that the non-requesting party shall be in receipt of such written audit. The requesting party shall pay the cost of such audit; provided, however, that if the audit results in a sum owed to the requesting party in excess of ten percent (10%) of the total amount either paid to or paid by the requesting party pursuant to the terms of this Agreement, the non-requesting party shall pay the expense of the audit. Each party covenants and agrees that its books and records shall be maintained at its corporate headquarters for at least three (3) years from the end of the period to which they are applicable, or if any audit is undertaken by either party or a controversy or a dispute should arise between the parties hereto regarding sums owed to either party under this Agreement, until such audit, controversy or dispute is finally completed, resolved or otherwise settled, even though such retention period may be after the expiration of the Term or earlier termination of this Agreement.

b)  The terms and provisions of this Section 6 shall survive the expiration or earlier termination of this Agreement.

7)  **Indemnification/Waiver/No Warranty**.

a)  Service Provider shall indemnify and hold harmless Lender and its affiliates, employees, officers and directors from any and all losses, liabilities, damages, penalties, third party claims or expenses (including reasonable attorneys' fees and cost of defense) that Lender may suffer or incur as a result of (i) any failure of the Service Provider to perform the

services contemplated in this Agreement or to comply with applicable law, including failure to comply with SBA Regulations and Guidelines, (ii) any claims, breach, losses, regulatory actions, violations or penalties arising from the action or operations of Service Provider, (iii) any errors made by Service Provider in acting on behalf of Lender with respect to CAFS, or (iv) any claims, losses, or violations resulting from an act of fraud, embezzlement or criminal activity by Service Provider, except to the extent such failure, claims or errors resulted from (A) the Service Provider's good faith interpretation of regulations, policies or formal guidance issued by the SBA, U.S. Treasury or other federal agency regarding the PPP Loan Program, (B) any actions or omissions by the SBA, U.S. Treasury or other federal agency with responsibility to administer the PPP Loan Program or (C) gross negligence or willful misconduct of Lender.

b)      Lender shall indemnify and hold harmless the Service Provider and its affiliates, employees, officers and directors from any and all third-party claims, losses, liabilities, damages, penalties or expenses (including reasonable attorneys' fees and cost of defense) that Service Provider may suffer or incur as a result of (i) any failure of Lender to perform services contemplated by this Agreement or to comply with applicable law, including failure to comply with SBA Regulations, (ii) any incorrect CAFS data provided by Lender or (iii) any claims, losses, or violations resulting from an act of fraud, embezzlement or criminal activity by the Lender, except to the extent such failure resulted from (i) Lender's good faith interpretation of regulations, policies or formal guidance issued by the SBA, U.S. Treasury or other federal agency regarding the PPP Loan Program, (ii) any actions or omissions by the SBA, U.S. Treasury or other federal agency with responsibility to administer the PPP Loan Program or (iii) gross negligence or willful misconduct of the Service Provider.

c)      If any claim or demand is asserted against any Person entitled to indemnification under this Section 7 (each, an "Indemnified Party") by any Person who is not a Party in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections (a) or (b) above, written notice of such claim or demand shall promptly be given to the Party (the "Indemnifying Party") from whom indemnification may be sought. The Indemnifying Party shall have the right, by notifying the Indemnified Party within ten (10) days of its receipt of the notice of the claim or demand, to assume the entire control (subject to the following sentence and the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice, unless (i) the employment of such counsel has been authorized in writing by the Indemnifying Party, (ii) the Indemnifying Party has not employed counsel to take charge of the defense within ten (10) days after delivery of the applicable notice or, having elected to assume such defense, thereafter ceases its defense of such action, or (iii) the Indemnified Party has reasonably concluded that there may be defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party), in any of which event attorneys' fees and expenses shall be borne by the Indemnifying Party) of the defense, compromise or settlement of the matter, including, at the Indemnifying Party's expense, employment of counsel of the Indemnifying Party's choice and reasonably satisfactory to the Indemnified Party. The Indemnified Party or Indemnifying Party may at any time notify the other of its intention to settle or compromise any claim, suit or action against the Indemnified Party in respect of which payments may be sought by the Indemnified Party hereunder, and (x) the Indemnifying Party may settle or compromise any such claim, suit or action solely for the payment of money damages in which the Indemnified Party does not admit any liability with respect to such claim, but shall not agree to any other settlement or compromise without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld (it being agreed that any failure of an Indemnified Party to consent to any settlement or compromise involving relief other than monetary damages shall not be deemed to be unreasonably withheld), and (y) the Indemnified Party may settle or compromise any such

claim, suit or action solely for an amount not exceeding One Thousand Dollars ($1,000) in which the Indemnified Party does not admit any liability with respect to such claim, but shall not settle or compromise any other matter without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, if the claim, suit or action giving rise to the Indemnifying Party's indemnification obligation is being brought by or before the SBA or another state or federal agency, authority or other regulatory body, then the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party, or to settle or compromise any such claim, suit or action, unless so authorized in writing by the Indemnified Party.

d) If the Indemnifying Party gives notice to any Indemnified Party that the Indemnifying Party will assume control of the defense, compromise or settlement of the matter, the Indemnifying Party will be deemed to have waived all defenses to the claims for indemnification by the Indemnified Party with respect to that matter. The Indemnifying Party shall promptly notify the Indemnified Party if the Indemnifying Party desires not to assume, or participate in the defense of, any such claim, suit or action. Any damages to the assets or business of the Indemnified Party caused by a failure of the Indemnifying Party to defend, compromise or settle a claim or demand in a reasonable and expeditious manner, after the Indemnifying Party has given notice that it will assume control of the defense, compromise or settlement of the matter, shall be included in the damages for which the Indemnifying Party shall be obligated to indemnify the Indemnified Party. If the Indemnifying Party makes any payment on any third-party claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such third-party claim. Each Party agrees to provide reasonable access to the other Party to such documents and information as may reasonably by requested in connection with the defense, negotiation or settlement of any such third-party claim.

e) If an Indemnified Party fails to give prompt notice of any claim being made or any suit or action being commenced in respect of which indemnification under this Section 7 may be sought, such failure shall not limit the liability of the Indemnifying Party; provided, that this provision shall not be deemed to limit the Indemnifying Party's rights to recover for any Loss which it can establish resulted from such failure to give prompt notice.

f) This Section 7 shall govern the obligations of the Parties with respect to the subject matter hereof but shall not be deemed to limit the rights which any party might otherwise have at law or in equity.

g) No Warranties. Notwithstanding the foregoing, nothing contained in this Agreement should be construed as a warranty or guarantee by either Party of loan portfolio performance or of the enforceability of the SBA guarantee on any Included Loan and any and all such warranties are hereby disclaimed.

h) Limitation of Liability. NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR LOST PROFITS OF ANY KIND, IN CONNECTION WITH THE TERMS OR THE BREACH OF THE TERMS OR SUBJECT MATTER OF THIS AGREEMENT, WHETHER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE OR OTHER THEORY). IN ADDITION, SERVICE PROVIDER WILL NOT BE LIABLE FOR ANY CLAIMS MADE OR ACTIONS TAKEN BY OR ON BEHALF OF ANY THIRD PARTY IN CONNECTION WITH INCLUDED LOANS OR RELATED SERVICES PROVIDED BY LENDER UNDER THIS AGREEMENT, TO THE EXTENT THAT LENDER WOULD NOT BE LIABLE UNDER SECTION 1106(H) OF THE CARES ACT.

i)    ANY DISPUTES RELATED TO LENDER'S LOAN DECISIONS, INCLUDING APPROVALS, AUTHORIZATIONS, UNDERWRITING, CLOSINGS, DISBURSEMENTS, DUE DILIGENCE AND LOAN SERVICING ACTIONS (INCLUDING THOSE RELATING TO AUTHORIZATION, LOAN DEFERMENTS, LOAN FORGIVENESS AND LOAN GUARANTEES) AS REQUIRED BY THE SBA, WILL BE RESOLVED BETWEEN LENDER AND THE DISPUTANT. LENDER RELEASES SERVICE PROVIDER (AND ITS AFFILIATES AND THEIR RESPECTIVE PERSONNEL) FROM CLAIMS, DEMANDS AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

8)    **Termination**.

a)    The Term of this Agreement shall renew automatically, as described in Section 2 above, unless either party hereto provides not fewer than thirty (30) days written notice to the other party prior to the expiration of the initial Term or any renewal thereof ("Notice of Non-Renewal").  Either party may terminate this Agreement at any time by giving sixty (60) days written notice to the other party hereto ("Notice of Termination").

b)    Within ten (10) days of its receipt or delivery, as the case may be, of Notice of Non-Renewal or Notice of Termination, Service Provider shall provide to Lender, in writing, a plan for providing to Lender either electronic or hard copies of any applicant and/or loan file material in its possession that is not otherwise in the possession of Lender.  If electronic copies are to be provided, both parties shall agree upon a data format and method of transmission. Service Provider will not unreasonably withhold its co-operation in such selection and transmission.  If "hard copies" (i.e., paper files) are to be provided, Lender shall pay to Service Provider the cost of producing and collating the hard copies at a cost not to exceed $100.00 per file; all other costs of providing such information shall be borne by Lender. Service Provider shall provide all such information to Lender no later than thirty (30) days following the date of expiration or termination of this Agreement.

9)    **Transition; Payment of Fees Upon Expiration or Termination**.

a)    In the event that any loan application for which Service Provider is responsible hereunder shall remain unfinished on the date of expiration or earlier termination of this Agreement, Lender may, in its sole discretion, (i) complete the loan application process itself, (ii) contract with another party (the "Replacement") to complete the application process, or (iii) require Service Provider to complete the loan application process.  If Lender elects to complete the loan application process itself or contracts with the Replacement to complete the application process, Service Provider shall provide to Lender or, at Lender's direction, the Replacement, as promptly as is reasonably possible, all applicant and/or loan file material in its possession that is not otherwise in the possession of Lender.  If Lender requires Service Provider to complete the loan application process, Service Provider shall cause such application to be completed in accordance with the terms and provisions of this Agreement, and all terms and provisions of this Agreement shall remain in full force and effect with respect to each such application until such time as the last application to be completed by Service Provider has been completed and Service Provider has been paid in full for its services.

b)    Service Provider shall be entitled to all fees accrued pursuant to the terms and provisions of Section 5 above through the end of the calendar month in which this Agreement terminates, notwithstanding that the actual date of payment made by a borrower may be designated by the FTA to be in the following calendar month.  By way of example, should a late payment be made by a borrower within the month in which this Agreement terminates

but after the date of termination, Service Provider shall be entitled to the fees related to that payment as described above in section 5, as related to and only for services actually performed.

10) **Maintenance of Confidential Information**.

a) The protection of confidential customer information is required at all times and Lender and Service Provider shall at all times comply with relevant state and federal regulations regarding disclosure of confidential information, including but not limited to the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6809) and the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.).

b) Service Provider acknowledges that all files maintained by Lender together with any and all correspondence, papers, documents, and other materials furnished to Service Provider under this Agreement by Lender or any borrower or loan applicant (the "Confidential Lender Information") are confidential business information and are the property of Lender. Service Provider agrees that the Confidential Lender Information shall be maintained in strictest confidence and shall not be disclosed to any third parties except as may be required by applicable state or federal law. During the Term and following the expiration or earlier termination of this Agreement, Service Provider shall not disclose or use to its own advantage, or to the advantage of any other person or entity, any such Confidential Lender Information which Service Provider obtained as a result of either party's performance of its obligations under this Agreement. For purposes of this Agreement, "Confidential Lender Information" shall not include information that (i) is in Service Provider's possession prior to its being provided by or on behalf of Lender, (ii) is or becomes publicly available (other than through a breach of this Agreement by Service Provider), or (iii) becomes available to Service Provider on a non-confidential basis, provided that the source of such information was not known by Service Provider to be bound by a confidentiality agreement or other legal or contractual obligation of confidentiality with respect to such information.

c) Lender acknowledges and agrees that it will have access to confidential business information and proprietary systems of Service Provider (the "Confidential Service Provider Information"). During the Term and following the expiration or earlier termination of this Agreement, Lender hereby agrees not to disclose or use to its own advantage, or to the advantage of any other person or entity any such Confidential Service Provider Information obtained as a result of either party's performance of its obligations under this Agreement. For purposes of this Agreement, "Confidential Service Provider Information" shall not include information that (i) is in Lender's possession prior to its being provided by or on behalf of Service Provider, (ii) is or becomes publicly available (other than through a breach of this Agreement by Lender), or (iii) becomes available to Lender on a non-confidential basis, provided that the source of such information was not known by Lender to be bound by a confidentiality agreement or other legal or contractual obligation of confidentiality with respect to such information.

i) The provisions of this Section 10 shall survive the expiration or earlier termination of this Agreement and shall be enforceable by either party hereto. In the event of a breach or threatened breach by Service Provider or Lender of the provisions of this Section 10 or any portion thereof, the other party shall have the right of injunction to restrain the same and the right to invoke any remedy allowed by law or in equity whether or not other remedies, indemnity or reimbursements are herein provided.

11) **Amendments**. This Agreement may be amended only by a written instrument executed by all parties hereto. Any such amendment shall be submitted to SBA for approval. If the SBA fails to approve such amendment, then such amendment shall have no force or effect and the parties thereto shall have no obligation thereunder.

{02933805;v5 }                                    9

12) **Governing Law.** This Agreement shall be governed by and interpreted pursuant to the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction (the "Governing Law"). Notwithstanding the foregoing or any provision of this Agreement to the contrary, this Agreement is subject to all applicable laws, regulations, and policies, including all SBA Loan Program Requirements (the "SBA Requirements"). In the event of any conflict between the Governing Law and the SBA Requirements, the SBA Requirements shall control. In the event that this Agreement conflicts with any other contract or agreement between the parties, now or in the future, this Agreement shall control with respect to Lender's Included Loans.

13) **Jurisdiction.** Each party hereto irrevocably submits to the nonexclusive jurisdiction of the United States District Court for the District of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the United States District Court for the District of Delaware and the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

14) **Arbitration**. In the event of any dispute, claim or controversy concerning, arising out of or relating to this Agreement, its effect, the breach thereof, or the transactions contemplated by it, the same shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA Rules"). The arbitration shall be before one neutral arbitrator to be selected in accordance with the AAA Rules and whose decision shall be rendered in writing. The results of the arbitration shall be final and binding upon the parties, with costs paid by the party who does not prevail in the arbitration, and judgment on the award may be entered in any court having jurisdiction thereof. In rendering the award, the arbitrator shall determine the rights and obligations of the parties according to the substantive and procedural laws of the State of Delaware. The arbitration shall be held in Wilmington, Delawarep, or at such other place as may be selected by mutual agreement of the parties. The arbitrator shall have no authority to award punitive damages or any other damages not measured by the prevailing party's actual damages, and may not, in any event, make any ruling, finding or award that does not conform to the terms and conditions of this Agreement. Neither party nor the arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties, unless required to do so by order of a governmental authority, or as required by either party's auditors in connection with the preparation of audited financial statements, or as required by the disclosure requirements of any U.S. or foreign securities law, regulation or stock exchange rule, or if a petition to enforce arbitration is necessary to be filed with a court of competent jurisdiction.

15) **Waivers**. Except as otherwise expressly provided herein, no purported waiver by any party of any breach by the other party of any of its obligations, agreements or covenants hereunder, or any part thereof, shall be effective unless made in a writing subscribed by the party or parties sought to be bound thereby, and no failure to pursue or elect any remedy with respect to any default under or breach of any provision of this Agreement, or any part thereof, shall be deemed to be a waiver of any other subsequent similar or different default or breach, or any election of remedies available in connection therewith, nor shall the acceptance or receipt by any party of any money or other consideration due him or it under this Agreement, with or without knowledge of any breach hereunder, constitute a waiver of any provision of this Agreement with respect to such or any other breach.

16) **Survival**. The representations, warranties, and confidentiality, indemnity and payment obligations of the parties hereto shall survive the expiration or earlier termination of this Agreement.

17) **Parties Bound**. This Agreement shall be binding upon, and inure to the benefit of, Lender and Service Provider.

18)  **Severability**. If any provision of this Agreement or the application thereof to any person, entity or circumstance shall, for any reason and to any extent, be determined by a court of applicable jurisdiction to be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

19)  **SBA Approval**. Receipt of SBA's written approval of this Agreement shall be a condition precedent to the obligations set forth herein. If the SBA does not approve this Agreement, this Agreement shall have no further force or effect and the parties shall be relieved from any and all obligations set forth herein.  In the event that any changes, amendments or modifications to this Agreement are contemplated by the parties hereto after this Agreement is approved by the SBA, such changes shall be submitted to SBA for prior review and approval, and such approval shall be a condition to the effectiveness of any such changes, amendments or modifications.

20)  **SBA Compliance.**  Lender and Service Provider agree as follows.

   a)  This Agreement is in compliance with 13 CFR 103.2, 103.5 and 13 CFR 120 et seq., as well as SBA's policies, procedures and regulations, including all PPP loan program requirements.

   b)  All compensation to Service Provider shall be paid directly by Lender and not by, or passed on by Lender to, borrowers or loan applicants.  Such compensation is for services actually performed, as specifically set forth in this Agreement for each type of service, and Service Provider is prohibited from charging the Small Business Applicant for the same services for which Lender is being charged.  Lender and Service Provider are prohibited from charging the Small Business Applicant for the same services or for any services under the PPP. The billing for loan packaging or for other loan processing services shall identify the borrower and/or loan applicant by name.  In no event shall the compensation be contingent upon approval or closing of any loan.

   c)  Service Provider and Lender shall not engage in the sharing of any SBA Secondary Market premium.

   d)  Service Provider will not assume a portion of the risk of the un-guaranteed portion of any loan.

   e)  Other than the contractual relationship created by this Agreement, there is no prior or existing relationship between Service Provider and Lender except: **[NONE]         .**

   f)  There is no apparent conflict of interest or self-dealing regarding this Agreement.

   g)  Neither borrowers nor applicants with respect to loans made under this Agreement shall be required to purchase any service from Service Provider at any time. Lender shall inform each borrower or applicant in writing that such borrower or applicant has no obligation to employ any third party, including Service Provider or Lender, to assist with its loan application.

   h)  Service Provider does not have any affiliation to other financial institutions, commercial lenders, CDCs, CUSOs, other lender service providers or loan brokers, except as follows: **Service Provider is affiliated with RedRidge Finance Group, LLC, Exworks Capital, LLC and World Trade Finance, LLC.  World Trade Finance, LLC is an SBA non-federally regulated 7(a) lender.**

21)  **Notices.** Unless otherwise provided herein, any approval, consent, certification, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively refer as

a "Notice") shall given or made in writing, and shall be deemed to have been duly given or made: if by hand, facsimile, or electronic mail, immediately upon receipt (provided that delivery shall be made on a business day prior to 5:00 p.m. local time of the recipient; otherwise, delivery shall be deemed to have occurred on the following business day); if by Federal Express, Express Mail or any other guaranteed overnight delivery service, one (1) business day after delivery to such overnight delivery service provider; and if mailed by certified mail, return receipt requested, three (3) days after mailing. The notices shall be addressed to the parties as follows:

| If to Lender: | Name: | Steven Kravitz, President<br>The Loan Source Inc. |
|---|---|---|
| | Address: | 353 E. 83rd Street, Suite 3H<br>New York, NY 10028 |
| | Phone: | 917-806-0808 |
| | Email: | skravitz123@theloansource.us |
| | | |
| If to Service Provider: | Name: | Luke LaHaie, CIO<br>ACAP SME, LLC |
| | Address: | 333 W. Wacker Dr., 16th Floor<br>Chicago IL 60606 |
| | Phone: | 248-535-7079 |
| | Email: | llahaie@acapgp.com |

Either party may change its address for notice by Notice given in the manner set forth above.

22) **Counterparts**. This Agreement may be signed in counterparts with each counterpart being deemed an original of the document. All of such counterparts together shall constitute but one and the same instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

23) **Entire Agreement**. The foregoing constitutes the entire agreement between the parties, and supersedes all prior agreements and understandings, oral or otherwise, among the parties hereto with respect to the matters contained herein. This Agreement has been drafted through a joint effort of the parties hereto and shall not be construed for or against Lender or Service Provider; instead, this Agreement shall be interpreted in accordance with the general tenor of the language hereof in an effort to reach the intended result.

24) **Conflict**. In the event that this Agreement conflicts with any other contract or agreement between the parties now or in the future, this Agreement will control with respect to Lender's SBA loan portfolio.

25) **Headings.** Section headings included in this Agreement are for convenience of reference only and in no way shall be used to construe or modify the provisions set forth in this Agreement.

26) **Lender Review of Client Books and Records**. Lender and its primary regulator may review, during normal business hours, all books and records related to Lender's clients maintained on the premises of Service Provider that are subject to regulatory supervision.

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement with the intent to be legally bound hereby.

Lender:

The Loan Source, LLC

By: _____
Name: Steven D. Kravitz
Title: President

Service Provider:

ACAP SME, LLC

By: _____
Name: Luke E. LaHaie
Title: CIO

{02933805;v1 }

[*Signature Page to The Loan Source, Inc. – ACAP SME, LLC Lender Service Provider Agreement*]

# **EXHIBIT 2**

# The Loan Source Inc.

### A Small Business Lending Company
### 353 East 83rd Street, Suite 3H
### New York, NY 10028

**Phone: (212) 683-4121**                                    **Fax: (212) 725-5835**

November 23, 2020

Dianna L. Seaborn, Director
Office Financial Assistance
US Small Business Administration
409 3rd Street, SW
Washington, DC 20416
dianna.seaborn@sba.gov

Re:     Application for SBA Approval of the Sale of a Controlling interest in The Loan Source Inc. to
        ACAP SME LLC

Dear Ms. Seaborn:

        With this letter, and pursuant to the notice requirements of 13 CFR §120.464, we hereby withdraw
our request for approval from the U. S. Small Business Administration of the transfer of ownership and
control of The Loan Source Inc., a Small Business Lending Company to ACAP SME LLC, which request
was submitted to SBA on or about July 15, 2020.

        This withdrawal is being made at this time for administrative efficiency reasons due to recent
litigation filed against the proposed Buyer, ACAP SME, LLC by ExWorks Capital, LLC and World Trade
Finance, LLC, which we promptly disclosed to SBA.  SBA has advised us that the pendency of this
litigation will be an adverse factor in the SBA's evaluation of the application and has therefore
recommended that the application be withdrawn at this time.  It is the parties' intention to re-apply once the
litigation in question has been resolved.

        If you have any questions regarding this request, please do not hesitate to contact us. Thank you for
your attention to this matter and for your service in support of America's small business community.

Sincerely,

The Loan Source Inc.


By: _____
        Steven D. Kravitz, President


Cc:     John M. Wade, Secondary Markets Program Chief, SBA Office of Financial Assistance
        Luke LaHaie, CIO, ACAP SME LLC

---

**A Federal Licensee Of The U.S. Small Business Administration**

# EXHIBIT 3

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
10/29/2020 2:52 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

10958721

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

**Chancery Division Civil Cover Sheet**
**General Chancery Section**                (02/19/20) CCCH 0623

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ExWorks Capital, LLC and World Trade Finance, LLC

                                     Plaintiffs

         v.

Randolph Abrahams, Luke LaHaie, RedRidge Finance Group,

LLC, RedRidge Lender Services, LLC, ACAP SME,         Defendants

LLC, and ACAP Fund GP, LLC

Case No: **2020CH06538**

### CHANCERY DIVISION CIVIL COVER SHEET
### GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

| | | | | | |
|---|---|---|---|---|---|
| 0005 | ☐ Administrative Review | | 0017 | ☐ Mandamus | |
| 0001 | ☐ Class Action | | 0018 | ☐ Ne Exeat | |
| 0002 | ☐ Declaratory Judgment | | 0019 | ☐ Partition | |
| 0004 | ☐ Injunction | | 0020 | ☐ Quiet Title | |
| | | | 0021 | ☐ Quo Warranto | |
| 0007 | ☑ General Chancery | | 0022 | ☐ Redemption Rights | |
| 0010 | ☐ Accounting | | 0023 | ☐ Reformation of a Contract | |
| 0011 | ☐ Arbitration | | 0024 | ☐ Rescission of a Contract | |
| 0012 | ☐ Certiorari | | 0025 | ☐ Specific Performance | |
| 0013 | ☐ Dissolution of Corporation | | 0026 | ☐ Trust Construction | |
| 0014 | ☐ Dissolution of Partnership | | 0050 | ☐ Internet Take Down Action (Compromising Images) | |
| 0015 | ☐ Equitable Lien | | | | |
| 0016 | ☐ Interpleader | | | ☐ Other (specify) _____ | |

⦿ Atty. No.: 61954     ◯ Pro Se 99500

Atty Name: Zachary T. Fardon

Atty. for: ExWorks Capital, LLC and World Trade Finance, LLC

Address: 353 N. Clark, Suite 1200

City: Chicago        State: IL

Zip: 60654

Telephone: 312-995-6333

Primary Email: zfardon@kslaw.com

Pro Se Only: ☐ I have read and agree to the terms of the Clerk's Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 1

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | 2020CH06538 |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
|     Defendants. | : | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1.    Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC seek injunctive and equitable relief to prevent irreparable harm being perpetrated by defendants Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC and its subsidiary RedRidge Lender Services, LLC (collectively, "RedRidge"), ACAP SME, LLC, and ACAP Fund GP, LLC (collectively, "ACAP", all collectively, "Defendants"). Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC also seek redress from and compensation for damages caused by defendants' wrongful acts.

2.    Defendants Abrahams and LaHaie exploited positions of trust within ExWorks and World Trade Finance to steal, misuse, and misappropriate Plaintiffs' money, personnel, assets, data, proprietary information, resources, and brand, and to unlawfully interfere with Plaintiffs' business relationships and opportunities.

3.    Defendants Abrahams and LaHaie—while employed by ExWorks and World Trade Finance and in breach of their fiduciary duties—stole World Trade Finance's opportunity to acquire a complementary business, The Loan Source, Inc. ("The Loan Source"). The acquisition of The Loan Source was a business opportunity World Trade Finance personnel developed, and which

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

World Trade Finance was prepared to pursue, all of which defendants Abrahams and LaHaie knew. To the detriment of World Trade Finance—and for defendants' own benefit—defendants Abrahams and LaHaie stole the business opportunity to acquire The Loan Source from World Trade Finance and they gave the opportunity to defendant ACAP instead. Defendant ACAP is the alter ego of defendants Abrahams and LaHaie, which they created, formed, and began conducting business through all while employed by Plaintiffs.

4.      Defendant ACAP, through defendants Abrahams and LaHaie, agreed to terms with The Loan Source for ACAP to acquire The Loan Source, all of which defendants Abrahams and LaHaie did while employed by ExWorks. Defendant ACAP, however, has not yet completed its acquisition of The Loan Source.

5.      In the interim period until defendant ACAP completes its acquisition, defendants ACAP, Abrahams, and LaHaie entered into an agreement with The Loan Source for ACAP to provide Paycheck Protection Program ("PPP") loan servicing work for PPP loans owned by The Loan Source. Defendants Abrahams and LaHaie caused defendant ACAP, their alter ego, to enter this agreement when both defendants Abrahams and LaHaie were still employed by Plaintiffs. To date, The Loan Source, with the assistance of defendants ACAP, Abrahams, and LaHaie has purchased more than $3.4 billion worth of PPP loans, which purchase activity began while defendants Abrahams and LaHaie were still employed at ExWorks. As defendants Abrahams and LaHaie well know, it was their improper use of ExWorks and World Trade Finance personnel, resources, proprietary data, and assets that has allowed defendant ACAP to perform this PPP servicing work, which constitutes a business opportunity to which World Trade Finance and ExWorks is entitled to and has a right to have presented to it.

6.      In light of defendants Abrahams and LaHaie forming defendant ACAP as a rival company while employed by ExWorks, and operating defendant ACAP while employed by

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

ExWorks, defendants Abrahams and LaHaie breached their fiduciary duties to Plaintiffs ExWorks and World Trade Finance, and they stole opportunities rightfully belonging to Plaintiffs. Plaintiffs now seek to enjoin Abrahams and LaHaie from using defendant ACAP to acquire The Loan Source. This is to prevent further irreparable harm to Plaintiffs and to recover the opportunity that was stolen from them. Plaintiffs further seek to enjoin defendants ACAP, Abrahams, and LaHaie from engaging in PPP loan servicing work for The Loan Source, which was a business opportunity that defendants Abrahams and LaHaie, while employed by ExWorks, should have presented to ExWorks, but did not; they instead took the opportunity for their new rival business, ACAP. Plaintiffs also seek to enjoin defendants ACAP, Abrahams, and LaHaie from engaging in competing loan work that was developed using the confidential and proprietary business information and assets of ExWorks and World Trade Finance, which defendants stole from ExWorks and World Trade Finance during their employment. Plaintiffs further seek equitable relief in the form of control and ownership of ACAP, which is a business opportunity created at ExWorks that defendants Abrahams and LaHaie pursued through the use of ExWorks resources for their own personal gain in violation of their fiduciary duties.

7.      Defendants Abrahams and LaHaie have engaged in their misdeeds for their own personal gain and for the benefit of defendants RedRidge and ACAP, which has caused significant monetary damages and irreparable harm to Plaintiffs ExWorks and World Trade Finance.

8.      In support, Plaintiffs ExWorks and World Trade Finance state as follows.

## NATURE OF THE ACTION

9.      Beginning in or about 2019, defendants Abrahams and LaHaie led an illegal scheme to abuse their positions of trust and responsibility to steal and misappropriate money and business opportunities from Plaintiffs for the defendants' own personal gain and to the detriment of Plaintiffs.

3

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

10.     Because defendant Abrahams was Chief Executive Officer of ExWorks, and defendant LaHaie was an ExWorks Managing Director, they both held fiduciary duties of candor, care, good faith, and loyalty to ExWorks and World Trade Finance, which they breached repeatedly and intentionally.

11.     In summary, the misdeeds of defendants Abrahams and LaHaie detailed herein include the following:

    a.     Beginning in or about 2019 and continuing into 2020, defendants Abrahams and LaHaie misappropriated and stole Plaintiffs' corporate resources, propriety information, personnel, and assets to form defendant ACAP—all of which defendants Abrahams and LaHaie did while employed by ExWorks—and which they improperly concealed from the ExWorks Board of Directors and its Operating Committee;

    b.     Beginning in or about March 2020, defendants Abrahams, LaHaie, and RedRidge stole approximately $3.7 million in U.S. Small Business Administration ("SBA") fees due to World Trade Finance from The Northern Trust for processing Paycheck Protection Program ("PPP") loan applications;

    c.     Beginning in or about March 2020, defendants Abrahams, LaHaie, and RedRidge stole approximately $1.5 million in SBA fees due to World Trade Finance from Franklin Synergy Bank for processing PPP loan applications;

    d.     Beginning in or about the summer of 2020, defendants Abrahams and LaHaie manipulated World Trade Finance's PPP loan processing contract with Northeast Bank, to permit defendant ACAP to assume responsibility for further PPP loan work with Northeast Bank;

    e.     Beginning in or about the summer of 2020, defendants Abrahams and LaHaie diverted to defendant ACAP approximately $1.3 million worth of PPP loan forgiveness work business with Northeast Bank;

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

       f.      In or about June 2020, defendants Abrahams, LaHaie, and RedRidge improperly diverted $695,000 in SBA fees due World Trade Finance;

       g.      Defendants Abrahams, LaHaie, and ACAP stole World Trade Finance's business opportunity to acquire The Loan Source, and secretly positioned ACAP to engage in loan servicing and processing for more than $3.4 billion worth of PPP loans held by The Loan Source;

       h.      Defendants Abrahams, LaHaie, and RedRidge engaged in excessive transfers of funds totaling approximately $3.7 million to RedRidge between June 2019 and March 2020 to prop up RedRidge's faltering operations; and

       i.      Defendant Abrahams converted a loan in the amount of $785,000 made to him by ExWorks in 2019, which Abrahams failed to pay back, even after his employment at ExWorks was terminated, breaching his contract with ExWorks Capital.

12.      Beginning in or about 2019, defendant Abrahams made the decision—unbeknownst to the ExWorks Board of Directors and its advisor who was also a shareholder (hereafter "shareholder-advisor"), and contrary to Abrahams's fiduciary duties—to no longer act in the best interests of Plaintiffs ExWorks and World Trade Finance. Instead, defendant Abrahams conspired with defendant LaHaie to surreptitiously form a rival lending business, which they ultimately named ACAP.

13.      Defendants Abrahams and LaHaie concealed their planned formation of ACAP from ExWorks, its Board of Directors, Operating Committee, and its shareholder-advisor. Defendants Abrahams and LaHaie also concealed that they were abusing their positions of trust within ExWorks to use company resources, proprietary information, and technology to form ACAP and get ACAP business, all while defendants Abrahams and LaHaie were still employed by ExWorks.

FILED DATE: 10/29/2020 2:52 PM  2020CH06538

14.     Throughout 2020, defendants Abrahams and LaHaie continued to develop ACAP and look for occasions to steal business opportunities from ExWorks. Defendants Abrahams and LaHaie did this when, as they knew, the ExWorks Board of Directors and its shareholder-advisor expected defendants Abrahams and LaHaie to be focused on the liquidity, capitalization, and related issues at ExWorks.

15.     By March 2020, the liquidity and capitalization issues that ExWorks faced—which unbeknownst to ExWorks were caused in large part by defendants Abrahams's and LaHaie's misconduct—led the ExWorks Board of Directors to create an Operating Committee. The ExWorks Board of Directors tasked the Operating Committee to provide oversight and advice for ExWorks's management (and thus its subsidiary, World Trade Finance). With the creation of the Operating Committee, all material decisions impacting ExWorks and World Trade Finance required the express approval and authorization of the entire Operating Committee.

16.     Following the formation of the Operating Committee, defendants Abrahams and LaHaie accelerated their plans to deplete ExWorks's assets and resources. Defendants Abrahams and LaHaie identified and took business opportunities that rightfully belonged to ExWorks and World Trade Finance to exploit and steal for their own gain at ACAP.

17.     Separately, between June 2019 and March 2020, defendant Abrahams caused ExWorks to make excessive transfers totaling approximately $3.7 million to defendant RedRidge. Defendant Abrahams caused the transfers to occur on multiple occasions during this nine-month period, in large amounts each of which exceeded hundreds of thousands of dollars, often under the guise of "prepaid" diligence fees. Defendant Abrahams intended for and used these payments to prop up RedRidge's business, which was faltering.

18.     Defendant Abrahams concealed the fact, frequency, and amount of these excessive transfers from the ExWorks Board of Directors, its Operating Committee, and its shareholder-

advisor. In fact, defendant Abrahams only stopped making the transfers after the ExWorks Board of Directors began an inquiry into ExWorks's financial condition in or about March 2020.

19.    Defendant Abrahams's excessive transfers harmed ExWorks. By February 2020, transfers to defendant RedRidge totaled approximately $2.66 million. As defendant Abrahams knew, depleting ExWorks of $2.66 million in operating cash caused ExWorks to be unable to meet payroll in the spring of 2020. Delaying payroll rattled ExWorks employees' confidence in the continued viability of ExWorks, and primed employees to be poached by defendants Abrahams and LaHaie to defendant ACAP.

20.    On March 27, 2020, the U.S. Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which included the PPP. The PPP was designed to assist small businesses negatively impacted by the pandemic conditions wrought by COVID-19. The PPP was operated by the SBA, allowing SBA-licensed entities to fund and process more than $650 billion in federal PPP loans to qualified businesses.

21.    With the passage of the CARES Act came an opportunity for ExWorks and World Trade Finance to improve its business. World Trade Finance held an SBA license, which permitted World Trade Finance to fund and process PPP loan applications on its own, and to partner with SBA-licensed banks to process and service their PPP loan applications.

22.    In March and April 2020, World Trade Finance raised approximately $20 million to fund PPP loans to ExWorks borrowers. World Trade Finance then used approximately $16 million to fund PPP loans to certain ExWorks borrowers.

23.    With the liquidity and capitalization issues facing ExWorks in the midst of the COVID-19 pandemic, the ExWorks Board of Directors instructed defendant Abrahams to focus on ExWorks's existing loan portfolio. Defendant Abrahams disregarded that clear instruction.

FILED DATE: 10/29/2020 2:52 PM  2020CH06538

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

24. Defendants Abrahams and LaHaie actively concealed from the ExWorks Board of Directors and its Operating Committee that defendants Abrahams and LaHaie would be using personnel, resources, and proprietary information belonging to World Trade Finance and ExWorks to perform PPP loan application processing for three banks.

25. Defendants Abrahams and LaHaie intentionally concealed this PPP loan application processing work from the ExWorks Board of Directors Operating Committee, and its advisor-shareholder, in order to allow defendants Abrahams and LaHaie to divert the SBA fees earned from this work to defendant RedRidge.

26. Specifically, by April 8, 2020, defendants Abrahams and LaHaie caused World Trade Finance to enter contracts written agreements with two banks for World Trade Finance to process the banks' PPP loan applications. Defendants Abrahams and LaHaie concealed these two contracts from the ExWorks Board of Directors, its Operating Committee, and its shareholder-advisor.

27. Defendant Abrahams and LaHaie then concealed a third contract, entered on or about April 28, 2020, by World Trade Finance to process a third bank's PPP loan applications.

28. As defendants Abrahams and LaHaie knew, ExWorks and World Trade Finance personnel had significant and substantial expertise and experience in SBA lending, which was critical to the three banks' decision to enter agreements with World Trade Finance to perform PPP loan application processing and servicing.

29. In addition to concealing the negotiation and execution of World Trade Finance's contracts with three banks to perform PPP loan application processing and servicing, defendants Abrahams and LaHaie took numerous steps to conceal the PPP work performed and to steal the SBA fees earned from this PPP work.

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

30.     For instance, while World Trade Finance's contracts with the three banks required the banks to pay World Trade Finance, defendants Abrahams and LaHaie caused the SBA fees— which totaled millions of dollars—to be diverted from World Trade Finance to defendant RedRidge.

31.     To conceal their diversion of the SBA fees, defendants Abrahams and LaHaie caused World Trade Finance to enter into a sham contract with defendant RedRidge, which—on paper— allowed defendants Abrahams and LaHaie to divert substantially all of the SBA fees earned to RedRidge.

32.     Furthermore, defendants Abrahams and LaHaie gave explicit instructions to ExWorks and World Trade Finance personnel to conceal their PPP loan application processing work from the ExWorks Board of Directors and its Operating Committee.

33.     Through the PPP work performed by ExWorks and World Trade Finance personnel, defendants Abrahams and LaHaie saw the potential profits available from the PPP loans. Contrary to their fiduciary obligations to their employer, ExWorks, defendants Abrahams and LaHaie took for themselves and ACAP further opportunities to profit from the PPP.

34.     Specifically, while still employed by ExWorks and owing ExWorks fiduciary duties, defendants Abrahams and LaHaie: (a) caused ACAP to enter contracts with two of the three banks already under contract with World Trade Finance to provide PPP loan services; (b) stole the opportunity to acquire The Loan Source, after the opportunity was identified and developed internally at ExWorks and World Trade Finance; and (c) diverted further PPP loan processing work to ACAP—work that rightfully belonged to Plaintiffs.

35.     While employed by ExWorks, defendants Abrahams and LaHaie planned to and did poach at least nine ExWorks employees to work at ACAP. Defendant Abrahams concealed his plan from the ExWorks Board of Directors and its Operating Committee. In fact, defendant Abrahams caused the ExWorks Board of Directors and its Operating Committee to expend substantial

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

resources in 2020 through continued payroll and severance packages with financial payments for these employees, while defendant Abrahams knew full well that he planned to bring them to ACAP once ACAP stole all available business opportunities from ExWorks and World Trade Finance.

36.    Only after fully exploiting ExWorks's and World Trade Finance's names, proprietary information, and business models did defendants Abrahams and LaHaie leave their positions of trust, loyalty, and care at ExWorks and World Trade Finance. Defendant LaHaie resigned effective June 30, 2020, and defendant Abrahams resigned on August 7, 2020, shortly after being confronted with his malfeasance.

37.    Following defendants Abrahams's and LaHaie's resignations, they have continued to operate ACAP, which is now performing PPP loan servicing for more than $3.4 billion worth of PPP loans that The Loan Source purchased.

38.    The illegal acts of defendants Abrahams and LaHaie, including by and through the defendants ACAP, RedRidge, and their ongoing acquisition of The Loan Source, violate the laws of the State of Illinois, and their illegal acts have caused substantial and irreparable damage and injury to ExWorks and World Trade Finance.

39.    Plaintiffs' loss of the business opportunities stolen by defendants Abrahams and LaHaie in breach of their fiduciary duties has put Plaintiffs at a severe competitive disadvantage. Without the injunctive relief requested by Plaintiffs, both ExWorks's and World Trade Finance's businesses face the loss of millions of dollars in potential revenue, and the dissipation of revenue properly due to them by defendants Abrahams and LaHaie.

## THE PARTIES

40.    Plaintiff ExWorks Capital, LLC is a Delaware limited liability company with its principal place of business located at 333 West Wacker Drive, 16th Floor, Chicago, Illinois 60606.

10

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

ExWorks Capital is an investment adviser registered with the U.S. Securities and Exchange Commission. ExWorks Capital's advisory clients are pooled investment vehicles.

41.     Plaintiff World Trade Finance, LLC is a California limited liability company. It is a wholly owned subsidiary of ExWorks. World Trade Finance is licensed to make, process, and service loans issued by the SBA.

42.     Defendant Randolph Abrahams served as the Chief Executive Officer and as a member of the Board of Directors of ExWorks and World Trade Finance between 2013 and August 7, 2020. As the CEO and Board member of ExWorks and World Trade Finance, Abrahams owed fiduciary duties of candor, care, good faith, and loyalty to ExWorks and World Trade Finance. Abrahams created ACAP while employed by Plaintiffs ExWorks and World Trade Finance, and Abrahams began operating ACAP while employed by Plaintiffs. On information and belief, Abrahams holds an ownership interest in defendant ACAP and is responsible for its operation. Abrahams also serves as the Chief Executive Officer and member of the Board of Directors of RedRidge. Abrahams is a citizen of the State of Illinois, and he resides in Winnetka, Illinois.

43.     Defendant Luke LaHaie was employed by ExWorks and World Trade Finance beginning in or about June 2015 and continuing until his resignation effective June 30, 2020. Defendant LaHaie previously worked at RedRidge from September 2012 until June 2015, at which time he joined ExWorks as a Senior Director. Defendant Abrahams promoted defendant LaHaie in or about January 2018 to the position of Managing Director of ExWorks and World Trade Finance, which defendant LaHaie held until his resignation effective June 30, 2020, and for which defendant LaHaie received substantial compensation. As Managing Director for Plaintiffs, defendant LaHaie was defendant Abrahams's top lieutenant within ExWorks and World Trade Finance, who had wide-ranging responsibilities provided by defendant Abrahams, including the authority to sign contracts on behalf of ExWorks and World Trade Finance. Defendant Abrahams also gave defendant LaHaie

access to the books and records, as well as borrower information, of ExWorks and World Trade Finance. As a result of his responsibilities and position, defendant LaHaie owed fiduciary duties of candor, care, good faith, and loyalty to ExWorks and World Trade Finance. Defendant LaHaie now serves as ACAP's Chief Investment Officer. LaHaie is a citizen of the State of Illinois, and he resides in Chicago, Illinois.

44.     Defendant ACAP SME, LLC ("ACAP SME") is a Delaware limited liability company organized on May 5, 2020, by defendant Abrahams with Abrahams as its sole member. ACAP SME currently lists its principal place of business located at 333 West Wacker Drive, 16th Floor, Chicago, Illinois 60606, which is the actual address and location of ExWorks and World Trade Finance. Defendants Abrahams and LaHaie formed and have used ACAP SME to defraud plaintiffs ExWorks and World Trade Finance, and to misappropriate and convert their business opportunities and assets.

45.     Defendant ACAP Fund GP, LLC ("ACAP Fund GP") is a Delaware limited liability company organized on December 11, 2019. Defendant ACAP Fund GP was registered as a foreign entity in the State of Illinois, on July 15, 2020. Defendant Luke LaHaie is the registered agent of defendant ACAP Fund GP. Defendants LaHaie and Abrahams are managers of ACAP Fund GP.

46.     Defendant RedRidge Finance Group, LLC ("RedRidge Finance Group") is a Delaware limited liability company formed on December 9, 2008. It was registered as a foreign entity in Illinois on January 29, 2009. Defendant Abrahams is one of two managers, and he has served as its Chief Executive Officer since its inception. RedRidge is in the business of performing financial diligence services. For at least the last several years, its largest client was ExWorks.

47.     Defendant RedRidge Lender Services, LLC ("RedRidge Lender Services") is a Delaware limited liability company, incorporated on September 11, 2009. RedRidge Lender Services is a subsidiary of RedRidge Finance Group; RedRidge Finance Group is the manager of RedRidge

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

Lender Services. RedRidge Diligence Services and RedRidge Due Diligence Services are trade names or divisions of RedRidge Lender Services.

## VENUE

48.     Venue is proper pursuant to 735 ILCS 5/2-101 as defendants' principal office was at all times relevant to this action and remains located in Cook County, Illinois. Further, most, if not all, of the business relations and disputes at issue occurred in Cook County, Illinois.

## THE FACTS

**I.      Background Regarding ExWorks and World Trade Finance**

49.     ExWorks is a senior secured debt fund that provides liquidity to businesses in need of financing. ExWorks distinguishes itself from its competition in part by its ability to consistently and efficiently close deals.

50.     ExWorks has been and is in the business of providing high-impact and growth-related short-term loans that banks either will not or cannot provide to borrowers. At times, these borrowers may present less established credit histories and can involve greater risks than those associated with typical bank loans. ExWorks mitigates those risks through a rigorous underwriting process and, ultimately, collateral to secure investments.

51.     ExWorks funds loans through the resources of four pooled investment vehicles, for which it serves as an investment adviser.

52.     World Trade Finance is a wholly owned subsidiary of ExWorks. World Trade Finance has developed expertise and experience over the years as a delegated SBA lender helping small businesses finance their domestic and export growth and operations with loans from $500,000 up to $5,000,000. World Trade Finance also has had the capability to pair SBA loans with non-SBA loans for financial needs that may not qualify for an SBA loan. With an SBA license and a team who

had expertise and experience with SBA lending practices, World Trade Finance was well-qualified to fund and process PPP loans through the CARES Act.

53.     RedRidge was created and is controlled by defendant Abrahams. RedRidge has been in the business of providing diligence services since 2009. Since 2013, ExWorks has been RedRidge's largest client, and ExWorks engages RedRidge to provide third-party due diligence services for prospective borrowers and current borrowers, which include field exams, inventory observations, accounts receivable verification, quarterly earnings reports, and collateral analysis.

54.     At no time did ExWorks grant defendants RedRidge, Abrahams, or LaHaie authority to make use of ExWorks's resources, employees, assets, or proprietary information for any reason or purpose other than for the benefit of ExWorks.

## II.     The Misconduct of Defendants Abrahams and LaHaie Leads to the Deterioration of the ExWorks Portfolio.

55.     In 2019, the ExWorks portfolio consisted of loans outstanding in excess of $422 million. In 2019, defendant Abrahams's attention to the portfolio was diverted by a contentious and litigious divorce. Defendant Abrahams used ExWorks personnel and resources to assist with the entirely personal process of preparing for and litigating a divorce, which use of resources defendant Abrahams concealed from the ExWorks Board of Directors and, eventually, its Operating Committee.

56.     Throughout 2019 and continuing through August 2020, defendants Abrahams and LaHaie, as well as personnel acting with them and at their direction, failed to properly manage and protect ExWorks's business interests. This contributed to the ExWorks loan portfolio in 2019 becoming challenged by a lack of liquidity, particularly with respect to its largest positions.

57.     Defendant Abrahams exacerbated the issues at ExWorks by funneling cash from ExWorks to defendant RedRidge under the guise of "prepaid" due diligence. Between June 2019 and March 2020, defendant Abrahams caused ExWorks to make multiple payments of hundreds of

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

thousands of dollars, ultimately totaling approximately $3.7 million, to prop up defendant RedRidge's business and operations.

58.     By transferring large cash positions out of ExWorks to defendant RedRidge, defendant Abrahams left ExWorks without the operating money necessary to meet payroll for its employees in the spring of 2020.

59.     In or about early March 2020, the ExWorks Board of Directors and its shareholder-advisor created an Operating Committee, consisting of defendant Abrahams and three individuals who collectively had deep experience and vast expertise in finance, legal, and business issues, to provide oversight and advice for ExWorks's management. In addition to the Operating Committee's oversight and advisory roles, the Operating Committee provided additional resources to ExWorks management to navigate the liquidity issues that it believed were created and exacerbated by the COVID-19 pandemic, but were in reality caused by the misconduct of defendants Abrahams and LaHaie.

60.     Following the formation of the Operating Committee, the ExWorks Board of Directors ordered that all work performed by RedRidge on behalf of ExWorks must first be approved by the Operating Committee.

61.     In May 2020, the ExWorks Board of Directors appointed an Acting Chief Operating Officer. The ExWorks Board of Directors mandated that all disbursements of funds by ExWorks be approved in advance by the Acting Chief Operating Officer. The ExWorks Board of Directors made defendant Abrahams aware that he needed to inform and seek approval by the full Operating Committee and ExWorks's newly appointed Acting Chief Operating Officer for all financial decisions and movement of funds, which, as set forth in greater detail below, defendant Abrahams intentionally avoided and failed to obtain.

III.     **Defendants Abrahams and LaHaie Surreptitiously Created ACAP to Steal Business Opportunities from ExWorks and World Trade Finance.**

62.     In 2019, defendants Abrahams and LaHaie created ACAP as a rival business to ExWorks, which they concealed from their employer, ExWorks. In 2020, when ExWorks faced challenges with liquidity, capitalization, and efforts to expand its loan portfolio, defendants Abrahams and LaHaie did not focus on addressing these issues as required by their fiduciary duties of care, good faith, and loyalty. Instead, defendants Abrahams and LaHaie ramped up efforts to use ExWorks's and World Trade Finance's personnel, proprietary information, assets, technology, and resources to build ACAP's business, and then steal ExWorks and World Trade Finance business opportunities for ACAP.

63.     On or about August 3, 2019, defendant Abrahams discussed a plan with defendant LaHaie to form a new entity, which defendants Abrahams and LaHaie called "NewCo." In a communication describing the plan for "NewCo" to outsiders, Abrahams stated, "ExWorks management plans to establish a NewCo targeting the asset-based-loan market." As reflected in this and other communications, defendant Abrahams expressed confidence in "NewCo" only because of the experience and reputation developed by ExWorks doing this work.

64.     By December 11, 2019, defendants Abrahams and LaHaie received a draft limited liability agreement for their new company, which they named ACAP Fund GP, LLC, and which identified Abrahams as the sole member of ACAP. Defendants Abrahams and LaHaie also received a draft certificate of formation for ACAP, identifying its registered office in Wilmington, Delaware.

65.     By December 18, 2019, defendants Abrahams and LaHaie caused the Internal Revenue Service to issue an Employer Identification Number for ACAP Fund GP, LLC, which Abrahams directed to be sent to ExWorks's business address in Chicago, Illinois.

66.     Defendants Abrahams and LaHaie also began planning to poach ExWorks employees for "NewCo" beginning no later than October 2019. Specifically, in October 2019,

16

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

defendants Abrahams and LaHaie identified four people who worked for ExWorks whom they planned to bring over to "NewCo." By July 2020, defendants Abrahams and LaHaie hired three of those four people for ACAP.

67.     In or about June 2020, defendants Abrahams and LaHaie hired five ExWorks employees—whom they earlier targeted for "NewCo"—after leaving ExWorks with severance agreements signed by Abrahams. These severance agreements included financial payments to the departing employees. As defendant Abrahams knew, the ExWorks Board of Directors, its Operating Committee, and its Acting Chief Operating Officer would not have permitted continued payments to these employees, nor would they have approved the severance packages, had they known defendant Abrahams intended to hire these people for ACAP.

68.     On July 14, 2020, defendant Abrahams, using his ACAP email address, sent an email communication to an ExWorks employee whom defendant Abrahams wanted to poach to ACAP: "You are on team if you want to be, [ExWorks IT Director] will be in touch on anything else you need[.] We are : Buying PPP loan pools from banks[;] Big deal/ mega deal debt deals portfolio servicing and purchasing[;] Anything that looks niche oriented in debt". Defendant Abrahams was employed by ExWorks at the time he sent this email; he thus clearly owed fiduciary duties to ExWorks, which he violated by his efforts to poach ExWorks employees to ACAP.

69.     Defendants Abrahams and LaHaie also secretly identified potential investors and sources of capital for ACAP throughout 2019 and continuing into 2020, all while employed by ExWorks and using ExWorks's proprietary data and confidential business information.

70.     Specifically, by January 21, 2020, defendants Abrahams and LaHaie identified a potential capital source who would provide "optimal lending structure for this [ACAP] relationship" to allow ACAP to originate loans and be the lender of record. Defendant LaHaie introduced a lawyer to the potential source of capital, saying, "Look forward to getting this done!" Defendant

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

LaHaie did this while Managing Director and while defendant Abrahams was the Chief Executive Officer of ExWorks, and while both accordingly owed fiduciary duties to ExWorks. Defendants Abrahams and LaHaie owed a duty to ExWorks to bring this potential source of capital to ExWorks, which they intentionally concealed from and failed to bring to the ExWorks Board of Directors.

71.     In addition to developing capital for ACAP, defendants Abrahams and LaHaie worked to build ACAP's loan portfolio, while they were still employed by ExWorks and thus owed fiduciary duties to ExWorks.

72.     For instance, in or about March 2020, defendants Abrahams and LaHaie actively pursued having ACAP—not ExWorks—purchase a portfolio of loans from a bank with whom World Trade Finance had a contractual relationship. Defendants Abrahams and LaHaie also actively conspired to steal borrowers already serviced by ExWorks. For one ExWorks borrower, in March 2020, defendants Abrahams and LaHaie plotted to have ACAP pay off the borrower's existing ExWorks loan and takeover the borrower's debt needs.

73.     Defendants Abrahams and LaHaie continued to abuse the assets, personnel, and resources of ExWorks and World Trade Finance following the passage of the CARES Act, and the deployment of the PPP funds to small businesses. As further discussed below, defendants Abrahams and LaHaie both abused ExWorks and World Trade Finance, and stole from them. Defendants' improper actions positioned ACAP to perform loan servicing for more than $3.4 billion in PPP loans, and to pursue acquisition of The Loan Source—both of which were business opportunities that rightfully belonged to Plaintiffs.

## IV.   Defendants Abrahams and RedRidge Diverted Money from ExWorks to RedRidge Often Under the False Pretenses of "Prepaid" Due Diligence.

74.     Defendant Abrahams intentionally caused ExWorks to rely solely on RedRidge to perform due diligence for its prospective and existing borrowers.

18

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

75.     In 2019, the ExWorks loan portfolio was not expanding with new borrowers. This negatively impacted RedRidge's profitability because ExWorks was RedRidge's largest customer for due diligence services.

76.     To prop up RedRidge's business, defendant Abrahams caused ExWorks to repeatedly transfer hundreds of thousands of dollars to RedRidge, when, as defendant Abrahams knew, RedRidge was only due modest amounts for actual due diligence performed.

77.     In the approximately ten-month time period between June 2019 and March 2020, defendant Abrahams abused his position of trust within ExWorks to cause ExWorks to make excessive transfers to RedRidge totaling approximately $3.7 million. Defendant Abrahams caused these payments to be paid in large amounts frequently and without regard to due diligence services actually performed by RedRidge.

78.     By way of example, defendant Abrahams caused ExWorks to make a $350,000 payment to RedRidge on June 27, 2019, and then another $125,000 payment on August, 2, 2019, and another $425,000 worth of payments on August 27 and 28, 2019, for a total of $900,000 over approximately a six-month timeframe. However, against that $900,000 balance, RedRidge only invoiced ExWorks for *two* diligence projects that totaled $22,050, on August 30, 2019.

79.     RedRidge continued to run a balance throughout 2019 and into 2020, all the while following a pattern of large payments by ExWorks with modest payments by defendants Abrahams and RedRidge against that balance over time.

80.     Defendant Abrahams was well aware of the excessive transfers he caused ExWorks to make, and he was further aware of the size of the outstanding balance. For instance, on March 9, 2020, defendant Abrahams received an email message from RedRidge's Chief Financial Officer, who stated, "Prepaid diligence (amounts owed to RDS [RedRidge] back to ExWorks LLC) at 12/31/19 is

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

$2.3M." RedRidge's Chief Financial Officer further stated, "The prepaid diligence is a concern – need a more normal level of ExWorks diligence to soften that advance."

81.     By improperly transferring approximately $3.7 million from ExWorks to RedRidge, defendant Abrahams created operating cash flow issues for ExWorks, including an inability to meet payroll for ExWorks and World Trade Finance personnel in or about March 2020.

82.     Specifically, on March 31, 2020, defendant Abrahams communicated to ExWorks and World Trade Finance personnel via electronic communication, "there may be a short delay in payroll for all ExWorks employees this month[.]" Defendant Abrahams blamed the shortfall on the "extreme conditions the viral shutdown has created," and "[c]ash for refinance and cash collections have slowed worldwide and effects [sic] our portfolio[.]" As defendant Abrahams knew, this was a false and misleading statement. While COVID-19 impacted operations, ExWorks did not have the money necessary to make payroll because defendant Abrahams caused approximately $3.7 million to be improperly transferred to RedRidge.

83.     On May 18, 2020, a member of the ExWorks Board of Directors who was also a member of the RedRidge Board of Directors, resigned from the RedRidge Board of Directors effective immediately. This ExWorks Director explained to defendant Abrahams that the ExWorks Director was shocked and upset to learn for the first time that defendant Abrahams caused ExWorks to pay millions of dollars in the form of prepaid diligence advances to RedRidge. This ExWorks Director explained to defendant Abrahams that the Director would have never, under any circumstances, permitted prepaid funds to an affiliated entity.

84.     In May 2020, a representative of the ExWorks Board of Directors confronted defendant Abrahams about the excessive transfers. Defendant Abrahams admitted that he had no good explanation for the transfers. Defendant Abrahams agreed to promptly return a substantial portion of the transfers. But, as discussed below, *see* ¶¶171-77 *infra*, defendant Abrahams improperly

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

used approximately $695,000 in SBA fees due to World Trade Finance to make part of his "repayment" of the excessive transfers.

## V.    The CARES Act and Paycheck Protection Program

85.    In response to the COVID-19 pandemic, the U.S. Congress passed the CARES Act, which was signed into law by President Donald J. Trump on March 27, 2020. The CARES Act provided over $2 trillion in economic relief to help the American people and businesses respond to the public health and economic impacts of COVID-19.

86.    A critical part of the CARES Act was the PPP. The PPP has been implemented by the SBA with support from the U.S. Department of the Treasury. The PPP authorized small businesses to apply for SBA loans to make up to eight weeks of payroll costs including benefits. PPP funds can also be used to pay interest on mortgages, rent, and utilities. These PPP loans are 100% government-guaranteed, with individual loans capped at $10 million.

87.    Under the PPP, small businesses may apply for loan forgiveness in an amount equal to their payroll costs and costs related to debt obligations. The amount of forgiveness is reduced proportionally by the number of employees laid off during the relevant time period, and excludes employees making in excess of $100,000.

88.    Small businesses applied for PPP loans from SBA lenders (like World Trade Finance) and federally insured depository institutions.

89.    To apply for a PPP loan, a small business needed to provide a completed PPP loan application to a lender. The lender would conduct an eligibility check based on SBA eligibility guidelines and subject to any additional checks required by the lender. Once complete, the lender would send the application to the SBA for approval through the SBA's E-Transaction (E-Tran)

FILED DATE: 10/29/2020 2:52 PM  2020CH06538

system.[1] The SBA would then approve or deny the loan application. If approved, the borrower would be provided with documentation related to the terms of the PPP loan and offered the opportunity to sign the loan documents. Then, ultimately, the borrower would receive the loan distribution.

## VI.  Defendant Abrahams Fraudulently Misled and Concealed from the ExWorks Board of Directors and Operating Committee PPP Work and Opportunities.

90.  Before the CARES Act became law, ExWorks and World Trade Finance personnel with SBA expertise explained to defendants Abrahams and LaHaie the opportunity presented by the PPP for ExWorks and World Trade Finance to generate business and profits. Defendants Abrahams and LaHaie then caused World Trade Finance to enter written contracts with three federally insured banks for World Trade Finance to process the PPP loan applications received by the banks. Defendant Abrahams intentionally concealed this PPP activity from the ExWorks Board of Directors and its Operating Committee. Defendants Abrahams and LaHaie ordered ExWorks and World Trade Finance personnel to conceal this activity from the Operating Committee.

91.  In March and April 2020, the ExWorks Board of Directors and its Operating Committee discussed with Abrahams funding PPP loans through World Trade Finance (which held an SBA license). The limited opportunity Abrahams presented to the Board of Directors and Operating Committee involved raising capital for World Trade Finance to fund PPP loans for certain of ExWorks's current borrowers—not loan application processing for three banks.

92.  The ExWorks Board of Directors and Operating Committee approved the limited strategy presented by defendant Abrahams. By mid-April 2020, World Trade Finance obtained approximately $20 million in capital to fund PPP loans. World Trade Finance then funded approximately $16 million worth of PPP loans to 22 borrowers from the ExWorks loan portfolio.

---

[1] E-Tran is the SBA's electronic loan processing system for SBA loans.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

93.     In early to mid-April 2020, defendant Abrahams presented to the ExWorks Board of Directors, its Operating Committee, and its shareholder-advisor, an offer from another entity to provide approximately $200 million in funding to World Trade Finance to make PPP loans, but on onerous terms, including with an option for this third-party entity to purchase World Trade Finance.

94.     On April 17, 2020, the ExWorks Board of Directors and its shareholder-advisor informed defendant Abrahams that he did not have authorization to pursue that particular deal but expressed interest in other opportunities. Specifically, the ExWorks Board of Directors directed defendant Abrahams via email communication that "the entire ExWorks team should be singularly focused on creating liquidity and meeting the very high and difficult hurdles that the bank syndicate has forced us to accept. The time is inappropriate to be thinking about expanding our offerings." The ExWorks Board of Directors acknowledged that defendant Abrahams had "been approached by many other institutional investors," which the Board of Directors "urge[d] [Abrahams] to pursue and are open to hearing about them if they are less cumbersome and less expensive." Defendant Abrahams responded, "Ok, thanks[.] Understood."

95.     Unbeknownst to the ExWorks Board of Directors and its Operating Committee, throughout March and April 2020, defendants Abrahams and LaHaie were conspiring to use World Trade Finance to enter contracts with three banks to process their PPP loan applications. Those contracts, which were signed by defendant LaHaie, were entered on April 5, April 8, and April 28, 2020, respectively, between World Trade Finance and the three banks.

96.     In April 2020, defendant Abrahams intentionally misstated to a member of the ExWorks Operating Committee that defendant Abrahams planned to have RedRidge assist one or two banks with the processing of PPP loan applications. Defendant Abrahams intentionally gave the false impression that this project would be led and conducted by RedRidge because, as defendant Abrahams knew, RedRidge was not an entity under the control and direction of the ExWorks Board

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

of Directors and its Operating Committee. But defendant Abrahams nonetheless planned to use the personnel, propriety information, resources, technology, and assets of ExWorks and World Trade Finance to lead this PPP loan work, with RedRidge assisting, as further described below.

97.     This PPP loan work that defendant Abrahams concealed from the ExWorks Board of Directors and its Operating Committee generated millions of dollars in SBA fees due to World Trade Finance. However, as part of their conspiracy, defendants Abrahams and LaHaie intentionally concealed and diverted these SBA fees to defendant RedRidge, as set forth below in greater detail.

   A.    **Defendants Abrahams and LaHaie Intentionally and Actively Concealed from the ExWorks Board of Directors and Its Operating Committee World Trade Finance's PPP Loan Processing Contracts with Three Banks.**

98.     Beginning in March and continuing through April 2020, defendants Abrahams and LaHaie used World Trade Finance to negotiate contracts to process and service PPP loan applications for three banks: (1) The Northern Trust; (2) Franklin Synergy Bank; and (3) Northeast Bank.

99.     As defendants Abrahams and LaHaie knew, it was critical to the three banks that their relationships were with World Trade Finance. World Trade Finance held an SBA license, and the banks wished to contract with an entity that had an SBA license to perform SBA loan application processing and servicing work. Indeed, during negotiations with the three banks, defendants Abrahams and LaHaie touted the experience and expertise that World Trade Finance had with SBA lending. Furthermore, World Trade Finance personnel with deep SBA experience and expertise were able to answer calls and provide confidence to the banks that World Trade Finance had the best platform available for SBA loan processing.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

**1.      Defendants Abrahams and LaHaie Intentionally and Actively Concealed World Trade Finance's PPP Loan Processing Contract with The Northern Trust.**

100.     Beginning in or about March 2020 and continuing until April 8, 2020, defendants Abrahams and LaHaie commandeered and used ExWorks and World Trade Finance personnel, as well as outside counsel for ExWorks and World Trade Finance, to negotiate a contract with The Northern Trust for World Trade Finance to process PPP loan applications for The Northern Trust's borrowers. World Trade Finance was integral to these negotiations because World Trade Finance held an SBA license, which defendants Abrahams and LaHaie knew RedRidge did not have. Defendants Abrahams and LaHaie agreed to and did conceal this activity from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

101.     Through a contract dated April 8, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing services to The Northern Trust. Defendant LaHaie signed the contract on behalf of World Trade Finance. Defendants Abrahams and LaHaie concealed the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

102.     Defendants Abrahams and LaHaie caused RedRidge to be identified in the contract as an affiliate of World Trade Finance. However, as defendants Abrahams and LaHaie knew, RedRidge had no contractual responsibilities, nor any contractual liabilities. RedRidge was not a signatory to the agreement.

103.     While RedRidge had no identified responsibilities and liabilities under the contract, World Trade Finance did. World Trade Finance warranted and represented that it was "licensed under the Small Business Act … to originate and service loans and thus are authorized to make Loans under the [PPP] Program."

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

104.    Defendants Abrahams and LaHaie knew World Trade Finance's SBA license was critical to The Northern Trust entering into the contract. As stated in the contract, "Each Party represents and warrants that it currently possesses, and covenants that it will at all relevant times maintain in good standing, all SBA required authorizations and licenses necessary to perform the Activities. The Parties acknowledge that given the urgent need to commence funding Loans under the Program, as of the Effective Date, SBA may not have formulated all regulations and guidance ('Regulations') that apply or will apply to the Program and Loans made thereunder."

105.    Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for a range of PPP loan application servicing for The Northern Trust, including: (a) supplying a website for prospective borrowers to access a loan application system; (b) answering questions received from prospective borrowers regarding the PPP and use of the system; (c) providing prospective borrowers with the ability to submit PPP loan applications consistent with SBA guidelines; (d) reviewing information provided by prospective borrowers to confirm eligibility to participate in the PPP; (e) validating prospective borrower-provided information as required by SBA regulations; (f) obtaining electronic versions of all required loan documents (including executed versions); (g) submitting necessary information to the SBA for approval; and (h) providing The Northern Trust with reports on a borrower-by-borrower basis on completed applications and other related information. As defendants Abrahams and LaHaie knew and caused, RedRidge assumed no such responsibilities.

106.    With respect to payment, the contract provided that The Northern Trust would "pay World Trade an amount equal to sixty percent (60%) of the processing fees paid by SBA to Northern Trust (or its Affiliates) under the CARES Act and the Regulations for Loans made to Prospective Borrowers that were processed by World Trade under the terms of this Agreement (the 'Charges')."

FILED DATE: 10/29/2020 2:52 PM  2020CH06538

107.     As defendants Abrahams and LaHaie knew, the payment terms were clear: The Northern Trust's payment of SBA fees were to go directly to World Trade Finance—not RedRidge. That, of course, was clear from the face of the contract.

**2.     Defendants Abrahams and LaHaie Intentionally and Actively Concealed World Trade Finance's PPP Loan Processing Contract with Franklin Synergy Bank.**

108.     Beginning in or about March 2020 and continuing until on or about April 5, 2020, defendants Abrahams and LaHaie commandeered and used ExWorks and World Trade Finance personnel, as well as outside counsel for ExWorks and World Trade Finance, to negotiate a contract with Franklin Synergy Bank to provide PPP loan application processing for Franklin Synergy Bank. World Trade Finance was integral to these negotiations because World Trade Finance held an SBA license, which defendants Abrahams and LaHaie knew RedRidge did not have. Defendants Abrahams and LaHaie agreed to and did conceal this activity from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

109.     Through a contract dated April 5, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing service to Franklin Synergy Bank. Defendant LaHaie signed the contract on behalf of Plaintiff World Trade Finance. Defendants Abrahams and LaHaie agreed to and did conceal the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

110.     Defendants Abrahams and LaHaie caused RedRidge Finance Group to be identified in the contract as an affiliate of World Trade Finance. However, as defendants Abrahams and LaHaie knew, RedRidge had no contractual responsibilities, nor any contractual liabilities. RedRidge was not a signatory to the contract.

111.     While RedRidge had no contractual responsibilities or liabilities, defendants Abrahams and LaHaie caused World Trade Finance to warrant that it was "licensed under the Small

Business Act … to originate and service loans and thus are authorized to make Loans under the [PPP] Program."

112. Defendants Abrahams and LaHaie knew that World Trade Finance's SBA license was critical to Franklin Synergy Bank entering into the contract. As stated in the agreement, "Each Party represents and warrants that it currently possesses, and covenants that it will at all relevant times maintain in good standing, all SBA required authorizations and licenses necessary to perform the Activities without the assistance of the other Party. The Parties acknowledge that given the urgent need to commence funding Loans under the Program, as of the Effective Date, SBA may not have formulated all regulations and guidance ('Regulations') that apply or will apply to the Program and Loans made thereunder."

113. Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for a range of PPP loan application servicing for Franklin Synergy Bank, including: (a) supplying a website for prospective borrowers to access a loan application system; (b) answering questions received from prospective borrowers regarding the PPP and use of the system; (c) reviewing information provided by prospective borrowers to confirm eligibility to participate in the PPP; (d) validating prospective borrower-provided information as required by SBA regulations; (e) obtaining electronic versions of all required loan documents (including executed versions); and (f) assisting with requests for loan forgiveness. As defendants Abrahams and LaHaie knew and caused, RedRidge assumed no such responsibilities.

114. Franklin Synergy Bank agreed to "pay World Trade, for itself and on behalf of RedRidge, an amount equal to 50% of the processing fees paid by SBA to Franklin (or its Affiliates) under the CARES Act and the Regulations for Loans made to Prospective Borrowers under the terms of this Agreement." As defendants Abrahams and LaHaie knew, the terms of the agreement

were clear that Franklin Synergy Bank's payments would go directly to World Trade—not RedRidge. That, of course, was clear from the face of the contract.

        **3.**    **Defendants Abrahams and LaHaie Intentionally and Actively Concealed World Trade Finance's PPP Loan Processing Contract with Northeast Bank.**

115.    Beginning in or about March 2020 and continuing until April 28, 2020, defendants Abrahams and LaHaie commandeered ExWorks and World Trade Finance personnel, as well as outside counsel for ExWorks and World Trade Finance to negotiate a contract with Northeast Bank to provide PPP loan servicing for Northeast Bank. World Trade Finance was integral to the negotiations because World Trade Finance held an SBA license, which defendants Abrahams and LaHaie knew RedRidge did not have.

116.    Through a contract dated April 28, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing services to Northeast Bank. Defendant LaHaie signed the contract on behalf of World Trade Finance. Defendants Abrahams and LaHaie agreed to and did conceal the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

117.    Notably—and in contrast to The Northern Trust and Franklin Synergy Bank agreements—RedRidge was not even mentioned in the Northeast Bank contract. Instead, as defendants Abrahams and LaHaie knew and caused, World Trade Finance was the only entity identified, and World Trade Finance solely assumed all responsibilities and liabilities under the contract to perform loan servicing work for Northeast Bank.

118.    Defendants Abrahams and LaHaie knew that World Trade Finance's SBA license was critical to Northeast Bank entering the contract. As stated in the contract, "Each of Lender and LSP has been duly authorized by the SBA to originate loans ("Loans") under the Paycheck Protection Program ("Program") created under the Coronavirus Aid, Relief, and Economic Security

Act of 2020 ("CARES Act")." Further, as stated in the contract, World Trade Finance was acknowledged as "experienced in SBA Lending, including origination, underwriting, closing, and servicing of SBA 7(a) loans, and provides guidance, assistance and services to lenders that market, underwrite, originate, close, fund, service, manage, and liquidate SBA 7(a) loans."

119.    Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for two distinct phases of work: (a) processing PPP loan applications and assisting in funding; and (b) loan forgiveness and subsequent servicing. According to Northeast bank, the fee split for World Trade Finance's work was to be approximately 40% for Phase I (loan application processing), and 60% for Phase II (loan forgiveness).

120.    With respect to Phase I loan application processing and funding assistance, World Trade Finance agreed to provide a range of PPP loan application services for Northeast Bank, including: (a) creating loan applications and related documents; (b) assisting Northeast in the completion of its portion of the SBA loan application documents; (c) completing, gathering, and obtaining all necessary SBA loan application documents and related borrower and guarantor due diligence items; (d) inputting borrower information into the bank's SBA loan processing software; and (e) submitting materials necessary to obtain PPP loan numbers through the E-Tran system.

121.    Under the terms of the parties' agreement, for Phase I (loan processing), Northeast Bank agreed to pay World Trade Finance (a) 1.0% of the loan amount for loans less than or equal to $350,000; (b) 0.5% of the loan amount for loans greater than $350,000 but less than $2 million; and (c) 0.25% of the loan amount for loans of $2 million or more.

122.    For Phase II (loan forgiveness), Northeast Bank agreed to pay World Trade Finance (a) 1.5% of the loan amount for loans less than or equal to $350,000; (b) 1% of the loan amount for loans greater than $350,000, but less than $2 million; and (c) .25% of the loan amount for $2 million or more.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

**B. Defendants Abrahams and LaHaie Actively Concealed Their Use of ExWorks and World Trade Finance Personnel and Resources to Execute the PPP Loan Work for the Three Banks.**

123. After defendants Abrahams and LaHaie concealed from the ExWorks Board of Directors and its Operating Committee World Trade Finance's PPP loan servicing agreements with The Northern Trust, Franklin Synergy Bank, and Northeast Bank, defendants Abrahams and LaHaie actively concealed that they were using World Trade Finance and ExWorks personnel and resources to conduct the PPP loan work for the three banks.

124. To conceal the use of ExWorks and World Trade Finance personnel and resources, defendants Abrahams and LaHaie took advantage of the work-from-home environment resulting from the COVID-19 pandemic. The defendants also gave explicit instructions to ExWorks and World Trade Finance employees to conceal their PPP loan work for the three banks from the ExWorks Operating Committee.

125. Specifically, and by way of example, on April 22, 2020, defendant LaHaie sent an electronic communication to ExWorks and World Trade Finance personnel saying, "Yo, just a heads up, make sure everyone knows not to disclose our bank partnerships." By "bank partnerships," LaHaie was referring to the contracts World Trade Finance entered with The Northern Trust and Franklin Synergy Bank for PPP loan work.

126. Defendant LaHaie then disparaged the ExWorks Operating Committee via electronic communication, stating that he "wouldn't trust [Operating Committee Member 1] with the weather forecast." LaHaie further directed personnel via electronic communication not to "openly talk to anyone that isn't Randy [Abrahams], everyone else is not working with us."

127. On May 11, 2020, ExWorks and World Trade Finance personnel were scheduled to have a conference call with the ExWorks Operating Committee regarding loan activity. Defendants Abrahams and LaHaie became aware of that call.

31

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

128.    On May 10, 2020, the day before the conference call, defendants Abrahams and LaHaie directed ExWorks and World Trade Finance personnel to conceal from the Operating Committee the full extent of the PPP work being done for the three banks. Specifically, defendant Abrahams directed the personnel via electronic communication to "keep all commentary to the SBA deals you manage, give them as much information they care to have on those," but to not "make any commentary on PPP activity beyond that funded in WT [World Trade Finance], if asked, and nothing on RFG/RDS [RedRidge] at all or any servicing we are doing there or any of the clients or agreements." Defendant Abrahams concluded by saying, "just want the [Operating] committee to stay in its lane and has nothing to do with our RFG [RedRidge] business at all[.]"

C.    **Defendants Abrahams and LaHaie Used ExWorks and World Trade Finance Personnel and Resources for the Three Banks' PPP Loan Processing Work.**

129.    The personnel and resources of ExWorks and World Trade Finance were critical to the success of the PPP loan application processing and servicing work for The Northern Trust, Franklin Synergy Bank, and Northeast Bank. It was World Trade Finance and ExWorks personnel—not RedRidge—who brought the PPP opportunity to defendants Abrahams and LaHaie, and these personnel did so before the CARES Act even became law. ExWorks and World Trade Finance personnel also worked day and night to understand how ExWorks and World Trade Finance could execute loans under the PPP and to develop a successful platform for World Trade Finance to process SBA loans.

130.    Because the PPP was being pushed out quickly by the federal government in response to the urgencies created by COVID-19, there was significant uncertainty around the details of the PPP. It was ExWorks and World Trade Finance personnel—not RedRidge personnel—who interfaced directly with the SBA to better understand the PPP and its anticipated requirements. ExWorks and World Trade Finance personnel then used that information to develop a proprietary process for staff to use to efficiently and quickly determine, with respect to each prospective PPP

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

loan applicant, the loan applicant's eligibility, maximum loan amount, and the documentation needed.

131.    World Trade Finance and ExWorks personnel developed an IT infrastructure for the loan processing work with the three banks. This required significant time, effort, and resources from ExWorks and World Trade Finance personnel. ExWorks and World Trade Finance personnel also developed the structure for a program to handle the E-Tran and loan document work for each SBA loan application. ExWorks and World Trade Finance personnel then trained RedRidge and ExWorks personnel on the intake of SBA loan applications, the processing of loans through E-Tran and completing and providing loan documentation for the banks, and also trained personnel from the financial institutions including The Northern Trust and Franklin Synergy Bank. ExWorks and World Trade Finance personnel also developed proprietary technology to efficiently gather potential SBA loan borrower information to be aggregated into a database for quicker processing.

132.    When the plan for the PPP work was being developed within ExWorks and World Trade Finance, the focus was on using as many ExWorks employees as possible to help with the loan servicing. Defendant LaHaie admitted as much on March 27, 2020: "EWC [ExWorks] has capacity and we will ramp that up first." Consistent with defendant LaHaie's own statement, the plan was to deploy all of ExWorks's personnel to the PPP loan work, and only after they were deployed turn to RedRidge to fill capacity.

133.    By April 1, 2020, defendants Abrahams and LaHaie formulated a plan to commit ExWorks and World Trade Finance personnel to PPP loan processing work. Defendant LaHaie complimented ExWorks and World Trade Finance personnel on their work, saying "thanks for running so hard to get us ready to lend via the PPP." As part of the plan authorized by defendants Abrahams and LaHaie, the core management and responsibilities for the PPP loan processing,

33

including operations, interfacing with the SBA, and addressing legal issues was entrusted to ExWorks and World Trade Finance personnel, not RedRidge.

134.    Via email communication on April 1, 2020, defendant LaHaie laid out the division of responsibilities for ExWorks, World Trade Finance, and RedRidge, and directed that ExWorks and World Trade Finance personnel be responsible for the following: (a) managing PPP loan borrower intake; (b) determining the maximum loan forgiveness amount due to each PPP loan borrower; (c) aggregating on a daily and ongoing basis questions to be handled by ExWorks personnel to be distributed to ExWorks and World Trade Finance personnel with SBA expertise on a daily basis; and (d) developing an internal borrower status listing for use by ExWorks personnel.

135.    On Friday, April 3, 2020, a senior employee of RedRidge, who operated under the direction of defendant Abrahams, informed RedRidge's employees that they would be assisting ExWorks personnel as needed on the PPP loan processing work. Specifically, the senior RedRidge employee described RedRidge's role as limited to "an opportunity to **assist** WTF [World Trade Finance] through **their** deployment of the PPP program. As you'd imagine, timing and coordination is of the utmost importance" (emphasis added).

136.    Also on Friday, April 3, 2020, defendant LaHaie directed ExWorks and World Trade Finance personnel "to work this weekend to get all of your borrowers into the SBA system so we are ready to fund them all as soon as the capital posts." Defendant LaHaie told ExWorks and World Trade Finance personnel that they were "taking on volume from at least two banks [The Northern Trust and Franklin Synergy Bank] starting Monday/Tuesday which will require significant work by all members of our team and RedRidge to process. We need everyone to bear down and let's work as hard as we possibly can over the next few months to get the capital out to Main Street America!"

137.    Then, on Saturday, April 4, 2020, defendant LaHaie informed ExWorks employees that they were needed for a mandatory training on a Sunday "regarding the SBA Payroll Protection

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

Program that World Trade (our SBA platform) **will be administering**" (emphasis added). LaHaie stated that "[t]he volume is going to be significant (1000+loans) that we will process and everyone in the company will be asked to step-up and help, across all of our offices." LaHaie emphasized that "all" ExWorks employees needed to join the Sunday call.

138.     ExWorks and World Trade Finance personnel worked full-time processing loans beginning no later than March 2020 and continuing through July 2020. Many ExWorks and World Trade Finance employees worked seven days a week, putting in 12-14 hours of work per day on the PPP loan processing under the direction of defendants Abrahams and LaHaie. Many ExWorks and World Trade Finance employees worked substantial hours and days on the processing of PPP loan applications.

139.     Defendant LaHaie also directed that the ExWorks team in the United Kingdom participate in the PPP loan application processing. Defendant LaHaie instructed the UK ExWorks team to input loans into E-Tran, process loan documentation, and assist with quality control. Defendant LaHaie demanded that at least three employees devote "as close to 100% of their time dedicated to this project as possible[.]"

140.     As the PPP loan application processing work progressed, defendants Abrahams and LaHaie continued to demand that ExWorks and World Trade Finance employees dedicate their full attention and resources to the work. As defendant LaHaie stated on April 28, 2020, to 14 ExWorks and World Trade Finance employees, "Ideally the UK team would spend nearly all of their day on this, especially the AM in London, system should work much better at that time. For the US folks, to the extent you can get up and do a super early morning shift, let's do it!"

141.     Defendant LaHaie promised ExWorks and World Trade Finance employees "production bonuses" with a bonus pool of at least $20,000 per 500 loans funded. As defendant LaHaie knew, thousands of PPP loans were ultimately funded through the work ExWorks and

World Trade Finance personnel performed. However, defendants Abrahams and LaHaie never paid employees the bonuses. In fact, both defendants departed ExWorks leaving ExWorks (and World Trade Finance) without the SBA fees generated from the employees' work to pay these bonuses.

142.     In furtherance of defendants Abrahams's and LaHaie's agreement to defraud ExWorks and World Trade to the benefit of their new company, ACAP, defendant Abrahams intentionally withheld the significant demand and resources that he and defendant LaHaie placed on ExWorks and World Trade Finance personnel from the ExWorks Operating Committee, and actively concealed their work from the ExWorks Operating Committee.

> **D.     Defendants Abrahams and LaHaie Diverted to Defendant RedRidge SBA Fees Contractually Due to World Trade Finance.**

143.     ExWorks's subsidiary, World Trade Finance, was the signatory to the PPP loan applications servicing agreements with the three banks and was responsible for execution of the work required by the agreements. As a result of the substantial volume of PPP loan applications that businesses submitted, defendants Abrahams and LaHaie decided to deploy defendant Abrahams's other business, RedRidge, to assist World Trade Finance. However, because RedRidge did not have an SBA license and because RedRidge personnel lacked relevant experience (their experience was in on-site due diligence for borrowers), RedRidge personnel were relegated to conducting ministerial assistance with the PPP loan applications for World Trade Finance.

144.     Because of the lack of expertise required of RedRidge employees, ExWorks and World Trade Finance personnel considered contracting with a temporary employment agency to provide additional personnel. Nonetheless, defendant Abrahams directed that idled RedRidge employees—who had free time because defendant Abrahams was no longer able to effectively bring in new business—assist World Trade Finance.

145.     Because World Trade Finance was a licensed SBA lender, SBA rules and regulations required that World Trade Finance have a written agreement in place governing the relationship

36

FILED DATE: 10/29/2020 2:52 PM  2020CH06538

between it and any subcontractors, like RedRidge. As defendants Abrahams and LaHaie knew, the contract had to describe the subcontractor's role and responsibilities for work performed. Defendants Abrahams and LaHaie directed and caused to be drafted a sham contract between World Trade Finance and RedRidge. Defendant LaHaie signed the sham contract on behalf of World Trade Finance, while defendant Abrahams directed a RedRidge employee to sign on RedRidge's behalf. The sham contract was signed April 11, 2020, and made effective as of March 20, 2020. Defendants Abrahams and LaHaie, of course, concealed this sham contract from the ExWorks Board of Directors and its Operating Committee.

146.     According to this sham contract, RedRidge "will be assisting Company [World Trade Finance] solely with system and process development and data analysis support." The bulk of the responsibility fell to World Trade Finance, who was responsible for "[a]ll eligibility decisions, developing processing and underwriting guidelines and compliance with SBA rules and regulations, interactions with customers who collaborate with [World Trade Finance] and loan servicing activities will be done exclusively by [World Trade Finance]."

147.     Defendants Abrahams and LaHaie intentionally kept the compensation portion of the sham contract vague and ambiguous so that they could manipulate distribution in favor of RedRidge and themselves. Per the agreement, "[a]ll application, servicing and other fees received by [World Trade Finance] will be shared with [RedRidge]. The proportion shared with [RedRidge] is intended to reflect the resources dedicated to the project as well as the volume of processed applications and will be calculated as follows[.]" The sham contract then provided the following table:

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

| Component | Fee Weighting | Basis of allocation |
|---|---|---|
| Project Coordinator | 20% | # of personnel involved |
| Lead Managers | 20% | # of personnel involved |
| Managers | 10% | # of personnel involved |
| Foreignness Calc | 10% | # of personnel involved |
| Operations | 10% | # of personnel involved |
| Processors | 30% | Volume of processed applications |
| Fee | 100% | |

148.    As defendants Abrahams, LaHaie, and RedRidge knew, the sham contract's fee structure was not presented to the ExWorks Board of Directors nor its Operating Committee as required by the ExWorks Board of Directors, and its terms were intentionally vague to inure to the benefit of defendants. Further, as defendants Abrahams, LaHaie, and RedRidge knew, this sham contract did not reflect the reality that ExWorks and World Trade Finance personnel, resources, and proprietary business information were the driving force behind the PPP loan work. Regardless of and despite those facts, defendants Abrahams, LaHaie, and RedRidge never even afforded ExWorks and World Trade Finance with the opportunity to receive fees earned, as defendants intentionally diverted SBA fees to RedRidge.

149.    As set forth in detail below, defendants Abrahams and LaHaie executed a plan to divert PPP loan fees due to World Trade Finance from The Northern Trust and Franklin Synergy Bank to RedRidge, and to reduce the amounts due World Trade Finance from Northeast Bank so that ACAP and The Loan Source could acquire the PPP loans, thereby stealing an opportunity for World Trade Finance to do further work for Northeast Bank on those loans.

**1.    Defendants Abrahams, LaHaie, and RedRidge Diverted SBA Fees from The Northern Trust to RedRidge.**

150.    World Trade Finance processed more than 1,000 PPP loans for The Northern Trust with assistance from RedRidge. This work entitled World Trade Finance to be paid approximately

38

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

$3.9 million in SBA fees generated from the processing of PPP loans pursuant to the parties' written agreement.

151.     Defendants Abrahams and LaHaie directed and caused to be directed that The Northern Trust make its SBA fee payments to RedRidge, not World Trade Finance.

152.     Specifically, on May 26, 2020, defendant RedRidge invoiced The Northern Trust for $3,732,805.46, for the processing of PPP loan applications. Defendant RedRidge's invoice instructed The Northern Trust to "make check payable to RedRidge Finance Group."

153.     On June 18, 2020, The Northern Trust informed defendant LaHaie and World Trade Finance personnel via email communication that The Northern Trust was ready to "issue payment to ExWorks for their portion [of the SBA fee for PPP loan processing]." World Trade Finance personnel forwarded the email from The Northern Trust to defendant Abrahams. Defendant Abrahams then asked RedRidge's Chief Financial Officer, "can you jump on this with invoice now and wire instructions previously sent for RFG [RedRidge]"? Tellingly, defendant Abrahams removed World Trade Finance personnel from this email to his RedRidge Chief Financial Officer, adding defendant LaHaie to the communication to keep him informed of their illegal profiteering at World Trade Finance's expense.

154.     The Northern Trust then made wire transfers to defendant RedRidge Finance Group, LLC in the amounts of $3,599,798.84, and $135,283.07, for a total of $3,735,081.91, for SBA fees rightfully due to World Trade Finance. Defendants failed to provide any of this money to World Trade Finance.

### 2.     Defendants Abrahams, LaHaie, and RedRidge Diverted SBA Fees from Franklin Synergy Bank to RedRidge.

155.     World Trade Finance processed more than 700 PPP loans for Franklin Synergy Bank with assistance from RedRidge. That work entitled World Trade Finance to be paid approximately $1.5 million in SBA fees generated from the PPP loan work World Trade Finance performed.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

156.     Defendants Abrahams and LaHaie directed and caused to be directed that Franklin Synergy Bank pay defendant RedRidge these fees.

157.     Specifically, on May 22, 2020, defendant RedRidge invoiced Franklin Synergy Bank for $1,477,191.82, related to the processing of PPP loans. Defendant RedRidge's invoice instructed Franklin Synergy Bank to "make check payable to RedRidge Finance Group." Franklin Synergy Bank paid defendant RedRidge $1,477,191.82 for SBA fees rightfully due to World Trade Finance. Defendants failed to provide any of this money to World Trade Finance.

158.     On June 8, 2020, Franklin Synergy Bank informed defendant LaHaie by email that the bank intended to make another payment of $605,456.11. Defendant LaHaie forwarded this email to defendant Abrahams and the RedRidge Chief Financial Officer, stating, "another $605k today coming to RFG [RedRidge]," and asking, "Can you please pay ACAP the software invoice when the $605k hits?" This additional $605,456.11 was SBA fees rightfully due to World Trade Finance, but defendants failed to provide any of this money to World Trade Finance.

159.     In total, Franklin Synergy Bank paid defendant RedRidge $1,574,372.27 for PPP loan processing work, all of which defendants Abrahams, LaHaie, and RedRidge concealed from the ExWorks Board of Directors its Operating Committee, and its Acting Chief Operating Officer, and which were properly due to World Trade Finance.

> **3.     Defendants Abrahams, LaHaie, and RedRidge Improperly Diminished SBA Fees Due from Northeast Bank, and Improperly Used the SBA Fees Received from Northeast Bank.**

160.     World Trade Finance, with assistance from defendant RedRidge, managed the processing of more than 1,750 PPP loans for Northeast Bank. For that work performed, World Trade Finance was due to be paid approximately $1.2 million in SBA fees from Northeast Bank.

161.     Rather than allow Northeast Bank to make payment to World Trade Finance, defendant Abrahams entered partial terminations of the contract between Northeast Bank and

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

World Trade Finance. Defendant Abrahams concealed these partial terminations of the contract from the ExWorks Board of Directors, its Operating Committee, and its Acting Chief Operating Officer. Defendant Abrahams did this to provide an opportunity to defendant ACAP and The Loan Source to purchase PPP loans from Northeast Bank; an opportunity that rightfully belonged to ExWorks and World Trade Finance.

162.     Defendants Abrahams and LaHaie had been contemplating since May 1, 2020, bringing Northeast Bank's PPP business to ACAP. Specifically, on May 1, 2020, defendant LaHaie informed defendant Abrahams via email, "I'm trying to get Northeast to give us all of their PPP to service, which would be another few hundred million." Defendant Abrahams responded, "That would be the massive positive change for RFG [RedRidge] model for the long haul as well[.] Its like all the pieces are laying in front of us[.]" Defendant LaHaie replied, "Yes sir! I just wouldn't want to be in our way at this point."

163.     By written contract dated June 26, 2020, and signed by defendant Abrahams on behalf of World Trade Finance, Northeast Bank agreed to pay World Trade Finance the reduced amount of $695,479.61 for processing certain PPP loans. The contract terminated World Trade Finance's rights to obtain further SBA fees through the provision of Phase II (loan forgiveness) services. Defendant Abrahams concealed this agreement from the ExWorks Board of Directors, its shareholder-advisor, its Operating Committee, and its Acting Chief Operating Officer. As defendant Abrahams knew, he was required to—but intentionally failed to—obtain authorization and approval before entering into financial arrangements such as this.

164.     As discussed below, *see* ¶¶171-77 *supra*, on June 29, 2020, defendant Abrahams improperly caused the approximately $695,000 in SBA fees funds to be improperly applied against RedRidge's outstanding balance for "prepaid" due diligence with ExWorks.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

165.     Then, by written agreement dated July 29, 2020, signed by defendant Abrahams on behalf of World Trade Finance, Northeast Bank agreed to pay World Trade Finance a reduced payment of $152,063 for work done processing certain PPP loans, further terminating World Trade Finance's ability to obtain SBA fees associated with Phase II services (loan forgiveness). Defendant Abrahams concealed this agreement from the ExWorks Board of Directors, its shareholder-advisor, its Operating Committee, and its Acting Chief Operating Officer. As defendant Abrahams knew, he was required to—but intentionally failed to—obtain authorization and approval before entering into financial arrangements such as this.

166.     When ExWorks and World Trade Finance personnel questioned Northeast Bank and defendant Abrahams regarding the expected PPP loan servicing fees due to World Trade Finance in July 2020, defendant Abrahams directed ExWorks and World Trade Finance personnel via electronic communication to "stand down" as he would "get any documents RFG [RedRidge] needs from them forward [sic] [.]"

167.     Also unbeknownst to the ExWorks Board of Directors, its shareholder-advisor, its Operating Committee, and its Acting Chief Operating Officer, defendants Abrahams and LaHaie caused a *new* agreement to be renegotiated between defendant ACAP and Northeast Bank for ACAP to purchase PPP loans directly from Northeast Bank. This occurred in or about June 2020, while defendants Abrahams and LaHaie were still employed by ExWorks and while both owed fiduciary duties to the company.

168.     The newly negotiated agreement between ACAP and Northeast Bank was intended by defendants Abrahams and LaHaie—and had the effect of—diverting both the opportunity for ExWorks and World Trade to purchase PPP loans from Northeast Bank, as well as the opportunity for World Trade Finance to earn SBA fees associated with loan forgiveness. These expected SBA

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

fees for loan forgiveness were substantial and totaled approximately $1.3 million based on the calculation under the original contract between World Trade Finance and Northeast Bank.

169.     Unbeknownst to the ExWorks Board of Directors, its shareholder-advisor, its Operating Committee, and its Acting Chief Operating Officer, defendants Abrahams and LaHaie entered into a letter of intent dated June 1, 2020, between ACAP and Northeast Bank, through which ACAP would purchase SBA loans from Northeast Bank. Importantly, as of June 1, 2020, **both** defendants Abrahams and LaHaie were employed by ExWorks, and owed fiduciary duties of care, candor, good faith, and loyalty to ExWorks.

170.     By intentionally (a) reducing the amount owed to World Trade Finance; (b) misapplying approximately $695,000 in SBA fees against RedRidge's "prepaid" diligence balance with ExWorks; (c) terminating the expectation of future PPP loan processing and forgiveness earnings reasonably expected from Northeast Bank; and (d) hiding the potential business opportunity with Northeast Bank away from World Trade Finance and ExWorks and to themselves, defendants RedRidge, Abrahams, and LaHaie breached their contractual obligations, breached their fiduciary obligations, and conspired to and did in fact defraud and steal from ExWorks and World Trade Finance.

## E.     Defendants Abrahams and RedRidge Used SBA Fees from Northeast Bank to Improperly Reduce RedRidge's Transfer Balance with ExWorks.

171.     Beyond simply stealing PPP loan processing fees due to World Trade Finance, defendants Abrahams and RedRidge improperly applied approximately $695,000 in SBA fees due World Trade Finance for PPP loan processing against RedRidge's outstanding prepaid balance with ExWorks.

172.     As discussed above, *see* ¶¶74-85 *supra*, between June 2019 and March 2020, defendants Abrahams and RedRidge caused ExWorks to make excessive transfers totaling approximately $3.7 million to RedRidge.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

173.     In May 2020, the ExWorks Board of Directors demanded that defendant Abrahams repay the outstanding balance of approximately $1.8 million to ExWorks. Defendant Abrahams agreed to make the repayment to ExWorks from RedRidge.

174.     Unbeknownst to the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee, defendants Abrahams and RedRidge used the SBA fees due World Trade Finance to make RedRidge's repayment to ExWorks totaling approximately $695,000 in June 2020.

175.     Specifically, on June 29, 2020, defendants Abrahams and RedRidge caused $695,480 in SBA fees received from Northeast Bank to be applied against the balance of excessive transfers.

176.     As defendants Abrahams and RedRidge knew, these amounts were SBA fees due to World Trade Finance for its PPP loan processing work, and these funds were **not** appropriately considered repayments of prepaid diligence. Defendant Abrahams concealed this information from ExWorks, its Board of Directors, and its Operating Committee, in order to give the false impression that defendant RedRidge had returned prepaid diligence payments to ExWorks.

177.     In addition to the $695,480 due to ExWorks, defendant RedRidge still has an outstanding balance of $25,633 in excessive transfers to repay.

## VII.     Defendants Abrahams and LaHaie Used the COVID-19 Pandemic to Benefit ACAP to the Detriment of ExWorks and World Trade Finance.

178.     Through the PPP loan work that ExWorks and World Trade Finance personnel performed in 2020, defendants Abrahams and LaHaie realized that the PPP presented a significant opportunity for their newly-formed company, ACAP. While both Abrahams and LaHaie were still employed by ExWorks, they took advantage of the assets, resources, confidential business information, and personnel of ExWorks and World Trade Finance to have ACAP commence business. As discussed in further detail below, defendants Abrahams and LaHaie breached their fiduciary duties to ExWorks and World Trade Finance by stealing opportunities from ExWorks and

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

World Trade Finance, and using ExWorks and World Trade Finance resources and assets to form and develop ACAP's PPP business, all while Abrahams and LaHaie were employed by ExWorks.

> **A.    Defendants Abrahams and LaHaie Accelerated the Development of ACAP During the COVID-19 Pandemic and Stole ExWorks Records for ACAP.**

179.    Beginning no later than March 18, 2020, and continuing through at least May 5, 2020, defendants Abrahams and LaHaie caused ExWorks to hire an IT consulting firm for Abrahams and LaHaie to steal ExWorks data.

180.    According to invoices for payment (paid by ExWorks, not ACAP), defendants Abrahams and LaHaie had the IT firm (a) "Export[] all Contacts with emails and send[] to Julia for email marketing purposes"; (b) "Creat[e] new records in ACAP Org from those created this week in the old EE ExWorks Org"; (c) "Add[] all Contacts, Clients, and Opportunities created in the old RR and Exworks [sic] Orgs into the new ACAP org"; and (d) "Create[] Processes to inform me when any new records were created in the PE Org; tested; created an unmanaged package and moved it to the ExWorks EE Org. Now I will be able to add any new Clients, Contacts, or Opportunities after the data import is done".

181.    Defendant Abrahams then charged the IT consultant's fees, which totaled approximately $5,135, to ExWorks for payment.

182.    As defendants ACAP, Abrahams, and LaHaie knew, ExWorks client information, contacts, and opportunities constituted confidential and proprietary business records belonging solely to ExWorks. None of the defendants—ACAP, Abrahams, or LaHaie—had authorization from the ExWorks Board of Directors and its Operating Committee to transfer this confidential proprietary data for their own use and benefit. The actions of defendants Abrahams and LaHaie were in complete disregard to the fiduciary duties each owed to ExWorks.

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

**B.    Defendants Abrahams and LaHaie Stole World Trade Finance's Opportunity to Acquire The Loan Source for Themselves and Defendant ACAP.**

183.    Defendants Abrahams and LaHaie intentionally stole the opportunity to acquire The Loan Source from ExWorks and World Trade Finance and concealed their theft of this opportunity from the ExWorks Board of Directors and Operating Committee, breaching their fiduciary obligations to the companies. Defendants Abrahams and LaHaie further engaged in breaches of their fiduciary duties beyond the theft by taking opportunities to engage in loan processing service from World Trade as set forth above, *see* ¶¶160-70 *supra*, and as discussed below.

184.    In April 2020, World Trade Finance personnel identified an opportunity for World Trade Finance to acquire The Loan Source, a proposed business activity appropriately within the scope of World Trade Finance's business and one in which World Trade Finance had the capacity to engage. Rather than pursue the opportunity for ExWorks and World Trade Finance—an opportunity that rightfully belonged to ExWorks and World Trade Finance—defendants Abrahams and LaHaie stole it for their own benefit, taking the opportunity and giving it to their own company, ACAP, to pursue.

185.    In April 2020, World Trade Finance personnel were looking to acquire a company that held a Small Business Lending Company License ("SBLC"). World Trade Finance personnel determined that acquiring such a business would provide it with an opportunity to expand its SBA loan offerings to prospective borrowers, which was within the same line of business of World Trade Finance, and which thus would have been complimentary to World Trade Finance's business.

186.    World Trade Finance personnel was in regular communication with a contact who worked with SBLC-licensed companies. That contact informed World Trade Finance personnel that he represented a potential SBLC-licensed company that was for sale.

187.    On or about April 22, 2020, World Trade Finance personnel informed defendant LaHaie, that he "found us an SBLC for sale for $10 mm, getting an nda sent over to review to

46

obtain some more info." Defendant LaHaie responded, "haha how did you manage that? in your spare time time!?" World Trade Finance personnel replied, "eyes and ears always open[.]"

188.    World Trade Finance personnel requested a non-disclosure agreement with the prospective SBLC-licensed company that was for sale. World Trade Finance personnel received the non-disclosure agreement that would cover acquisition discussions. The non-disclosure agreement identified World Trade Finance as the interested party. On or about April 24, 2020, World Trade Finance personnel provided the non-disclosure agreement to defendant LaHaie.

189.    On or about April 24, 2020, after receiving the non-disclosure agreement, defendant LaHaie directed that the proposed non-disclosure agreement not involve World Trade Finance. Specifically, defendant LaHaie stated, "Need this changed to RedRidge Finance Group, LLC." Also that same day, defendant LaHaie informed World Trade Finance Personnel, "i want to sign the nda as it will be RFG [RedRidge] and not ewc [ExWorks] signing."

190.    On or about April 26, 2020, defendant LaHaie signed the non-disclosure agreement, purporting to be a Managing Director of defendant RedRidge. Importantly, in April and May 2020 when this was occurring, defendant LaHaie was a Managing Director of ExWorks and World Trade Finance. Defendant LaHaie did not resign from ExWorks until June 30, 2020.

191.    Following execution of the non-disclosure agreement, defendants Abrahams and LaHaie learned that the SBLC-licensed company was The Loan Source. Defendant LaHaie received The Loan Source's financial statements and a proposed deal timeline, which defendant LaHaie provided via electronic communication to defendant Abrahams.

192.    Defendants Abrahams and LaHaie, from that point forward, did not involve World Trade Finance personnel in the pursuit of the acquisition of The Loan Source.

193.    Defendants Abrahams and LaHaie concealed from the ExWorks Board of Directors and its Operating Committee the existence of the opportunity to acquire The Loan Source.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

194.    By May 2, 2020, defendants ACAP, Abrahams, and LaHaie provided an offer sheet with terms to The Loan Source. The offer sheet outlined the terms of ACAP's proposed acquisition of The Loan Source, with a proposed closing date of May 8, 2020. In transmitting the offer sheet, defendant LaHaie stated that they were willing to pay "a significant premium" only "because of the PPP business we [defendants Abrahams and LaHaie] can put on the business." Defendant LaHaie further stated, "This is why we have such a short time to close this out, if we wait a few months we would not be willing to pay the premium we have offered here. In addition to the PPP program, we have significant investor capital lined up that we will use to fund [SBA] 7a loans going forward that we will deploy via the SBLC."

195.    According to the offer sheet transmitted by defendants Abrahams and LaHaie, the buyer would be a "created ACAP vehicle ('NewCo' or 'Buyer'), with ACAP to "control and operate LS [The Loan Source]," through which ACAP would "[p]articipate in PPP via origination of new deals and purchase of pools of PPP Loans from other PPP lenders (mainly community and smaller banks)[.]"

196.    While ACAP initiated its acquisition of The Loan Source in May 2020, ACAP has not yet completed its acquisition of The Loan Source.

**C.      Defendants Abrahams and LaHaie Stole World Trade Finance's Opportunity to Perform PPP Loan Servicing Work for The Loan Source.**

197.    Separately—because ACAP has not yet completed its acquisition of The Loan Source—ACAP is performing PPP loan servicing work for The Loan Source. Through this arrangement—which is strikingly similar to the contractual arrangement between World Trade Finance and RedRidge—ACAP is now servicing the billions of dollars' worth of PPP loans that The Loan Source recently began to purchase after ACAP initiated its acquisition of The Loan Source.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

198.     According to publicly available records,[2] on May 13, 2020, defendant ACAP entered into an agreement to provide servicing for PPP loans purchased by The Loan Source. As of May 13, 2020, both defendants Abrahams and LaHaie were employed by ExWorks; defendant LaHaie's employment did not terminate until June 30, 2020, while defendant Abraham's employment with ExWorks did not terminate until August 7, 2020.

199.     Subsequently, The Loan Source accessed the PPP Liquidity Facility, which was created to permit the twelve Federal Reserve Banks to operate liquidity facilities to lenders who made loans to small businesses through the PPP. On information and belief, The Loan Source entered into a letter agreement with the Federal Reserve Bank of Minneapolis following the ACAP-The Loan Source agreement dated May 13, 2020.

200.     On June 12, 2020, Northeast Bank—which already had a PPP servicing agreement with World Trade Finance—entered into a Paycheck Protection Program Liquidity Facility Correspondent Bank Agreement with The Loan Source and ACAP. Defendant LaHaie signed the agreement on behalf of defendant ACAP. Pursuant to the agreement, Northeast Bank agreed to serve as the correspondent bank for The Loan Source and ACAP, through which Northeast bank would act as The Loan Source's depository institution for purposes of the PPP Liquidity Facility.

201.     Defendants Abrahams and LaHaie caused defendant ACAP to begin touting its PPP experience and expertise. According to defendant ACAP's website, http://acapgp.com/about, ACAP "was created exclusively to service PPP loans." The website states, "We are an SBA-approved non-bank servicing partner providing complete PPP loan servicing solutions." As discussed above, *see supra* Section VI.A-VI.C, this is exactly the work that World Trade Finance and

---

[2] When Northeast Bank agreed to serve as a correspondent bank for The Loan Source and ACAP, Northeast Bank filed an SEC Form 8-K, which included as an exhibit its Paycheck Protection Program Liquidity Facility Correspondent Agreement, dated June 12, 2020, which referenced ACAP's loan servicing agreement with The Loan Source.

ExWorks were doing for The Northern Trust, Franklin Synergy Bank, and Northeast Bank. Also according to ACAP's website, "The Loan Source originates SBA and PPP loans." According to publicly available records, numerous banks have transferred their PPP loans to The Loan Source, including Northeast Bank—a bank that already had a contractual relationship with World Trade Finance to perform PPP loan processing service.

202.     Banks, particularly smaller and regional banks that issued PPP loans, began packaging and selling their PPP loans to The Loan Source. The sale of the PPP loans enabled the banks to register the profits from the PPP initiative (in exchange for giving up a percentage of the processing fees), while avoiding a potentially long-term and complicated regulatory process that will be imposed by the SBA to certify and approve loan forgiveness or repayment. Banks have been willing to sell their PPP portfolios at a discount to get the loans off their books more quickly.

203.     Beginning in or around May 2020, defendants ACAP and LaHaie, while LaHaie was still Managing Director of ExWorks and World Trade Finance, began discussions with The Loan Source and Franklin Synergy Bank regarding the purchase of PPP loans from Franklin Synergy Bank.

204.     On June 1, 2020, Franklin Synergy Bank received a draft Loan Purchase and Sale Agreement, through which the bank's PPP loans would be sold to The Loan Source. On or about June 17, 2020, The Loan Source purchased the PPP loans from Franklin Synergy Bank for $228,371.78. Franklin Synergy Bank and The Loan Source executed a Custodial and Escrow Agreement on July 20, 2020 and the balance of the PPP loan purchase funds – $207,557.90 – were released by the custodian The Kingdom Trust Company on July 29, 2020.

205.     In June 2020, Northeast Bank entered into an agreement to sell $457.6 million PPP loans to The Loan Source.  By the end of June 2020, The Loan Source was in the process of

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

purchasing approximately $1.27 billion worth of PPP loans, including approximately $815.3 million worth of PPP loans from lenders other than Northeast Bank.

206.    On July 3, 2020, defendant LaHaie, in his capacity as Chief Investment Officer for ACAP, was interviewed by the media. LaHaie stated, "Some banks weren't ready for a June close because they had quarter- or year-end [results], so they wanted to circle back in July and August, so we're expecting as much, if not even more, for the closings in July and August." Defendant LaHaie further stated that banks considering a sale should make the decision in the near term since PPP borrowers would soon request forgiveness, and there are significant up-front costs in developing the process to handle a forgiveness request. LaHaie said the market generally priced the loans at 98.5 cents on the dollar.

207.    In June 2020, defendants Abrahams and LaHaie caused defendant ACAP to market itself on its website as a loan processing company with an "expert team assembled" that had "already closed on $1.3B in loan acquisitions to date." Defendant ACAP purported to be an entity to whom banks could "sell your PPP loans with confidence" as "ACAP was created exclusively to service PPP loans."

208.    By mid-October 2020, ACAP's website stated that ACAP and TLS bought $3.3 billion worth of PPP loans, but as of October 25, 2020, ACAP removed that reference.

209.    On October 19, 2020, defendant LaHaie published an article in "The Business Journals" stating defendant ACAP and The Loan Source partnered to handle "PPP origination, servicing, and forgiveness," publicizing the fact that the partnership between The Loan Source and defendant ACAP has "$3.4 billion in purchased PPP loans to date."

**VIII.    Defendants Abrahams and LaHaie Continued to Conceal ACAP from ExWorks, Its Board of Directors, and Its Operating Committee.**

210.    In the midst of the scheme by defendant Abrahams and LaHaie to create ACAP while still employed by ExWorks, defendants Abrahams and LaHaie discussed ways to help

themselves to the detriment of ExWorks. For example, on May 12, 2020, defendant LaHaie asked defendant Abrahams, "What do you think about moving me to RFG [RedRidge] and then having a contract back to ExWorks for my time and cost?" According to defendant LaHaie's email communication, defendant LaHaie "would feel more comfortable with this arrangement" because defendant LaHaie disparagingly viewed the ExWorks Board of Directors as "Hitler's Youth."

211. However, only after months of plotting and scheming, and only after establishing ACAP as a competing business to ExWorks, did defendant LaHaie resign from ExWorks and World Trade Finance. On June 30, 2020, defendant LaHaie resigned from ExWorks and World Trade Finance, and immediately began touting himself as ACAP's Chief Investment Officer.

212. On July 8, 2020, members of the ExWorks Operating Committee and defendant Abrahams had a conference call with a representative from an ExWorks investor. During the call, the representative said that he heard ExWorks started a new company named ACAP. The ExWorks Operating Committee members responded in substance that they were unfamiliar with ACAP and that ACAP was not an ExWorks entity. Even though defendant Abrahams had otherwise been an active participant during the call, defendant Abrahams said nothing about ACAP, nor did he respond to the representative.

213. Later in July 2020, a member of the ExWorks Operating Committee confronted defendant Abrahams about ACAP. Defendant Abrahams admitted that he owned ACAP. Defendant Abrahams then falsely claimed that he told the investor's representative after the July 8, 2020 conference call that defendant Abrahams was involved in ACAP without the knowledge of the ExWorks Operating Committee. However, as defendant Abrahams knew, he never informed the investor's representative that he held an ownership interest in ACAP.

214. Defendants Abrahams and LaHaie violated their fiduciary duties to ExWorks by concealing ACAP from the ExWorks Board of Directors, its shareholder-advisor, and its Operating

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

Committee. Defendants Abrahams and LaHaie further committed fraud by concealing their activities on behalf of and in the interest of ACAP from the ExWorks's Chief Compliance Officer.

215.     At all times relevant to this complaint, ExWorks has maintained a Regulatory Compliance Manual (the "Manual") that directly addresses outside business activities by employees, including defendants Abrahams and LaHaie.

216.     The Manual provides a blanket prohibition on outside business activities without consent. More specifically, the Manual has specific pre-clearance and disclosure policies regarding outside business activities. The Manual provides in pertinent part as follows:

- Supervised Persons are prohibited from engaging in outside business activities, serving on boards of directors, making investment decisions on behalf of non-Clients … without the prior written approval of the Compliance Officer.

- No Supervised Persons may utilize property of ExWorks, or utilize the services of ExWorks or its Employees, for his or her personal benefit or the benefit of another person or entity, without approval of the Compliance Officer. For this purpose, "property" means both tangible and intangible property, including funds, premises, equipment, supplies, information, business plans, business opportunities, confidential research, intellectual property, proprietary processes, and ideas for new research or services.

- A Supervised Person may not participate in any business opportunity that comes to his or her attention as a result of his or her association with ExWorks and in which he or she knows that ExWorks might be expected to participate or have an interest, without:

  o Disclosing in writing all necessary facts to the Compliance Officer;

  o Offering the particular opportunity to ExWorks; and

  o Obtaining written authorization to participate from the Compliance Officer.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

217.    The Manual provides that any violations warrant sanctions up to and including the suspension of employment, a referral to the SEC, a criminal referral, termination of employment for cause, and/or a combination of the foregoing.

218.    On January 24, 2020, ExWorks hosted its annual internal compliance training meeting, which defendants Abrahams and LaHaie attended. During the meeting, employees' compliance obligations regarding outside business activities were among the topics addressed during the meeting, and employees were reminded that Supervised Persons were prohibited from engaging in outside business activities without the approval of Compliance.

219.    In January 2020, defendants Abrahams and LaHaie attested in writing that they received and reviewed the Manual.  They also completed a required questionnaire, which asked: "Have you complied with ExWorks' requirements regarding the disclosure and approval of outside business activities?" Both defendants Abrahams and LaHaie falsely responded "Yes" to the question. As both defendants knew at the time, they were intentionally concealing and failing to disclose their outside business activities associated with the formation and use of ACAP to divert opportunities from ExWorks to themselves.

220.    Additionally, on February 28, 2020, in response to a request for information regarding any "side investments or entities that you [Abrahams] may have an interest in" from the ExWorks Chief Compliance Officer, defendant Abrahams only disclosed his interest in Kenilworth Property Holdings, LLC, and his son's trust, which had ownership interests in ExWorks as the "only related entities." Abrahams also disclosed his ownership interest in Big Palm, LLC, a purported music production business, stating, "nothing else active." Defendant Abrahams intentionally concealed from the ExWorks Chief Compliance Officer his outside business activities associated with the formation and use of ACAP to divert opportunities from ExWorks and to himself.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

221.     Indeed, the same day that defendant Abrahams made these materially false representations to the ExWorks Chief Compliance Officer, defendant Abrahams was discussing with defendant LaHaie and others funding models for ACAP, as well as marketing materials for ACAP. In fact, the same day that defendant Abrahams made his false certification to the ExWorks Chief Compliance Officer about ACAP, defendants Abrahams and LaHaie engaged in discussions with a third party regarding a proposed ACAP fund brochure, which described ACAP as a "new entity formed in 2020 … to fund industry agnostic senior secured credit facilities, collateralized by operating company assets such as accounts receivable, inventories, machinery and equipment and intellectual property."

222.     On June 22, 2020, the ExWorks Chief Compliance Officer questioned defendant Abrahams about ACAP after observing defendant Abrahams's use of an ACAP email address during routine surveillance. Defendant Abrahams falsely stated to the Chief Compliance Officer that ACAP was in the process of being set up to provide special servicing to PPP loans in lieu of RedRidge providing such services in the future, but it was not yet fully operational. ExWorks's Chief Compliance Officer informed defendant Abrahams of ExWorks's policies regarding outside business activities, and Abrahams responded that a disclosure would be forthcoming.

223.     On July 9, 2020, the Chief Compliance Officer asked defendant Abrahams to disclose any new outside business activities. Defendant Abrahams responded via email communication, "I have previously disclosed the new LLC that is RedRidge related, to do niche market loan servicing, per our last call[.]" Defendant Abrahams intentionally failed to seek pre-approval from the Chief Compliance Officer as required to engage in this business, and defendant Abrahams also intentionally failed to provide accurate information regarding the true nature and extent of ACAP's business to the ExWorks Chief Compliance Officer, which went well beyond "niche" market loan servicing as defendant Abrahams knew.

55

## IX. Defendant Abrahams Improperly Converted an ExWorks Loan Made to Him For His Own Personal Use and Benefit.

224. On or about April 15, 2019, ExWorks agreed to make a loan in the amount of $785,000 to defendant Abrahams, and on or about April 16, 2019, funds in the amount of $785,000 were transferred by ExWorks to Abrahams for the loan.

225. Defendant Abrahams had an obligation to repay the loan per the terms of his contract with ExWorks Capital. Defendant Abrahams had this obligation, and the funds were not otherwise authorized to be convertible into a bonus or made in lieu of compensation to defendant Abrahams.

226. On or about April 15, 2019, the ExWorks Board of Directors explicitly stated to defendant Abrahams via email communication: "[W]e are fine with your borrowing $785,000 today from ExWorks Capital. However, we are not agreeing to an additional $785,000 bonus for your 2018 compensation. While we will certainly take into consideration the outcome of the [creditors'] situation, any additional bonus will be determined by us in our sole discretion."

227. This statement from the ExWorks Board of Directors came in response to an email communication from defendant Abrahams discussing options whereby the loan could be considered compensation if certain performance goals are met; however, defendant Abrahams ended his email communication by stating, "[t]he [loan] amount is now considered a loan to me."

228. At all times, the $785,000 rightfully belonged to ExWorks Capital and was only intended to be a temporary loan to defendant Abrahams, with full expectation by all parties that the loan amount would be repaid in full to ExWorks Capital.

229. After Defendant Abrahams received the email response identified above from the ExWorks Board of Directors, Abrahams forwarded it to the Chief Financial Officer of ExWorks.

230. ExWorks issued the $785,000 loan to defendant Abrahams and carried the loan on its accounting books and records as a note receivable.

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

231.     Defendant Abrahams failed to repay the $785,000 loan prior to the termination of his employment in August 2020, breaching his contract with Plaintiffs Exworks Capital, and defendant Abrahams has failed to repay the $785,000 to this date even after demands for repayment have been made.

## COUNT I: BREACH OF FIDUCIARY DUTIES
### (Defendants Abrahams and LaHaie)

232.     Paragraphs 1 through 231 are incorporated by reference.

233.     At all times relevant to this litigation, defendant Abrahams, as CEO and member of the Board of Directors for Plaintiffs ExWorks and World Trade Finance, and defendant LaHaie, as Managing Director of Plaintiffs ExWorks and World Trade Finance, owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs.

234.     Defendants Abrahams and LaHaie knowingly, recklessly, and in bad faith violated their fiduciary duties of candor, care, loyalty, and good faith owed to Plaintiffs. Defendants Abrahams and LaHaie put their personal interests ahead of the interests of Plaintiffs, their employers.

235.     Defendants Abrahams and LaHaie stole money from ExWorks and World Trade Finance, seized for themselves business opportunities that rightfully belonged to Plaintiffs, actively concealed and intentionally misrepresented matters to the ExWorks Board of Directors and its Operating Committee, and abused assets and resources of ExWorks and World Trade Finance for their own benefit.

236.     As a result of the breach of the fiduciary duties by defendants Abrahams and LaHaie, Plaintiffs have been injured, face continued irreparable injury, and have no adequate remedy at law. Plaintiffs are threatened with losing an opportunity to partner with banks to perform PPP loan servicing work, the opportunity to acquire The Loan Source, and the work performed by defendant

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

ACAP; all of which rightfully belong to Plaintiffs but were stolen by defendants Abrahams and

LaHaie. Plaintiffs' inability to pursue the rights to these business opportunities makes it difficult to

determine the financial damages owed. The benefits of granting injunctive and equitable relief far

outweigh any possible injury to Defendants.

237.     Defendants Abrahams and LaHaie willfully and intentionally breached their fiduciary

duties to Plaintiffs.

## COUNT II: CONSTRUCTIVE FRAUD
### (Defendants Abrahams, LaHaie, and ACAP)

238.     Paragraphs 1 through 231 are incorporated by reference.

239.     At all times relevant to this litigation, defendant Abrahams, as CEO and member of

the Board of Directors for Plaintiffs ExWorks and World Trade Finance, and defendant LaHaie, as

Managing Director of Plaintiffs ExWorks and World Trade Finance, owed fiduciary duties of

candor, care, good faith, and loyalty to Plaintiffs. Defendant ACAP was formed by defendants

Abrahams and LaHaie while they were employed by Plaintiffs, and defendant ACAP was operated

and used by defendants Abrahams and LaHaie as their alter ego while employed by Plaintiffs.

240.     Defendants Abrahams and LaHaie personally, and through their alter ego defendant

ACAP, knowingly, recklessly, and in bad faith violated their fiduciary duties of candor, care, loyalty,

and good faith owed to Plaintiffs. Defendants Abrahams and LaHaie put their personal interests

ahead of the interests of Plaintiffs.

241.     Defendants Abrahams and LaHaie personally, and through their alter ego defendant

ACAP, engaged in conduct that was calculated to deceive ExWorks and World Trade Finance,

including acts, omissions, and concealments by defendants Abrahams and LaHaie in breach of their

legal and equitable duties, as well as the trust and confidence placed in them by Plaintiffs.

242.     As a result of the constructive fraud committed by defendants Abrahams and LaHaie, and their alter ego defendant ACAP, Plaintiffs suffered damages and irreparable harm.

243.     The acts, omissions, and concealments by defendants Abrahams and LaHaie, and their alter ego defendant ACAP, were willful and intentional.

### COUNT III: EMBEZZLEMENT
**(Defendants Abrahams and LaHaie)**

244.     Paragraphs 1 through 231 are incorporated by reference.

245.     Defendants Abrahams and LaHaie owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs by virtue of defendant Abrahams's role as Chief Executive Officer and member of the Board of Directors of Plaintiffs ExWorks and World Trade Finance, and defendant Luke LaHaie as Managing Director of Plaintiffs ExWorks and World Trade Finance, respectively.

246.     Plaintiffs had an absolute and unconditional right to the immediate possession of the fees generated from the PPP loan application processing work performed under contracts with Franklin Synergy Bank, The Northern Trust, and Northeast Bank.

247.     With the intent to embezzle, defendants Abrahams and LaHaie embezzled the funds due to World Trade Finance for the use of defendants Abrahams, LaHaie, and RedRidge.

248.     Plaintiffs did not consent in any manner to defendants Abrahams and LaHaie taking the funds at issue for their own personal use.

249.     Defendants Abrahams and LaHaie have not returned the funds to Plaintiffs, and defendants Abrahams and LaHaie continue to maintain control, dominion, and ownership over the funds.

250.     The embezzlement of funds by defendants Abrahams and LaHaie was willful and intentional.

FILED DATE: 10/29/2020 2:52 PM    2020CH06538

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

## COUNT IV: EMBEZZLEMENT
### (Defendant Abrahams and RedRidge)

251. Paragraphs 1 through 231 are incorporated by reference.

252. Defendant Abrahams owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiff ExWorks by virtue of defendant's roles as Chief Executive Officer. Also during this same relevant time period, defendant RedRidge had an arrangement with Plaintiff ExWorks to provide due diligence services in good faith and with honesty and fair dealing.

253. Plaintiff ExWorks had an absolute and unconditional right to the immediate possession of its money properly earned.

254. With the intent to embezzle, defendants Abrahams and RedRidge converted Plaintiff ExWorks's funds to defendant RedRidge often under the guise of "prepaid" due diligence fees.

255. Plaintiff ExWorks did not consent in any manner to defendants Abrahams and RedRidge taking the funds at issue for their own use.

256. Defendants Abrahams and RedRidge have not returned Plaintiff's funds, and defendants Abrahams and RedRidge continue to maintain control, dominion, and ownership over the funds.

257. The embezzlement of funds by defendants Abrahams and RedRidge was willful and intentional.

## COUNT V: CONVERSION
### (Defendants Abrahams, LaHaie, and RedRidge)

258. Paragraphs 1 through 231 are incorporated by reference.

259. At all times relevant to this litigation, Plaintiffs had an absolute and unconditional right to the immediate possession of the fees generated from the PPP loan application processing work performed under contracts with Franklin Synergy Bank, The Northern Trust, and Northeast Bank.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

260.     Defendants Abrahams, LaHaie, and RedRidge intentionally and substantially interfered with those funds by taking the funds and misappropriating the funds for their own personal use and enjoyment.

261.     Plaintiffs did not consent in any manner to defendants Abrahams, LaHaie, and RedRidge taking the funds at issue for their own personal use.

262.     Defendants Abrahams, LaHaie, and RedRidge have not returned the funds to Plaintiffs, and defendants Abrahams, LaHaie, and RedRidge continue to maintain control, dominion, and ownership over the funds.

263.     Plaintiffs made demands to defendants Abrahams, LaHaie, and RedRidge for the return of those funds to no avail. Furthermore, demand would be futile and no demand is necessary because defendants Abrahams, LaHaie, and RedRidge engaged in direct conversion of the funds at issue.

264.     The misappropriation of the funds by defendants Abrahams, LaHaie, and RedRidge was willful and intentional.

### COUNT VI: CONVERSION
**(Defendants Abrahams)**

265.     Paragraphs 1 through 231 are incorporated by reference.

266.     At all times relevant to this litigation, Plaintiff ExWorks had an absolute and unconditional right to receive repayment from defendant Abrahams for the $785,000 loan issued to him in April 2019.

267.     Defendant Abrahams intentionally and substantially interfered with Plaintiff ExWorks's receipt of those funds by taking the funds and misappropriating the funds for his own personal use and enjoyment.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

268.     Plaintiff ExWorks did not consent in any manner to defendant Abrahams taking the funds at issue for his own unauthorized personal use.

269.     Defendant Abrahams has not returned the funds to Plaintiff ExWorks, and defendant Abrahams continues to maintain unauthorized use, control, dominion, and ownership over the funds.

270.     Plaintiff ExWorks made demands to defendant Abrahams for the return of those funds to no avail. Furthermore, demand would be futile and no demand is necessary because defendant Abrahams engaged in direct conversion of the funds.

271.     Defendant Abrahams's misappropriation of the funds was willful and intentional.

## COUNT VII: BREACH OF CONTRACT
### (Defendants Abrahams)

272.     Paragraphs 1 through 231 are incorporated by reference.

273.     At all times relevant to this litigation, defendant Abrahams was party to a valid and enforceable contract for a loan in the amount of $785,000 with Plaintiff ExWorks.

274.     Defendant Abrahams breached the contract by not repaying the $785,000 loan through his acts and omissions described above.

275.     As a direct result of defendant Abrahams's actions, plaintiff ExWorks suffered damages in the amount of $785,000.

## COUNT VIII: FRAUDULENT CONCEALMENT
### (Defendants Abrahams and LaHaie)

276.     Paragraphs 1 through 231 are incorporated by reference.

277.     Defendants Abrahams and LaHaie failed to disclose material facts about their actions, including: (a) their failures to disclose ACAP's existence and true purpose to ExWorks, including to the Board of Directors, the Operating Committee, and as required by the Chief Compliance Officer and Compliance Manual; (b) the full extent and nature of the PPP loan

application processing work conducted by World Trade Finance and RedRidge for The Northern Trust, Franklin Synergy Bank, and Northeast Bank; (c) the fee-sharing arrangement between World Trade Finance and RedRidge for PPP loan application processing; (d) the opportunity to acquire The Loan Source; and (e) the opportunity to engage in PPP loan servicing work with The Loan Source.

278.    Defendants Abrahams and LaHaie actively concealed these facts and made these omissions with knowledge of the false impression created thereby.

279.    Plaintiffs reasonably relied upon defendants Abrahams's and LaHaie's omissions, which were intended to induce and actually did induce Plaintiffs to entrust defendants Abrahams and LaHaie with company resources, financial benefits, and other benefits to the detriment of Plaintiffs.

280.    Defendants Abrahams's and LaHaie's fraudulent concealments caused Plaintiffs to suffer injuries and irreparable harm, for which they are entitled to damages and other legal and equitable relief.

281.    Defendants Abrahams's and LaHaie's violations were willful and intentional.

## COUNT IX: FRAUDULENT MISREPRESENTATION
### (Defendants Abrahams)

282.    Paragraphs 1 through 231 are incorporated by reference.

283.    Defendant Abrahams made multiple intentionally false statements and misrepresentations, including: (a) his false statement to the ExWorks Board of Directors and its Operating Committee in April 2020 that RedRidge would be processing PPP loan applications; (b) his false statement to a member of the ExWorks Operating Committee in July 2020 that he followed up with the representative for the ExWorks investor following the investor call involving the Operating Committee to make clear ACAP was distinct from ExWorks; and (c) his false and

misleading disclosures to ExWorks's Chief Compliance Officer relating to his outside business activities, including ACAP.

284. Defendant Abrahams made these statements with full knowledge of their falsehood.

285. Plaintiffs reasonably relied upon defendant Abrahams's statements, which were intended to induce and actually did induce Plaintiffs to entrust defendant Abrahams with company resources, financial benefits, and other benefits to the detriment of Plaintiffs.

286. Defendant Abrahams's fraudulent misrepresentations caused Plaintiffs to suffer injuries, for which they are entitled to damages and other legal and equitable relief.

287. Defendant Abrahams's violations were willful and intentional.

## COUNT X: FRAUDULENT MISREPRESENTATION
### (Defendants LaHaie)

288. Paragraphs 1 through 231 are incorporated by reference.

289. Defendant LaHaie made multiple intentionally false statements and misrepresentations, including his false disclosures to ExWorks's Chief Compliance Officer relating to his outside business activities, including the development of ACAP.

290. Defendant LaHaie made these statements with full knowledge of their falsehood.

291. Plaintiffs reasonably relied upon defendant LaHaie's statements, which were intended to induce and actually did induce Plaintiffs to entrust defendant LaHaie with company resources, financial benefits, and other benefits to the detriment of Plaintiffs.

292. Defendant LaHaie's fraudulent misrepresentations caused Plaintiffs to suffer injuries, for which they are entitled to damages and other legal and equitable relief.

293. Defendant LaHaie's violations were willful and intentional.

## COUNT XI: BREACH OF CONTRACT
### (Defendant Abrahams)

294. Paragraphs 1 through 231 are incorporated by reference.

295.     At all times relevant to this litigation, defendant Abrahams was party to a valid and enforceable contract, namely, the Operating Agreement, with Plaintiff ExWorks.

296.     At all relevant times, Section 3.4(b) of the Operating Agreement provided, "Notwithstanding Section 18-402 of the Act, except as expressly authorized in writing by the Board or this Agreement, no Member, nor any officer, employee or agent of any Member, as such, shall have the authority or power, directly or indirectly, to act as agent of the Company for any purpose, or to engage in any transaction, make any commitment, enter into any contract or incur any obligation (whether as principal, surety or agent) in the name of the Company, or in any other way to bind the Company or to hold itself out as acting for or on behalf of the Company."

297.     At all relevant times, Section 7.8 of the Operating Agreement provided, "Except as may be otherwise expressly provided in this Agreement, a Director may engage in other commercial activities; provided, however, that the majority vote of the Directors shall be required for a Director to use property belonging to the Company, including confidential or proprietary information or other matters entrusted to a Director as a result of the status of being a Director."

298.     At all relevant times, Section 7.11 of the Operating Agreement provided that the Chief Executive Officer **shall not** "acquire any assets, business, securities or properties of any other Person other than in the ordinary course of business," nor, "sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of the Company's assets, business or properties with a value in excess of $200,000 other than in the ordinary course of business."

299.     Defendant Abrahams breached the Operating Agreement, specifically Sections 3.4, 7.8, and 7.11, through his acts and omissions described above.

300.     As a direct result of defendant Abrahams's actions, plaintiff ExWorks suffered damages.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

## COUNT XII: TORTIOUS INTERFERENCE WITH CONTRACT
### (Defendants Abrahams, LaHaie, RedRidge, and ACAP)

301.    Paragraphs 1 through 231 are incorporated by reference.

302.    Plaintiff World Trade Finance has valid and enforceable agreements with three banks to perform PPP loan application processing and servicing.

303.    At all times relevant to the litigation, defendants Abrahams, LaHaie, RedRidge, and ACAP were aware of these agreements and contractual relationships.

304.    With that knowledge, defendants Abrahams, LaHaie, RedRidge, and ACAP misappropriated the funds owed under the contracts to plaintiff World Trade Finance and funneled the funds to defendants for their own personal use.

305.    In misappropriating the funds owed to plaintiff World Trade Finance, defendants Abrahams, LaHaie, RedRidge, and ACAP intentionally and unjustifiably interfered with World Trade Finance's contractual relationships with the three banks.

306.    The actions of defendants Abrahams, LaHaie, RedRidge, and ACAP caused a breach of the contracts by the banks.

307.    Defendants Abrahams, LaHaie, RedRidge, and ACAP interfered with World Trade Finance's contractual relationships in an attempt to gain a competitive advantage in the PPP loan application processing and servicing market, and with the malicious intent to cause harm to plaintiff World Trade Finance.

308.    As a direct and proximate result of the willful and intentional interference of defendants Abrahams, LaHaie, RedRidge, and ACAP with these contractual relationships, the three banks have breached their contracts with plaintiff World Trade Finance by failing to pay plaintiff World Trade Finance amounts due under their contracts.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

309.     As a direct result of the actions by defendants Abrahams, LaHaie, RedRidge, and ACAP, plaintiff World Trade Finance suffered damages.

310.     The interference by defendants Abrahams, LaHaie, RedRidge, and ACAP was willful and intentional.

### COUNT XIII: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Defendants Abrahams, LaHaie, RedRidge, and ACAP)

311.     Paragraphs 1 through 231 are incorporated by reference.

312.     Plaintiffs ExWorks and World Trade Finance sought to acquire an entity holding an SBLC license, through which Plaintiffs would have derived the potential business opportunity to increase its business and obtain substantial economic benefit.

313.     Plaintiffs had a reasonable expectation of entering in a valid business relationship with The Loan Source for its SBLC license.

314.     Defendants Abrahams, LaHaie, RedRidge, and ACAP were aware of this business opportunity, and they interfered with and are continuing to interfere with the business opportunity by, among other things, taking the business opportunity to acquire The Loan Source for themselves with the malicious and purposeful intent to injure Plaintiffs and to defeat Plaintiffs' reasonable business expectancy using wrongful means.

315.     Such interference has resulted in and continues to result in irreparable injury to Plaintiffs' goodwill, reputation, and business interests.

316.     Such interference has also resulted in harm in the form of lost profits for which Plaintiffs are entitled to compensation and other relief as deemed necessary.

317.     As a direct and proximate result of defendants' willful and intentional interference with this relationship, potential business and opportunities have been steered away from Plaintiffs.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

### COUNT XIV: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
**(Defendants Abrahams, LaHaie, and ACAP)**

318.    Paragraphs 1 through 231 are incorporated by reference.

319.    Because of its superior loan servicing reputation, plaintiffs ExWorks and World Trade Finance have developed business relationships with Franklin Synergy Bank and Northeast Bank, through which plaintiffs have derived or has the potential to derive substantial economic benefit.

320.    Plaintiffs had a reasonable expectation of entering in a valid business relationship with the banks for further PPP loan work, including further loan application processing and servicing.

321.    Defendants Abrahams, LaHaie, and ACAP were aware of these relationships and have interfered with and are continuing to interfere with the relationships, with the malicious and purposeful intent to injure Plaintiffs and defeat Plaintiffs' reasonable business expectancy using wrongful means.

322.    Such interference has resulted in and continues to result in irreparable injury to Plaintiffs' goodwill, reputation, and business interests.

323.    Such interference has also resulted in harm in the form of lost profits for which Plaintiffs are entitled to compensation and other relief as deemed necessary.

324.    As a direct and proximate result of the willful and intentional interference with these relationships by defendants Abrahams, LaHaie, and ACAP, current and potential customers have been steered away from Plaintiffs.

### COUNT XV: CIVIL CONSPIRACY
**(All Defendants)**

325.    Paragraphs 1 through 231 are incorporated by reference.

68

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

326.     On information and belief, beginning as early as August 3, 2019, all named defendants did knowingly and willfully conspire and agree among themselves to: (a) conceal their plan for the development of a new entity, which became ACAP; (b) fraudulently divert opportunities owed to Plaintiff for ACAP and its new ill-gotten partnership with The Loan Source; (c) entice Plaintiffs to believe defendants Abrahams and LaHaie would continue to work diligently and effectively as fiduciaries for ExWorks, while unbeknownst to Plaintiffs, all named defendants conspired and agreed to develop ACAP, partner with The Loan Source, and poach employees from ExWorks to come work for ACAP; and (d) convert monies owed to Plaintiffs ExWorks and World Trade Finance from the banks for all named defendants' own use and benefit, including to provide capital to ACAP, as set forth herein.

327.     In furtherance of this conspiracy and agreement, all named defendants engaged in fraudulent misrepresentations, omissions, and concealment of facts, as described herein, all in a calculated attempt to obtain Plaintiffs' funds owed from the banks for the benefit of all named defendants.  Such overt acts were committed in furtherance of the conspiracy and agreement, and with the knowledge that such fraudulent misrepresentations and omissions were necessary to steal the funds owed to Plaintiffs for the benefit of all named defendants.

328.     All named defendants were willing and intentional participants in the joint activity.

329.     These actions by defendants as set forth herein were in violation of the rights of Plaintiffs and committed in furtherance of the conspiracy and agreement.

330.     As a direct and proximate result of the conspiracy and agreement to steal from and defraud Plaintiffs, Plaintiffs have suffered significant damage.

331.     All named defendants' conduct was undertaken with malicious and willful intent.

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

## COUNT XVI: UNJUST ENRICHMENT
### (All Defendants)

332.     Paragraphs 1 through 231 are incorporated by reference.

333.     All named defendants unjustly retained benefits owed to the Plaintiffs to the detriment of Plaintiffs.

334.     All named defendants' retention of the benefits violates the fundamental principles of justice, equity, and good conscience.

335.     In reliance on the bad faith and intentionally wrongful actions taken by all named defendants, all named defendants received financial benefits owed to Plaintiffs.

336.     All named defendants appreciate and have knowledge of the benefits conferred directly upon them by Plaintiffs, including through SBA fees paid by third parties for PPP loan servicing, the business opportunities rightfully due to ExWorks and World Trade Finance, and $785,000 provided by ExWorks.

337.     Under principles of justice, equity, and good conscience, all named defendants should not be permitted to retain the money belonging to Plaintiffs. The financial benefits derived by all named defendants rightfully belong to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court:

338.     Enter an order enjoining defendants ACAP, Abrahams, and LaHaie from acquiring The Loan Source and directing defendants ACAP, Abrahams, and LaHaie to deposit any and all profits as a result of defendant ACAP's partnership with The Loan Source into a special escrow account;

339. Enter an order enjoining defendants ACAP, Abrahams, and LaHaie from engaging in business that is competitive with ExWorks and World Trade Finance, including but not limited to the servicing of PPP loans;

340. Award judgment in Plaintiffs' favor and against defendants Abrahams, LaHaie, RedRidge, ACAP, and The Loan Source as appropriate on Counts One through Fifteen of this Complaint;

341. Award damages in favor of Plaintiffs against defendants sufficient to compensate Plaintiffs for the economic and non-economic damages sustained by Plaintiffs as a result of defendants' actions as alleged herein, including but not limited to defendants' ill-gotten profits from the bank loan fees and purchase of The Loan Source and/or defendants' lost profits;

342. Require defendants to submit to the Court an equitable accounting of the use and disposition of all moneys, assets, and corporate resources of Plaintiffs as described more specifically above;

343. Impose a constructive trust over all moneys, assets, and corporate resources under the control of defendants and equitably belonging to Plaintiffs as described more specifically above;

344. Award punitive damages against defendants;

345. Award attorney's fees and costs to Plaintiffs; and

346. Award such other relief the Court considers appropriate.

## JURY TRIAL DEMAND

347. Plaintiffs hereby demand a jury trial on all issues so triable.

/s/ Zachary T. Fardon
Zachary T. Fardon

KING & SPALDING LLP
Zachary T. Fardon
Patrick M. Otlewski
353 N. Clark Street, 12th Floor
Chicago, IL 60654

FILED DATE: 10/29/2020 2:52 PM   2020CH06538

Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  October 29, 2020

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
         Cook County, IL

FILED
11/4/2020 12:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11007258

FILED DATE: 11/4/2020 12:00 AM  2020CH06538

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| ExWorks Capital, LLC and World Trade Finance, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC, Redridge Lender Services, LLC, ACAP SME, LLC, and ACAP Fund GP, LLC, | ) ) ) ) ) ) ) | No. 2020-CH-06538 |
| Defendants. | ) ) ) | |

## <u>NOTICE OF APPEARANCE OF KATTEN MUCHIN ROSENMAN LLP</u>

PLEASE TAKE NOTICE THAT Katten Muchin Rosenman, LLP, hereby appears on behalf of

Defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender

Services, LLC.

FILED DATE: 11/4/2020 12:00 AM   2020CH06538

Dated:  November 3, 2020

Respectfully submitted,

By: /s/  Michael J. Diver
*One of the Attorneys for Randolph Abrahams,*
*RedRidge Finance Group, LLC, and RedRidge*
*Lender Services, LLC*

Michael J. Diver
Sarah K. Weber
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200
Firm I.D. 41832

FILED DATE: 11/4/2020 12:00 AM   2020CH06538

FILED
11/4/2020 12:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11007258

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| ExWorks Capital, LLC and World Trade Finance, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | |
| Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC, Redridge Lender Services, LLC, ACAP SME, LLC, and ACAP Fund GP, LLC, | ) ) ) ) ) ) ) ) | No. 2020-CH-06538 |
| Defendants. | ) ) ) | |

## <u>NOTICE OF FILING</u>

**PLEASE TAKE NOTICE** that on November 3, 2020, the undersigned filed a Notice of Appearance of Katten Muchin Rosenman, LLP, in the above-captioned case, a true copy of which is attached hereto and hereby served upon you.

FILED DATE: 11/4/2020 12:00 AM   2020CH06538

Dated:  November 3, 2020

Respectfully submitted,

By: /s/  Michael J. Diver

*One of the Attorneys for RedRidge Finance*
*Group, LLC and RedRidge Lender Services, LLC*

Michael J. Diver
Sarah Weber
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

FILED DATE: 11/4/2020 12:00 AM   2020CH06538

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ExWorks Capital, LLC and<br>World Trade Finance, LLC, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)<br>)<br>) |
| Randolph Abrahams,<br>Luke LaHaie,<br>RedRidge Finance Group, LLC,<br>Redridge Lender Services, LLC,<br>ACAP SME, LLC, and<br>ACAP Fund GP, LLC, | )<br>)<br>)<br>)   No. 2020-CH-06538<br>)<br>)<br>) |
| Defendants. | )<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I, Michael J. Diver, the undersigned attorney, hereby certify that on this 3rd day of November, 2020, a copy of the **NOTICE OF APPEARANCE OF KATTEN MUCHIN ROSENMAN, LLP**, was served upon the following individuals, via electronic mail transmission:

Zachary T. Fardon
Patrick M. Otlewski
King & Spalding LLP
335 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Michael Tein
Tein Malone PLLC
3480 Main Highway
Coconut Grove
305.442.0954

*One of the Attorneys*
*for Mr. LaHaie, ACAP*
*SME, LLC, and ACAP*
*Fund GP, LLC*

FILED DATE: 11/4/2020 12:00 AM   2020CH06538

Dated:  November 3, 2020

Respectfully submitted,

By: /s/  Michael J. Diver

*One of the Attorneys for RedRidge Finance Group, LLC and RedRidge Lender Services, LLC*

Michael J. Diver
Sarah K. Weber
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
11/4/2020 12:50 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11021301

FILED DATE: 11/4/2020 12:50 PM   2020CH06538

Notice and Acknowledgment of
Receipt of Summons and Complaint          (10/12/18) CCG 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ExWorks Capital, LLC and World Trade
Finance, LLC                Plaintiff(s)

vs.

Randolph Abrahams, Luke LaHaie, RedRidge
Finance Group, LLC, RedRidge Lender Services,
LLC, ACAP SME, LLC, and ACAP Fund GP, LLC      Defendant(s)

Case No.   2020CH06538

Defendant(s)
Amount Claimed:   $ _____

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: Luke LaHaie         Address: 505 N. McClurg Ct. Apt. 402
        (Name)

City: Chicago       State: IL   Zip: 60611

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____30_____ * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____30_____ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____60_____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____10/30/20_____ .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 2

**Notice and Acknowledgment of**
**Receipt of Summons and Complaint**                    **(10/12/18) CCG 0063 B**

FILED DATE: 11/4/2020 12:50 PM   2020CH06538

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/ gethelp.asp.**

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: Michael R. Tein

Address: 3480 Main Highway

City: Coconut Grove            State: FL     Zip: 33133

Email: tein@teinmalone.com

Relationship to Entity/Authority to Receive Service of Process: Attorney for Defendant
(Not applicable if your are the named Defendant or Respondent.)

Dated: 11/03/2020

_____
Signature

\*    (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\*   (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
11/4/2020 12:48 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11021247

FILED DATE: 11/4/2020 12:48 PM   2020CH06538

Notice and Acknowledgment of
Receipt of Summons and Complaint
    (10/12/18) CCG 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ExWorks Capital, LLC and World Trade
Finance, LLC
    Plaintiff(s)

vs.

Randolph Abrahams, Luke LaHaie, RedRidge
Finance Group, LLC, RedRidge Lender Services,
LLC, ACAP SME, LLC, and ACAP Fund GP, LLC
    Defendant(s)

Case No.   2020CH06538

Defendant(s)
Amount Claimed:   $ _____

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: ACAP SME, LLC
    (Name)
Address: 333 W. Wacker Drive, 16th floor

City: Chicago    State: IL    Zip: 60606

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____ 30 * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____ 30 _ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____ 60 ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____ 10/30/20 .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 2

Notice and Acknowledgment of
Receipt of Summons and Complaint                    **(10/12/18) CCG 0063 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-filing, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.**

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: Michael R. Tein

Address: 3480 Main Highway

City: Coconut Grove                  State: FL      Zip: 33133

Email: tein@teinmalone.com

Relationship to Entity/Authority to Receive Service of Process: Attorney for Defendant
(Not applicable if your are the named Defendant or Respondent.)

Dated: 11/03/2020

_____
Signature

---

\*      (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\*    (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

FILED DATE: 11/4/2020 12:48 PM   2020CH06538

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
11/4/2020 12:32 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11020015

FILED DATE: 11/4/2020 12:32 PM   2020CH06538

**Notice and Acknowledgment of
Receipt of Summons and Complaint**        **(10/12/18) CCG 0063 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ExWorks Capital, LLC and World Trade
Finance, LLC        Plaintiff(s)

vs.

Randolph Abrahams, Luke LaHaie, RedRidge
Finance Group, LLC, RedRidge Lender Services,
LLC, ACAP SME, LLC, and ACAP Fund GP, LLC    Defendant(s)

Case No.    2020CH06538

Defendant(s)
Amount Claimed:   $ _____

### NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: ACAP Fund GP, LLC      Address: 333 W. Wacker Drive, 16th floor
        (Name)

City: Chicago       State: IL   Zip: 60606

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____30_____ * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____30_____ _ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____60_____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on ___10/30/20___ .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 2

Notice and Acknowledgment of
Receipt of Summons and Complaint                    **(10/12/18) CCG 0063 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/ gethelp.asp.**

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: Michael R. Tein

Address: 3480 Main Highway

City: Coconut Grove                    State: FL    Zip: 33133

Email: tein@teinmalone.com

Relationship to Entity/Authority to Receive Service of Process: Attorney for Defendant
(Not applicable if your are the named Defendant or Respondent.)

Dated: 11/03/2020

Signature

*   (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

**   (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 11/4/2020 12:32 PM   2020CH06538

FILED
11/5/2020 2:53 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11040778

FILED DATE: 11/5/2020 2:53 PM   2020CH06538

Notice and Acknowledgment of
Receipt of Summons and Complaint                    (10/12/18) CCG 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | |
|---|---|
| ExWorks Capital, LLC and World Trade Finance, LLC                     Plaintiff(s) | Case No.    2020CH06538 |
| vs. | |
| Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC, RedRidge Lender Services, LLC, ACAP SME, LLC, and ACAP Fund GP, LLC    Defendant(s) | Defendant(s) Amount Claimed:    $ _____ |

### NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: RedRidge Lender Services, LLC                 Address: 333 W. Wacker Drive, 16th floor
            (Name)

City: Chicago                          State: IL    Zip: 60606

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____30_____ * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____30_____ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____60_____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____10/30/20_____ .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Notice and Acknowledgment of**
**Receipt of Summons and Complaint**                    **(10/12/18) CCG 0063 B**

FILED DATE: 11/5/2020 2:53 PM   2020CH06538

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/ gethelp.asp.**

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name:  Michael J. Diver

Address:  525 West Monroe Street

City:  Chicago            State:  IL       Zip:  60605

Email:  michael.diver@katten.com

Relationship to Entity/Authority to Receive Service of Process:  Counsel for RedRidge Lender Services, LLC
(Not applicable if your are the named Defendant or Respondent.)

Dated:  11/3/2020

/s/ Michael J. Diver

Signature

\*   (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\*  (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
　　　Cook County, IL

FILED
11/5/2020 2:48 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11040630

FILED DATE: 11/5/2020 2:48 PM   2020CH06538

Notice and Acknowledgment of
Receipt of Summons and Complaint                    (10/12/18) CCG 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ExWorks Capital, LLC and World Trade

Finance, LLC                              Plaintiff(s)       Case No.    2020CH06538

vs.

Randolph Abrahams, Luke LaHaie, RedRidge       Defendant(s)       Defendant(s)

Finance Group, LLC, RedRidge Lender Services,       Amount Claimed:   $ _____
LLC, ACAP SME, LLC, and ACAP Fund GP, LLC

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To:  RedRidge Finance Group, LLC          Address:  333 W. Wacker Drive, 16th floor
　　　　　　　　(Name)

City:  Chicago                    State:  IL    Zip:  60606

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____30_____ * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____30_____ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____60_____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____10/30/20_____ .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Notice and Acknowledgment of**
**Receipt of Summons and Complaint** **(10/12/18) CCG 0063 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: Michael J. Diver

Address: 525 West Monroe Street

City: Chicago State: IL Zip: 60605

Email: michael.diver@katten.com

Relationship to Entity/Authority to Receive Service of Process: Counsel for RedRidge Finance Group, LLC
(Not applicable if your are the named Defendant or Respondent.)

Dated: 11/3/2020

/s/ Michael J. Diver

Signature

\* (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\* (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 11/5/2020 2:48 PM 2020CH06538

FILED
11/5/2020 2:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11040544

FILED DATE: 11/5/2020 2:46 PM   2020CH06538

**Notice and Acknowledgment of
Receipt of Summons and Complaint** **(10/12/18) CCG 0063 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | |
|---|---|
| ExWorks Capital, LLC and World Trade Finance, LLC <br> Plaintiff(s) | Case No. __2020CH06538__ |
| vs. | Defendant(s) |
| Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC, RedRidge Lender Services, LLC, ACAP SME, LLC, and ACAP Fund GP, LLC <br> Defendant(s) | Amount Claimed: $ _____ |

### NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: __Randolph Abrahams__   Address: __445 Sheridan Road__
(Name)

City: __Winnetka__   State: __IL__   Zip: __60093__

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____30_____ * days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____30_____ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____60_____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____10/30/20_____ .

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 2

Notice and Acknowledgment of
Receipt of Summons and Complaint                    (10/12/18) CCG 0063 B

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile. illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/ gethelp.asp.**

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: Michael J. Diver

Address: 525 West Monroe Street

City: Chicago                    State: IL          Zip: 60605

Email: michael.diver@katten.com

Relationship to Entity/Authority to Receive Service of Process: Counsel for Randolph Abrahams
(Not applicable if your are the named Defendant or Respondent.)

Dated: 11/3/2020

/s/ Michael J. Diver

Signature

\*    (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\*   (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 11/5/2020 2:46 PM   2020CH06538

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED
11/6/2020 4:57 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059768

FILED DATE: 11/6/2020 4:57 PM   2020CH06538

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

ExWorks Capital, LLC, and      :
World Trade Finance, LLC,      :
     :
     Plaintiffs,      :
     :     Case No. 2020 CH 06538
     v.      :
     :
Randolph Abrahams,      :
Luke LaHaie,      :
RedRidge Finance Group, LLC,      :
RedRidge Lender Services, LLC,      :
ACAP SME, LLC, and      :
ACAP Fund GP, LLC,      :
     :
     Defendants.      :

## **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 735 ILCS 5/11-102 et seq., Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC, respectfully request that this Court enter a preliminary injunction (a) enjoining defendants from acquiring The Loan Source, Inc., (b) enjoining defendants from engaging in PPP loan servicing work for and through The Loan Source during the pendency of this litigation other than as specifically approved by the Court or court-appointed receiver, and (c) appointing a receiver to administer all past and future funds collected by defendants for PPP loan servicing during the pendency of this litigation.

In support of this Motion, Plaintiffs provide as follows:

1.      Plaintiffs' Complaint requests that this Court award judgment in Plaintiffs' favor as a result of the Defendants' numerous misdeeds, which include egregious breaches of fiduciary duties by defendants Abrahams and LaHaie while officers of Plaintiffs, their use of an alter ego, defendant ACAP, to usurp and steal opportunities from Plaintiffs, as well as defendants' use of confidential and proprietary business information of Plaintiffs to make defendant ACAP operational, and to do business with The Loan Source.

FILED DATE: 11/6/2020 4:57 PM   2020CH06538

2.      Plaintiffs had a right to the good faith and loyalty of defendants Abrahams and

LaHaie while each were employed by Plaintiffs in positions of trust, discretion, and responsibility.

Defendants Abrahams and LaHaie breached those fiduciary duties repeatedly and intentionally to

harm Plaintiffs, and help defendants' nascent business, ACAP, compete against Plaintiffs.

3.      Plaintiffs had a right to be presented with corporate opportunities by defendants

Abrahams and LaHaie. These defendants knew their fiduciary obligations and intentionally failed to

perform them as required by law. Defendants engaged in intentional acts of concealment to keep

hidden what they were doing until both had left Plaintiffs' employment.

4.      Without equitable and injunctive relief, Plaintiffs will suffer irreparable harm for

which there is no adequate remedy at law. Injunctive and equitable relief is necessary to preserve the

status quo until a trial on the merits.

5.      Plaintiffs are likely to succeed on the merits of each of their claims.

6.      Defendants forfeited their rights to a balance of hardships by their malicious and

wrongful acts. Regardless, the public interest and balance of equities weigh heavily in favor of

injunctive relief.

For these reasons, detailed more fully in Plaintiffs' Memorandum of Law in Support of this

Motion for Preliminary Injunction, and any further evidence and argument as Plaintiffs may present

in support of this Motion, Plaintiffs respectfully request that this Court grant the following relief:

(a) Enjoin defendants from acquiring The Loan Source, Inc.;

(b) Enjoin defendants from engaging in PPP loan servicing work for and through The Loan

Source during the pendency of this litigation other than as specifically approved by the Court or

court-appointed receiver;

(c) Appoint a receiver to administer all past and future funds collected by defendants for

PPP loan servicing during the pendency of this litigation; and

FILED DATE: 11/6/2020 4:57 PM   2020CH06538

(d) Any and all other relief that this Court deems just.

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  November 6, 2020

FILED DATE: 11/6/2020 4:57 PM    2020CH06538

## CERTIFICATE OF SERVICE

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Plaintiffs' Motion for a Preliminary Injunction, through the Court's electronic filing system and/or as otherwise indicated below to:

Michael J. Diver (michael.diver@katten.com)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60605
*Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

Michael R. Tein (tein@teinmalone.com)
Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
*Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

FILED
11/6/2020 5:06 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059865

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC, and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 2020 CH 06538 |
| | : | |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Respectfully Submitted,

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  November 6, 2020

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

## INTRODUCTION

Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC seek injunctive and equitable relief, pursuant to 735 ILCS 5/11-102 *et seq.*, to prevent irreparable harm from being perpetrated by defendants Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC and its subsidiary RedRidge Lender Services, LLC (collectively, "RedRidge"), ACAP SME, LLC, and ACAP Fund GP, LLC (collectively, "ACAP", all collectively, "Defendants").

Earlier this year, defendants Abrahams and LaHaie—while still employed by Plaintiffs and thus in breach of their fiduciary duties to Plaintiffs—set up a rival business. That business is defendant ACAP, the alter ego of defendants Abrahams and LaHaie. Defendants Abrahams and LaHaie—all while employed by Plaintiffs—made ACAP operational using Plaintiffs' confidential business model and information, as well as Plaintiffs' assets, personnel, technology, and resources.

Defendants Abrahams and LaHaie then stole from Plaintiffs the opportunity to acquire The Loan Source, Inc. This acquisition was a business opportunity within the scope of Plaintiffs' activities and of value to Plaintiffs. Rather than present The Loan Source opportunity to Plaintiffs, defendants Abrahams and LaHaie secretly arranged for defendant ACAP to acquire The Loan Source. As fiduciaries and agents of Plaintiffs, defendants Abrahams and LaHaie were bound to act solely for Plaintiffs in all matters related to their employment. The two intentionally disregarded and breached their obligations for their own benefit.

On information and belief, defendants ACAP, Abrahams, and LaHaie have not yet completed their acquisition of The Loan Source. While the acquisition is not yet complete, defendants Abrahams, LaHaie, and ACAP began doing business with The Loan Source while defendants Abrahams and LaHaie were employed by Plaintiffs. During that time, defendants Abrahams and LaHaie had defendant ACAP contract with The Loan Source to do loan servicing for Paycheck Protection Program ("PPP"), including loans that The Loan Source acquired with

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

defendants' help. Defendants Abrahams and LaHaie used Plaintiffs' PPP business, technology, assets, and relationships to aide in developing defendant ACAP, and its PPP loan work with The Loan Source, to the detriment of Plaintiffs.

From when they were employed by Plaintiffs to now, defendants Abrahams, LaHaie, and ACAP with The Loan Source have purchased more than **$3.4 billion** worth of PPP loans. That PPP loan purchase activity was initiated while defendants Abrahams and LaHaie were Plaintiffs' officers and held fiduciary duties to Plaintiffs.

Plaintiffs respectfully request that the Court provide preliminary injunctive relief to maintain the status quo pending trial by: (a) enjoining defendants from acquiring The Loan Source, Inc., (b) enjoining defendants from engaging in PPP loan servicing work for and through The Loan Source during the pendency of this litigation other than as specifically approved by the Court or court-appointed receiver, and (c) appointing a receiver to administer all past and future funds collected by defendants for PPP loan servicing during the pendency of this litigation.

The relief Plaintiffs request is the only remedy capable of preventing irreparable harm. Injunctive relief is the sole avenue that will allow Plaintiffs to recover the business opportunities and associated profits that defendants stole. If this Court does not enter an order preliminarily enjoining defendants, Plaintiffs' business will be severely disadvantaged without an adequate remedy at law.

Waiting for trial in this matter will not remedy Plaintiffs or make them whole. Awaiting a financial award does not provide Plaintiffs with the ability to acquire The Loan Source. Similarly, a financial award at trial will not provide Plaintiffs with the ability to pursue the contractual relationships that defendants wrongfully steered to ACAP. A financial award alone thus cannot do justice in this case, which involves blatant, malicious, and knowing breaches of fiduciary duties by defendants Abrahams and LaHaie.

FILED DATE: 11/6/2020 5:06 PM    2020CH06538

## FACTUAL BACKGROUND

### I.    Background regarding Plaintiffs and Defendants.

Plaintiff ExWorks Capital, LLC is an investment adviser and senior secured debt fund. Plaintiff ExWorks provides liquidity to businesses in need of financing. (Compl. ¶40)

Plaintiff World Trade Finance is a wholly owned subsidiary of Plaintiff ExWorks. (Compl. ¶41) Plaintiff World Trade Finance is licensed to make, process, and service U.S. Small Business Association ("SBA") loans. (*Id.*) Plaintiff World Trade Finance developed expertise and experience over the years as an SBA lender. (*Id.*) Since April 2020, Plaintiff World Trade Finance has been in the business of making, processing, and servicing PPP loans. (Compl. ¶52)

Defendant Abrahams served as the Chief Executive Officer and member of the Board of Directors of Plaintiffs from 2013 until his employment ended on August 7, 2020. (Compl. ¶42)

Defendant Luke LaHaie served as Managing Director of Plaintiffs ExWorks and World Trade Finance from 2018 until his resignation effective June 30, 2020. (Compl. ¶43) As Managing Director, defendant LaHaie served as defendant Abrahams's top lieutenant. Defendant LaHaie had wide-ranging responsibilities, including the authority to sign contracts on behalf of Plaintiffs. (*Id.*)

Through the positions held by defendants Abrahams and LaHaie, they both had fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs. (*Id.*) Defendants violated those fiduciary duties egregiously and continuously starting in 2019 and continuing throughout the course of their employment into 2020. (Compl. ¶¶232-37)

### II.    While Employed by Plaintiffs, Defendants Abrahams and LaHaie Formed Defendant ACAP to Divert Business Opportunities Away From Plaintiffs.

In 2019, defendants Abrahams and LaHaie created defendant ACAP as a rival business to Plaintiff ExWorks. (Compl. ¶62) Defendants Abrahams and LaHaie concealed the development and formation of defendant ACAP from their employer. (*Id.*) By December 2019, unbeknownst to the

3

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

ExWorks Board of Directors, defendants Abrahams and LaHaie developed a limited liability company agreement for defendant ACAP, and they prepared a certificate of formation for ACAP, identifying its registered office in Wilmington, Delaware. (Compl. ¶64) By December 18, 2019, defendants Abrahams and LaHaie caused the Internal Revenue Service to issue an Employer Identification Number for defendant ACAP, which defendant Abrahams directed to be sent to the business address of Plaintiff ExWorks in Chicago, Illinois. (Compl. ¶65)

In early 2020, Plaintiff ExWorks faced increased challenges with its loan portfolio due to the actions and inattention of defendant Abrahams and his cohorts. (Compl. ¶62) Rather than focus on Plaintiff's business as required by their fiduciary duties, defendants Abrahams and LaHaie secretly accelerated their development of defendant ACAP to the point that it was operating as a fully functional business. (*Id.*)

To ramp up defendant ACAP's operations, defendants Abrahams and LaHaie stole Plaintiffs' proprietary information, assets, and technology. (*Id.*) The two relied on Plaintiffs' proprietary business information and strategies to build a PPP loan servicing platform for defendant ACAP, which defendants Abrahams and LaHaie caused ACAP to deploy, all while defendants Abrahams and LaHaie were employed by Plaintiffs. (Compl. ¶73)

Defendants Abrahams and LaHaie did not have permission from Plaintiffs to start a competing business. Defendants Abrahams and LaHaie actively concealed their formation of defendant ACAP from the ExWorks Board of Directors and its Operating Committee. (Compl. ¶70)

III.   **While Employed by Plaintiffs, Defendants Abrahams and LaHaie Breached Their Fiduciary Duties by Stealing Business Opportunities for Themselves, Defendant ACAP, and Defendant RedRidge.**

Before the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") became law, ExWorks and World Trade Finance personnel with SBA expertise explained to defendants

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

Abrahams and LaHaie the opportunity presented by the PPP for ExWorks and World Trade Finance to generate business and profits. (Compl. ¶90)

In March and April 2020, Plaintiff ExWorks's Board of Directors and Operating Committee discussed with defendant Abrahams the funding of PPP loans through Plaintiff World Trade Finance, which held an SBA license. (Compl. ¶91) Defendant Abrahams discussed with the Board of Directors and Operating Committee of Plaintiff having World Trade Finance fund PPP loans for certain of ExWorks's then-current borrowers. (*Id.*) The Board of Directors of Plaintiff ExWorks approved the opportunity presented by defendant Abrahams. (Compl. ¶92) By mid-April 2020, World Trade Finance funded approximately $16 million worth of PPP loans to 22 borrowers from the ExWorks loan portfolio. (*Id.*)

Then, in April 2020, defendant Abrahams presented to the Board of Directors of Plaintiff ExWorks an entity's offer that would have given the entity an option to purchase World Trade Finance. (Compl. ¶93) On April 17, 2020, the Board informed defendant Abrahams that he did not have authorization for this particular deal. (Compl. ¶94) Specifically, the Board directed defendant Abrahams via email communication that "the entire ExWorks team should be singularly focused on creating liquidity and meeting the very high and difficult hurdles that the bank syndicate has forced us to accept. The time is inappropriate to be thinking about expanding our offerings." (*Id.*) In that same email, the Board acknowledged that defendant Abrahams had "been approached by many other institutional investors," which the Board "urge[d] [Abrahams] to pursue and are open to hearing about them if they are less cumbersome and less expensive" than the rejected offer. Defendant Abrahams responded, "Ok, thanks[.] Understood." (*Id.*)

While the Board of Directors did not approve that particular offer, defendant Abrahams still had both the explicit instruction and fiduciary obligation, as CEO of ExWorks, to continue to present PPP and related business opportunities to Plaintiffs. Defendant chose to disregard the

Board's instruction, to violate his fiduciary duties, to accelerate his secret scheme for ACAP, and to surreptitiously steal opportunities from Plaintiffs.

A.   **Defendants Abrahams and LaHaie Concealed Their Use of World Trade Finance to Conduct PPP Loan Application Processing for Three Banks.**

Unbeknownst to the ExWorks Board of Directors and Operating Committee, defendants Abrahams and LaHaie had Plaintiff World Trade Finance enter written contracts with three banks, The Northern Trust, Franklin Synergy Bank, and Northeast Bank. (Compl. ¶98) Defendant LaHaie signed the contracts on behalf of Plaintiff World Trade Finance with the three banks. Defendants Abrahams and LaHaie caused Plaintiff World Trade Finance to be responsible for the processing of those three banks' PPP loan applications. (Compl. ¶¶101, 109, 116)

Defendants Abrahams and LaHaie caused defendant RedRidge to be identified in two of the three bank contracts as an affiliate of Plaintiff World Trade Finance. (Compl. ¶¶102, 110) As defendants Abrahams and LaHaie knew, defendant RedRidge had no contractual responsibilities, nor any contractual liabilities. Defendant RedRidge was not a signatory to the bank contracts. (*Id.*)

Defendants Abrahams and LaHaie actively concealed from Plaintiffs' Board of Directors and Operating Committee that they were using Plaintiffs' personnel and resources to conduct the PPP loan work for the three banks. (Compl. ¶123) To conceal the use of Plaintiffs' personnel and resources, defendants Abrahams and LaHaie took advantage of the work-from-home environment resulting from the COVID-19 pandemic. (Compl. ¶124) Defendants Abrahams and LaHaie also gave explicit instructions to Plaintiffs' employees to conceal their PPP work for the three banks from the Operating Committee of Plaintiff ExWorks. (Compl. ¶¶125-28)

Plaintiffs' personnel developed an IT infrastructure for the loan processing work with the three banks. (Compl. ¶131) This required significant time, effort, and resources from Plaintiffs' personnel. (*Id.*) Plaintiffs' personnel also developed the structure for a platform to process the

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

thousands of SBA loan applications received. (*Id.*) Plaintiffs' personnel then trained defendant RedRidge personnel on the intake of SBA loan applications and their processing. (*Id.*)

Plaintiffs' personnel worked full-time processing PPP loans from March 2020 through July 2020. Plaintiffs' personnel did not know that defendants Abrahams and LaHaie had them working for defendants' own financial gain and contrary to their fiduciary duties to Plaintiffs ExWorks and World Trade Finance. Many Plaintiffs' personnel worked seven days a week, 12-14 hours per day. (Compl. ¶138) They processed over 2,400 PPP loan applications in that time period for the three banks, with ministerial assistance from RedRidge personnel provided along the way. (Compl. ¶143)

Defendants Abrahams and LaHaie knew that the PPP loan application processing generated millions of dollars in SBA fees, properly due to World Trade Finance as contractually agreed by the three banks. Under the contracts, Plaintiff World Trade Finance was due **$6 million** in SBA fees. World Trade Finance never received that money. Defendants Abrahams and LaHaie directed the three banks to send SBA fees to defendant RedRidge, which received all of the $6 million. Defendant RedRidge shared none of the $6 million in SBA fees with Plaintiffs.

**B.** **While Employed by Plaintiffs, defendants Abrahams and LaHaie Accelerated the Operations of Defendant ACAP and Stole Opportunities from Plaintiffs.**

From mid-March 2020 through at least May 5, 2020, defendants Abrahams and LaHaie had an IT consulting firm export ExWorks's contacts (including email addresses), client lists, and opportunities over to ACAP's IT system. (Compl. ¶179) Defendant Abrahams then charged the IT consultant's fees, which totaled approximately $5,135, to Plaintiff ExWorks. (Compl. ¶181)

Defendants Abrahams and LaHaie—while senior executives and officers working for ExWorks—registered defendant ACAP SME as a corporate entity in May 2020 to compete directly with the PPP loan work performed by Plaintiff World Trade Finance. (Compl. ¶178) When COVID-19 impacted Plaintiffs' business and layoffs became necessary, defendants Abrahams and LaHaie recruited Plaintiffs' employees for defendant ACAP. (Compl. ¶¶66-68)

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

With defendant ACAP fully operational and functioning, defendants Abrahams and LaHaie began using defendant defendant ACAP to steal opportunities from Plaintiffs—all while both were still employed by Plaintiffs. (Compl. ¶178)

1.     **Defendants Abrahams and LaHaie Used Defendant ACAP to Steal the Opportunity to Acquire The Loan Source.**

In April 2020, Plaintiff World Trade Finance was looking to acquire a company that held a Small Business Lending Company License ("SBLC"). (Compl. ¶185) Having an SBLC would have expanded Plaintiff World Trade Finance's SBA offerings and given it security in the event the SBA changed its regulations regarding SBA lending.[1] (*Id.*) When defendants Abrahams and LaHaie learned that Plaintiff World Trade Finance had a target company identified, they usurped Plaintiff World Trade Finance. (Compl. ¶¶186-96) Defendants Abrahams and LaHaie stole the opportunity, gave it to defendant ACAP, and never presented it (as they were obliged to do) to Plaintiffs' Board of Directors or Operating Committee. (*Id.*)

Importantly, there are only 14 companies that hold SBLCs. The SBA instituted a moratorium on new SBLCs decades ago. As a result, the only way to acquire an SBLC is to acquire a company holding an SBLC. In late April 2020, personnel from Plaintiff World Trade Finance informed defendant LaHaie that a company with an SBLC was available for sale. (Compl. ¶187) The employee provided a non-disclosure agreement to defendant LaHaie for Plaintiffs to pursue the acquisition. (Compl. ¶188)

Acting contrary to their fiduciary obligations, defendants Abrahams and LaHaie switched out Plaintiff World Trade Finance from the non-disclosure agreement. (Compl. ¶¶189-90) Defendant ACAP then actively pursued the acquisition of the company with the SBLC, which

---

[1] In 2020, the SBA has been considering a proposed rule regarding the SBA Supervised Lenders Application Process (RIN 3245-AH04), which would amend, in substantial ways, a number of SBA regulations that impact access to capital for small businesses and the operations of SBA lenders.

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

turned out to be The Loan Source. (Compl. ¶¶191-96) Defendants Abrahams and LaHaie had fiduciary duties to present this opportunity to the Board of Directors of ExWorks, which they intentionally did not do. (Compl. ¶193)

By early May 2020, defendants Abrahams and LaHaie surreptitiously caused their alter ego, defendant ACAP, to enter into an agreement to acquire The Loan Source. (Compl. ¶¶194-96) On information and belief, that acquisition has not yet been completed because defendant ACAP has not yet received approval from the SBA to acquire The Loan Source.

### 2. Defendants Abrahams and LaHaie Used Defendant ACAP and The Loan Source to Steal Business with Northeast Bank from Plaintiffs.

While employed by Plaintiffs, defendants Abrahams and LaHaie coordinated with The Loan Source to have it acquire Northeast Bank's PPP loans so that defendant ACAP could service them—rather than Plaintiff World Trade Finance, who was already servicing the loans. (Compl. ¶¶167-70). Specifically, in June 2020, while still employed by Plaintiffs, defendants Abrahams and LaHaie caused an agreement to be entered between defendant ACAP, The Loan Source, and Northeast Bank for The Loan Source to purchase Northeast Bank's PPP loans. (Compl. ¶169) Defendants Abrahams and LaHaie, as officers employed by Plaintiffs, did this secretly and in clear violation of their fiduciary duties to Plaintiffs. (*Id.*)

Defendants' agreement with Northeast Bank resulted in Plaintiffs losing the opportunity to earn SBA fees from loan forgiveness with Northeast Bank. (Compl. ¶168) These expected SBA fees for loan forgiveness are substantial and would have totaled approximately $1.3 million. (*Id.*)

### 3. Defendants Abrahams and LaHaie Used Defendant ACAP to Expand Its PPP Loan Servicing Work for The Loan Source.

While employed by Plaintiffs, defendants Abrahams and LaHaie caused defendant ACAP, their alter ego, to enter into an agreement with The Loan Source for defendant ACAP to provide PPP loan servicing work for PPP loans owned by The Loan Source. (Compl. ¶¶197-98) To date,

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

The Loan Source, with the assistance of defendants ACAP, Abrahams, and LaHaie, has purchased more than $3.4 billion worth of PPP loans. (Compl. ¶208) That purchase activity began with Northeast Bank, as described above, and has continued after defendants Abrahams and LaHaie left Plaintiffs' employment. As defendants Abrahams and LaHaie well know, it was their improper use of ExWorks and World Trade Finance personnel, resources, proprietary data, technology, and assets that has allowed defendant ACAP to perform this PPP loan servicing work, which has prejudiced Plaintiffs' business and opportunities to profit therefrom.

## LEGAL STANDARD

A preliminary injunction preserves the status quo until the case can be decided on the merits to prevent irreparable harm to a party. *See Gold v. Ziff Commc'ns Co.*, N.E.2d 404, 408 (Ill. App. Ct. 1989). To obtain a preliminary injunction, Plaintiffs must show four elements: (1) a clearly ascertained right in need of protection; (2) irreparable injury in the absence of an injunction; (3) no adequate remedy at law; and (4) a likelihood of success on the merits of the case. *See Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 91 (Ill. 2006). Plaintiffs need only "raise a 'fair question' that each of the elements is satisfied." *Makindu v. Illinois High Sch. Ass'n*, 40 N.E.3d 182, 190 (Ill. App. Ct. 2015). Once Plaintiffs establish these elements, the Court will "determine if the balance of hardships to the parties supports the grant of a preliminary injunction." *Nw. Podiatry Ctr., Ltd. v. Ochwat*, 990 N.E.2d 347, 356 (Ill. App. Ct. 2013).

## ARGUMENT

### I.   Plaintiffs' Business Rights Require Protection from Defendants.

Plaintiffs' ability to engage in PPP loan servicing and the potential opportunity to acquire The Loan Source are clear business opportunities belonging to Plaintiffs that defendants usurped, took advantage of, and stole. Defendants Abrahams and LaHaie were bound by fiduciary duties to Plaintiffs, but they breached those duties repeatedly and in bad faith.

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

Plaintiffs have a right to seek to acquire The Loan Source, which defendants stole for themselves. Plaintiffs have a right to engage in PPP loan servicing for Northeast Bank, The Loan Source, and other financial institutions, which defendants stole for themselves. Plaintiffs have the right to earn SBA fees for PPP loan servicing, which defendants stole for themselves in the past and have interfered with Plaintiffs' ability to do going forward.

As officers of Plaintiffs, defendants Abrahams and LaHaie were required to present all of these opportunities to Plaintiffs because they were "within the scope of [Plaintiffs'] activities and of present or potential value to it[.]" *LCOR Inc. v. Murray*, No. 97 C 1302, 1997 WL 136278, at *6 (N.D. Ill. Mar. 20, 1997). Defendants knew they had this obligation—they presented other PPP opportunities in April 2020 to the Board of Directors—but they intentionally failed to present these opportunities.

Plaintiffs have a right to officers who act consistent with their fiduciary duties. Under Illinois law, employees—like defendants Abrahams and LaHaie—cannot commence a rival business while still employed: "do[ing] so is [a] breach of the employee's common law fiduciary duty of loyalty to his employer, and gives rise to a cause of action, the remedies of which could include entry of an injunction restraining such competition." *Cross Wood Prod., Inc. v. Suter*, 422 N.E.2d 953, 957 (Ill. App. Ct. 1981). As the *Cross* court recognized, "an ongoing concern has the right to be free from interference with its customers by those in its employ, and that such right is entitled to protection during the pendency of a lawsuit brought to vindicate the right." *Id.* at 956. This right is well established. *See Murges v. Bowman*, 627 N.E.2d 330, 338 (Ill. App. Ct. 1993) (upholding temporary restraining order where defendant solicited employees to join his competitive firm without notifying plaintiff in breach of defendant's fiduciary duties); *Comedy Cottage, Inc. v. Berk*, 495 N.E.2d 1006, 1011 (1986). This case presents facts more compelling and egregious than *Cross Wood*, *Comedy Cottage*, and *Murges*. In this case, while employed by Plaintiffs, defendants Abrahams and LaHaie not only stole

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

PPP work with Northeast Bank (Compl. ¶¶167-69), they then stepped into World Trade Finance's shoes to try to acquire The Loan Source. (Compl. ¶¶186-96)

## II.   Plaintiffs Have No Adequate Legal Remedy and Will Suffer Irreparable Harm.

An injury is "irreparable when it is of such nature that the injured party cannot be adequately compensated therefor in damages or when damages cannot be measured by any certain pecuniary standard." *Cross Wood*, 422 N.E.2d at 953. "An adequate remedy at law is one which is clear, complete and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." *Id.* at 957.

Plaintiffs face three forms of irreparable harm, which are not subject to compensatory damages "measur[able] by any certain pecuniary standards." *Id.*

First, Plaintiffs are losing the profits from the PPP work that defendant ACAP is now performing, as well as Plaintiffs' competitive position to engage in PPP work. From the inception of PPP in March as part of the CARES Act pandemic relief, and until defendant Abrahams resigned from ExWorks in August, Plaintiffs justifiably believed that defendants engaged solely in business deals for Plaintiffs' benefit, consistent with their fiduciary responsibilities. Through acts of concealment over those months, defendants hid their efforts to diminish Plaintiffs' competitive position, and increased their own personal position in the market. By all measures, defendants Abrahams and LaHaie moved quickly and surreptitiously to build a business now servicing more than **$3.4 billion** worth of PPP loans with The Loan Source. *See id.* (finding loss of competitive advantage "not readily subject to measurement by any certain pecuniary standard").

Second, Plaintiffs will lose the opportunity to acquire the SLBC license held by The Loan Source. That opportunity is extremely rare. In January 1982, the SBA imposed a moratorium on issuing additional SBLC licenses. Only 14 SBLC licenses exist. The only way to acquire an SBLC is to buy a company that holds one of the 14 SBLCs (like The Loan Source) after receiving SBA

written approval. Given the rareness of the opportunity to acquire an SBLC, Plaintiffs have no adequate remedy at law. The only available remedy is equitable. *See LCOR*, 1997 WL 136278, at *11 (finding irreparable harm element established where defendant interfered with the purchase of "a unique property in an attractive market" because "[t]he potential market value cannot be adequately measured or quantified" since profits would not "be an accurate measure of profits potentially earned"); *Comedy Cottage*, 495 N.E.2d at 1012 ("enjoining defendant from interfering with plaintiffs' … property interest in obtaining a lease of its place of business").

Third, Plaintiffs face the loss of profits due to defendants' breach of their fiduciary duties, including the $6 million in SBA fees that defendants stole for themselves, and the SBA fees that ACAP is earning from its partnership with The Loan Source. Given defendants' bad faith and wrongful acts, a receiver to administer all funds collected by defendants is the only just result. *See Murges*, 627 N.E.2d at 338-339.

## III. Plaintiffs Are Likely to Succeed on the Merits.

Demonstrating a likelihood of success on the merits requires only that Plaintiffs "raise a fair question regarding the existence of a claimed right and a fair question that [they] will be entitled to the relief prayed for if the proof sustains the allegations." *Kalbfleisch ex rel. Kalbfleisch v. Columbia Cmty. Unit Sch. Dist. Unit No. 4*, 396 Ill. App. 3d 1105, 1114 (5th Dist. 2009).

Plaintiffs will succeed in establishing that defendants Abrahams and LaHaie breached their fiduciary duties, which requires: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damages proximately caused therefrom. *See Lawlor v. N. Am. Corp. of Illinois*, 983 N.E.2d 414, 433 (Ill. App. Ct. 2012).

First, defendants Abrahams and LaHaie held fiduciary duties to Plaintiffs. From 2013 through August 7, 2020, defendant Abrahams was Chief Executive Officer of Plaintiff ExWorks, and a Director of Plaintiff ExWorks. (Compl. ¶42) Defendant LaHaie was a senior employee who

FILED DATE: 11/6/2020 5:06 PM 2020CH06538

FILED DATE: 11/6/2020 5:06 PM    2020CH06538

held the position of Managing Director for Plaintiffs. (Compl. ¶43) As officers, both defendants held fiduciary duties of loyalty and fidelity, as well as obligations to avoid self-dealing at the expense of Plaintiffs. *See Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126 (First District May 10, 2019); *E.J. McKernan*, 252 Ill. App. 3d at 530, 191 Ill.Dec. 391, 623 N.E.2d 981 ("[A]n employee is held accountable for breaching his fiduciary duty to his employer when he goes beyond such preliminary competitive activities and commences business as a rival concern while still employed.").

Second, defendants Abrahams and LaHaie breached their fiduciary duty by seizing "for [their] own advantage a business opportunity which rightfully belongs to the corporation by which [they are] employed." *Advantage Marketing Group, Inc.*, 2019 IL App (1st) at ¶ 23. The law barred defendants from stealing the opportunity to acquire The Loan Source without presenting it to Plaintiffs, soliciting World Trade Finance's customer—Northeast Bank—for ACAP and The Loan Source, and engaging in further PPP loan servicing for The Loan Source, without presenting the opportunities to Plaintiffs. Each of these opportunities was "reasonably incident to [Plaintiffs'] present or prospective business," and were opportunities "in which [Plaintiffs have] the capacity to engage." *Id.* at ¶ 23.

Third and finally, the breach of defendants' fiduciary duties has harmed Plaintiffs. Plaintiffs have been harmed by the loss of the opportunity to acquire an SBLC, which is a rare commodity that The Loan Source holds since there are only 14 available in the United States. Plaintiffs have also been harmed by the lost opportunity to engage in further PPP loan forgiveness work with Northeast Bank, which defendants stole for ACAP and The Loan Source. Plaintiffs have also been harmed by the loss of their ability to competitively operate in the PPP loan servicing space, which defendants caused by their partnering with The Loan Source while still employed by Plaintiffs. *See LCOR*, 1997 WL 136278, at *11; *Comedy Cottage*, 495 N.E.2d at 1012.

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

IV.   **Defendants' Wrongful Acts Forfeited Their Right to a Balance of Hardships, Which Regardless Weighs in Favor of a Preliminary Injunction.**

In a traditional preliminary injunction case, this Court would balance harm to the defendant against benefit to the plaintiff. *See, e.g.*, *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 287 (2005). But this Court need not balance the hardships where, as here, defendants Abrahams and LaHaie acted "despite knowledge of the [Plaintiffs'] rights and understood the possible consequences." *Id.* at 287. In this case, defendants Abrahams and LaHaie knew full well the harm to Plaintiffs by actively concealing their actions and steering corporate opportunities away from Plaintiffs to themselves. Defendants' willful behavior establishes that an equitable balancing is not necessary.

Even if equitable balancing were required, the scales tip heavily in Plaintiffs' favor. Plaintiffs will face the hardships that naturally follow having lost corporate opportunities, while defendants will be free to continue their ill-gotten relationship with The Loan Source and profit from the loan servicing work that defendants know full well belongs to Plaintiffs.

## CONCLUSION

Plaintiffs respectfully request that this Court enter an order granting the following preliminary injunctive relief against Defendants:

(a) enjoining defendants from acquiring The Loan Source, Inc.;

(b) enjoining defendants from engaging in PPP loan servicing work for and through The Loan Source during the pendency of this litigation other than as specifically approved by the Court or court-appointed receiver;

(c) appointing a receiver to administer all past and future funds collected by defendants for PPP loan servicing during the pendency of this litigation; and

(d) Any and all other relief that this Court deems just.

FILED DATE: 11/6/2020 5:06 PM   2020CH06538

Respectfully Submitted,

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  November 6, 2020

FILED DATE: 11/6/2020 5:06 PM    2020CH06538

## <u>CERTIFICATE OF SERVICE</u>

 Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, through the Court's electronic filing system and/or as otherwise indicated below to:

> Michael J. Diver (michael.diver@katten.com)
> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, IL 60605
> *Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

> Michael R. Tein (tein@teinmalone.com)
> Tein Malone PLLC
> 3480 Main Highway
> Coconut Grove, FL 33133
> *Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

 Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED
11/6/2020 5:17 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059958

FILED DATE: 11/6/2020 5:17 PM   2020CH06538

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 2020 CH 06538 |
| v. | : | |
| | : | |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

Pursuant to Illinois Supreme Court Rule 201, Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC, respectfully request that this Court enter an order expediting discovery in advance of an evidentiary hearing on Plaintiffs' Motion for a Preliminary Injunction.

In support of this Motion, Plaintiffs provide as follows:

1. On October 29, 2020, Plaintiffs filed a Complaint for Injunctive and Other Relief (the "Complaint"). On November 6, 2020, Plaintiffs filed a Motion for Preliminary Injunction against defendants Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC and RedRidge Lender Services, LLC (collectively, "RedRidge"), ACAP SME, LLC and ACAP Fund GP, LLC (collectively, "ACAP", all collectively, "Defendants"), and a Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction.

2. As detailed in the Complaint and Preliminary Injunction pleadings, Defendants engaged in extensive acts of fraud and misconduct against Plaintiffs, including egregious breaches of fiduciary duties by defendants Abrahams and LaHaie while employed by Plaintiffs.

FILED DATE: 11/6/2020 5:17 PM   2020CH06538

3.      Plaintiffs have brought claims against Defendants for breach of fiduciary duties, constructive fraud, embezzlement, conversion, breach of contract, fraudulent concealment, fraudulent misrepresentation, tortious interference with contract, tortious interference with business expectancy, civil conspiracy, and unjust enrichment. (Compl. ¶¶232-337)

4.      Plaintiffs now seek preliminary injunctive relief against Defendants to: (a) enjoin them from acquiring The Loan Source, Inc.; (b) enjoin them from engaging in PPP loan servicing work for and through The Loan Source, Inc. during the pendency of this litigation other than as specifically approved by the Court or court-appointed receiver; and (c) appointing a receiver to administer all past and future funds collected by Defendants for PPP loan servicing during the pendency of this litigation.

5.      In advance of an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction, Plaintiffs seek to obtain discovery from Defendants on an expedited basis. Evidence necessary for the resolution of Plaintiff's Motion is in the exclusive possession of Defendants and other third parties. Plaintiffs need to obtain this evidence to carry their burden of demonstrating why a preliminary injunction is appropriate. Plaintiffs cannot be forced to wait to pursue discovery in the ordinary course of litigation, as records regarding ACAP, The Loan Source, and PPP loan work being performed by Defendants is not in Plaintiffs' possession. Accordingly, good cause exists for expedited discovery to occur in advance of the preliminary injunction hearing.

6.      This Court has "considerable discretion in ruling on matters pertaining to discovery." *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 11, 909 N.E.2d 848, 859 (2009). That discretion permits this Court to order expedited discovery when, as here, Plaintiffs seek to enjoin defendants from taking actions in breach of their fiduciary duties. *See generally Buntrock & Gidwitz v. Terra*, 348 Ill.App.3d 875, 879 (1st Dist. 2004) (noting that trial court ordered expedited discovery).

FILED DATE: 11/6/2020 5:17 PM  2020CH06538

7.      Ordering expedited discovery will not prejudice Defendants, as defendants Abrahams and LaHaie should be expected to provide information regarding the wrongful acts each committed, and each should have all such information readily available and within their knowledge. Likewise, the remaining Defendants who directly participated in the misappropriation and theft of Plaintiffs' corporate opportunities should have readily available information responsive to this matter.

8.      The expedited discovery Plaintiffs request is limited in scope. Specifically, Plaintiffs request permission from the Court to issue document requests to defendants and third parties on the subject matters related to its motion for a preliminary injunction, interrogatories related thereto, and requests for admission, as well as permission to take depositions of certain Defendants and witnesses.

WHEREFORE, Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC respectfully requests that this Court order expedited discovery in this matter.

Respectfully submitted,

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  November 6, 2020

**CERTIFICATE OF SERVICE**

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Plaintiffs' Motion for Expedited Discovery, through the Court's electronic filing system and/or as otherwise indicated below to:

> Michael J. Diver (michael.diver@katten.com)
> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, IL 60605
> *Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

> Michael R. Tein (tein@teinmalone.com)
> Tein Malone PLLC
> 3480 Main Highway
> Coconut Grove, FL 33133
> *Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
11/6/2020 5:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11060001

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC, and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 2020 CH 06538 |
| v. | : | |
| | : | |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

## NOTICE OF FILING

To: See Attached Certificate of Service

PLEASE TAKE NOTICE that on **November 6, 2020,** the undersigned caused to be filed with the Clerk of the Court **Plaintiffs' Motion for Expedited Discovery and Notice of Motion of Plaintiffs' Motion for Expedited Discovery.**

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated: November 6, 2020

FILED DATE: 11/6/2020 5:22 PM   2020CH06538

FILED DATE: 11/6/2020 5:22 PM   2020CH06538

## <u>CERTIFICATE OF SERVICE</u>

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Notice of Filing, through the Court's electronic filing system and/or as otherwise indicated below to:

Michael J. Diver (michael.diver@katten.com)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60605
*Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

Michael R. Tein (tein@teinmalone.com)
Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
*Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
Cook County, IL

FILED DATE: 11/6/2020 5:11 PM   2020CH06538

FILED
11/6/2020 5:11 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059917

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

ExWorks Capital, LLC, and          :
World Trade Finance, LLC,          :
                                   :
        Plaintiffs,                :
                                   :          Case No. 2020 CH 06538
        v.                         :
                                   :
Randolph Abrahams,                 :
Luke LaHaie,                       :
RedRidge Finance Group, LLC,       :
RedRidge Lender Services, LLC,     :
ACAP SME, LLC, and                 :
ACAP Fund GP, LLC,                 :
                                   :
        Defendants.                :

## NOTICE OF FILING

To: See Attached Certificate of Service

PLEASE TAKE NOTICE that on **November 6, 2020,** the undersigned caused to be filed

with the Clerk of the Court **Plaintiffs' Motion for Preliminary Injunction, Memorandum in**

**Support of Plaintiffs' Motion for a Preliminary Injunction, and Notice of Motion of**

**Plaintiffs' Motion for Preliminary Injunction.**

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated:  November 6, 2020

FILED DATE: 11/6/2020 5:11 PM   2020CH06538

## CERTIFICATE OF SERVICE

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Notice of Filing, through the Court's electronic filing system and/or as otherwise indicated below to:

> Michael J. Diver (michael.diver@katten.com)
> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, IL 60605
> *Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*
>
> Michael R. Tein (tein@teinmalone.com)
> Tein Malone PLLC
> 3480 Main Highway
> Coconut Grove, FL 33133
> *Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

Return Date: No return date scheduled
Hearing Date: 2/26/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
11/6/2020 3:44 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11058087

FILED DATE: 11/6/2020 3:44 PM   2020CH06538

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ExWorks Capital, LLC and<br>World Trade Finance, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>Randolph Abrahams,<br>Luke LaHaie,<br>RedRidge Finance Group, LLC,<br>Redridge Lender Services, LLC,<br>ACAP SME, LLC, and<br>ACAP Fund GP, LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 2020-CH-06538 |

## CERTIFICATE OF SERVICE

I, Michael J. Diver, the undersigned attorney, hereby certify that on this 6th day of November, 2020, a copy of **1) DEFENDANTS REDRIDGE FINANCE GROUP, LLC'S AND REDRIDGE LENDER SERVICES, LLC'S FIRST SET OF INTERROGATORIES**, and 2) **DEFENDANTS REDRIDGE FINANCE GROUP, LLC'S AND REDRIDGE LENDER SERVICES, LLC'S FIRST SET OF REQUESTS FOR PRODUCTION** were served upon the following individuals, via electronic mail transmission:

Zachary T. Fardon
Patrick M. Otlewski
King & Spalding LLP
335 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com

Michael Tein
Tein Malone PLLC
3480 Main Highway
Coconut Grove
305.442.0954

*One of the Attorneys*

FILED DATE: 11/6/2020 3:44 PM    2020CH06538

potlewski@kslaw.com

*Attorneys for Plaintiffs*

*for Mr. LaHaie, ACAP SME, LLC, and ACAP Fund GP, LLC*

Dated:  November 6, 2020

Respectfully submitted,

By: /s/  Michael J. Diver
*One of the Attorneys for RedRidge Finance Group, LLC and RedRidge Lender Services, LLC*

Michael J. Diver
Sarah K. Weber
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

FILED DATE: 11/6/2020 3:44 PM    2020CH06538

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
11/6/2020 3:44 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11058087

| | | |
|---|---|---|
| ExWorks Capital, LLC and | ) | |
| World Trade Finance, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Randolph Abrahams, | ) | |
| Luke LaHaie, | ) | |
| RedRidge Finance Group, LLC, | ) | |
| Redridge Lender Services, LLC, | ) | No. 2020-CH-06538 |
| ACAP SME, LLC, and | ) | |
| ACAP Fund GP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

<u>**NOTICE OF FILING**</u>

**PLEASE TAKE NOTICE** that on November 6, 2020, the undersigned filed a Certificate of Service of the attached **1) DEFENDANTS REDRIDGE FINANCE GROUP, LLC'S AND REDRIDGE LENDER SERVICES, LLC'S FIRST SET OF INTERROGATORIES, and 2) DEFENDANTS REDRIDGE FINANCE GROUP, LLC'S AND REDRIDGE LENDER SERVICES, LLC'S FIRST SET OF REQUESTS FOR PRODUCTION**, true copies of which are attached hereto and hereby served upon you.

Dated:  November 6, 2020                    Respectfully submitted,

                                                    By: /s/  Michael J. Diver
                                                    *One of the Attorneys for RedRidge Finance
                                                    Group, LLC and RedRidge Lender Services, LLC*

FILED DATE: 11/6/2020 3:44 PM    2020CH06538

Michael J. Diver
Sarah Weber
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

FILED
11/6/2020 5:08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059890

FILED DATE: 11/6/2020 5:08 PM   2020CH06538

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

ExWorks Capital, LLC, and                  :
World Trade Finance, LLC,                   :
                                            :
        Plaintiffs,                         :
                                            :       Case No. 2020 CH 06538
        v.                                  :
                                            :
Randolph Abrahams,                          :
Luke LaHaie,                                :
RedRidge Finance Group, LLC,                :
RedRidge Lender Services, LLC,              :
ACAP SME, LLC, and                          :
ACAP Fund GP, LLC,                          :
                                            :
        Defendants.                         :

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on **Monday, November 16, 2020, at 9:30 a.m.**, or as soon

thereafter as counsel may be heard, we shall appear virtually before the Judge sitting on behalf of

Calendar 03 of the Circuit Court of Cook County, County Department, Chancery Division located

at the Richard J. Daley Center, 50 W. Washington Street, Chicago, Illinois, via Zoom as per the

Court's order, and there present a copy of Plaintiffs' Motion for a Preliminary Injunction.

                                    /s/ Zachary T. Fardon
                                    Zachary T. Fardon
                                    **KING & SPALDING LLP**
                                    Zachary T. Fardon
                                    Patrick M. Otlewski
                                    Courtney Roldan
                                    353 N. Clark Street, 12th Floor
                                    Chicago, IL 60654
                                    Phone: 312.995.6333
                                    zfardon@kslaw.com
                                    potlewski@kslaw.com

                                    *Attorneys for Plaintiffs*

Dated:  November 6, 2020

**CERTIFICATE OF SERVICE**

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Notice of Plaintiffs' Motion for a Preliminary Injunction, through the Court's electronic filing system and/or as otherwise indicated below to:

Michael J. Diver (michael.diver@katten.com)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60605
*Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

Michael R. Tein (tein@teinmalone.com)
Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
*Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

/s/ Zachary T. Fardon

FILED DATE: 11/6/2020 5:08 PM   2020CH06538

Return Date: No return date scheduled
Hearing Date: 11/16/2020 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
Cook County, IL

FILED
11/6/2020 5:19 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06538

11059982

FILED DATE: 11/6/2020 5:19 PM   2020CH06538

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC, and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 2020 CH 06538 |
| v. | : | |
| | : | |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on **Monday, November 16, 2020 at 9:30 a.m.**, or as soon

thereafter as counsel may be heard, we shall appear virtually before the Judge sitting on behalf of

Calendar 03 of the Circuit Court of Cook County, County Department, Chancery Division located

at the Richard J. Daley Center, 50 W. Washington Street, Chicago, Illinois, via Zoom as per the

Court's order, and there present a copy of Plaintiffs' Motion for Expedited Discovery.

/s/ Zachary T. Fardon
Zachary T. Fardon
**KING & SPALDING LLP**
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated: November 6, 2020

FILED DATE: 11/6/2020 5:19 PM   2020CH06538

## <u>CERTIFICATE OF SERVICE</u>

Zachary T. Fardon, an attorney, hereby certifies that he served the foregoing Notice of Expedited Discovery, through the Court's electronic filing system and/or as otherwise indicated below to:

> Michael J. Diver (michael.diver@katten.com)
> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, IL 60605
> *Attorney for defendants Randolph Abrahams, RedRidge Finance Group, LLC, and RedRidge Lender Services, LLC*

> Michael R. Tein (tein@teinmalone.com)
> Tein Malone PLLC
> 3480 Main Highway
> Coconut Grove, FL 33133
> *Attorney for defendants Luke LaHaie, ACAP Fund GP, LLC, and ACAP SME, LLC*

on this 6th day of November, 2020.

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

<u>/s/ Zachary T. Fardon</u>

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| ExWorks Capital, LLC and<br>World Trade Finance, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Randolph Abrahams, | ) | |
| Luke LaHaie, | ) | |
| RedRidge Finance Group, LLC, | ) | |
| Redridge Lender Services, LLC, | ) | No. 2020-CH-06538 |
| ACAP SME, LLC, and | ) | |
| ACAP Fund GP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## NOTICE OF FILING

 **PLEASE TAKE NOTICE** that on November 6, 2020, the undersigned filed a Verified Statement of Out-of-State Attorney Michael R. Tein Pursuant to Illinois Supreme Court Rule 707 and a Notice of Appearance of Michael R. Tein, in the above-captioned case, true and correct copies of which are attached hereto and hereby served upon you.

1

Dated:  November 6, 2020

Respectfully submitted,

By: /s/  Michael R. Tein
_____
*One of the Attorneys for Mr. LaHaie, ACAP*
*SME, LLC, and ACAP, Fund GP, LLC*

Michael R. Tein
Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
305.442.1101

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| ExWorks Capital, LLC and<br>World Trade Finance, LLC, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>)<br>) | |
| Randolph Abrahams,<br>Luke LaHaie,<br>RedRidge Finance Group, LLC,<br>Redridge Lender Services, LLC,<br>ACAP SME, LLC, and<br>ACAP Fund GP, LLC, | )<br>)<br>)<br>)<br>)<br>) | No. 2020-CH-06538 |
| Defendants. | )<br>)<br>)<br>) | |

**CERTIFICATE OF SERVICE**

I, Michael R. Tein, the undersigned attorney, hereby certify that on this 6th day of November, 2020, copies of the **VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY MICHAEL R. TEIN PURSUANT TO ILLINOIS SUPREME COURT RULE 707** and the **NOTICE OF APPEARANCE OF MICHAEL R. TEIN**, were served upon the following individuals, via electronic mail transmission:

Zachary T. Fardon
Patrick M. Otlewski
King & Spalding LLP
335 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Michael J. Diver
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

*One of the Attorneys for RedRidge Finance Group, LLC and RedRidge Lender Services, LLC*

1

Dated:  November 6, 2020          Respectfully submitted,

By: /s/  Michael R. Tein
       *One of the Attorneys for Mr. LaHaie, ACAP*
       *SME, LLC, and ACAP, Fund GP, LLC*

       Michael R. Tein
       Tein Malone PLLC
       3480 Main Highway
       Coconut Grove, FL 33133
       305.442.1101

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| EXWORKS CAPITAL, LLC AND<br>WORLD TRADE FINANCE, LLC,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>RANDOLPH ABRAHAMS.<br>LUKE LAHAIE,<br>REDRIDGE FINANCE GROUP, LLC,<br>REDRIDGE LENDER SERVICES, LLC,<br>ACAP SME, LLC AND<br>ACAP FUND GP, LLC,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　Case No. 2020-CH-06538<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY MICHAEL R. TEIN<br>PURSUANT TO ILLINOIS SUPREME COURT RULE 707</u>

I, Michael R. Tein, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707:

1.　　My full name is Michael Ross Tein.  My date of birth is January 11, 1967.  The address of the office from which I practice law, related email address and telephone number is as follows:

Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
tein@teinmalone.com
305.442.1101

2.　　I represent Defendants Luke LaHaie, ACAP SME, LLC, and ACAP Fund GP, LLC in *ExWorks Capital, LLC vs. Randolph Abrahams et al.*, in the Circuit Court of Cook County, Illinois, Case No. 2020-CH-6538.

3(a).　　I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).　　I have not received a registration number from the ARDC.

1

4(a).    I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number:

Michael Ross Tein Florida Bar No. 993522
Michael Ross Tein Massachusetts Board of Bar Overseers No. 563029


4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.       I have no office or other presence in Illinois for the practice of law.

6.       I submit to the disciplinary authority of the Supreme Court of Illinois;

7.       I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding;

(8)      The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

Michael J. Diver
ARDC No. 6236968
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
312.902.5200

9.       I certify that I have served this Statement upon all parties entitled to service under this rule: the ARDC, Mr. Diver (who represents the remaining Defendants in this matter), and counsel for the Plaintiffs.

**<u>Verification</u>**

I verify the accuracy and completeness of each of the above statements.


/s/  Michael R. Tein
Michael R. Tein

# Supreme Court of Florida

## Certificate of Good Standing

*I JOHN A. TOMASINO, Clerk of the Supreme Court of the State of Florida, do hereby certify that*

### MICHAEL ROSS TEIN

*was admitted as an attorney and counselor entitled to practice law in all the Courts of the State of Florida on* **DECEMBER 9, 1993,** *is presently in good standing, and that the private and professional character of the attorney appear to be good.*



*WITNESS my hand and the Seal of the Supreme Court of Florida at Tallahassee, the Capital, this November 2, 2020.*

*Clerk of the Supreme Court of Florida*

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

————

BE IT REMEMBERED, that at the Supreme Judicial Court holden at Boston within and for said County of Suffolk, on the **fifth** day of **April** A.D. **1993**, said Court being the highest Court of Record in said Commonwealth:

## Michael Ross Tein

being found duly qualified in that behalf, and having taken and subscribed the oaths required by law, was admitted to practice as an Attorney, and, by virtue thereof, as a Counsellor at Law, in any of the Courts of the said Commonwealth: that said Attorney is at present a member of the Bar, and is in good standing according to the records of this Court*.

In testimony whereof, I have hereunto set my hand and affixed the seal of said Court, this **fifth** day of **November** in the year of our Lord **two thousand and twenty.**

MAURA S. DOYLE, Clerk

\* Records of private discipline, if any, such as a private reprimand imposed by the Board of Bar Overseers or by any court, are not covered by this certification.
X3116

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| ExWorks Capital, LLC and<br>World Trade Finance, LLC,<br><br>     Plaintiffs,<br><br>     v.<br><br>Randolph Abrahams,<br>Luke LaHaie,<br>RedRidge Finance Group, LLC,<br>Redridge Lender Services, LLC,<br>ACAP SME, LLC, and<br>ACAP Fund GP, LLC,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 2020-CH-06538 |

<u>**NOTICE OF APPEARANCE OF MICHAEL R. TEIN**</u>

PLEASE TAKE NOTICE THAT Michael R. Tein, hereby appears on behalf of

Defendants Luke LaHaie, ACAP SME, LLC, and ACAP Fund GP, LLC.

Dated:  November 6, 2020             Respectfully submitted,

                                           By: /s/  Michael R. Tein

_____
*One of the Attorneys for Luke LaHaie, ACAP*
*SME, LLC, and ACAP, Fund GP, LLC*

Michael R. Tein
Tein Malone PLLC
3480 Main Highway
Coconut Grove, FL 33133
305.442.1101

2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| ExWorks Capital, LLC and | : | |
| World Trade Finance, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 2020 CH 06538 |
| v. | : | |
| | : | The Honorable Allen Walker |
| Randolph Abrahams, | : | |
| Luke LaHaie, | : | |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

## AGREED ORDER

THIS CAUSE coming before the Court on Plaintiffs' Motion for Preliminary Injunction and Motion for Expedited Discovery, counsel for Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC and counsel for Defendants Randolph Abrahams, Luke LaHaie, RedRidge Finance Group, LLC, RedRidge Lender Services, LLC, ACAP SME, LLC, and ACAP Fund GP, LLC, having conferred and agreed, and this Court being fully advised;

IT IS HEREBY ORDERED:

1. A continued hearing on Plaintiffs' Motion for Preliminary Injunction and Motion for Expedited Discovery is scheduled on November 30, 2020, at 1:00 p.m. Central. Unless otherwise indicated by the Court, the status will be conducted via Zoom using the following information: Zoom Meeting ID: 955 0046 1687 and Meeting Password 640378.

Dated: November 16, 2020

**E N T E R E D:**

Allen Price Walker
Associate Judge

Nov. 16, 2020

Judge

Circuit Court - 2071

**Counsel for Plaintiffs:**
KING & SPALDING LLP
Zachary T. Fardon
Patrick M. Otlewski
Courtney Roldan
353 N. Clark Street, 12th Floor
Chicago, IL 60654
Phone: 312.995.6333
zfardon@kslaw.com