IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ExWorks Capital, LLC and | : | |
| World Trade Finance, LLC, | : | |
| | : | Case No. 20-cv-07033 |
| Plaintiffs, | : | |
| | : | Hon. Charles P. Kocoras |
| v. | : | |
| | : | |
| Randolph Abrahams, | : | (Removed from Circuit Court of Cook County, |
| Andrew Hall, | : | Illinois, County Department, Chancery |
| Luke LaHaie, | : | Division, Case No. 2020 CH 06538) |
| RedRidge Finance Group, LLC, | : | |
| RedRidge Lender Services, LLC, | : | |
| ACAP SME, LLC, and | : | |
| ACAP Fund GP, LLC, | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1.      Plaintiffs ExWorks Capital, LLC and World Trade Finance, LLC seek injunctive, equitable, and legal relief to prevent ongoing irreparable harm being perpetrated by defendants Randolph Abrahams, Andrew Hall, Luke LaHaie, RedRidge Finance Group, LLC and its subsidiary RedRidge Lender Services, LLC (collectively, "RedRidge"), ACAP SME, LLC, and ACAP Fund GP, LLC (collectively, "ACAP"), as well as redress from and compensation for damages caused by the defendants' wrongful acts.

2.      For years as employees of ExWorks, defendants Abrahams, Hall, and LaHaie committed fraud, breached their fiduciary obligations to ExWorks, and concealed their misconduct from the ExWorks Board of Directors, its shareholder-advisor, Operating Committee, the ExWorks Funds Limited Partner Advisory Committee ("LPAC"), and Funds investors. Defendant RedRidge, which was led by Abrahams and performed services for ExWorks, also engaged in fraudulent business practices that harmed ExWorks and its loan portfolio. Defendants perpetrated their frauds

against ExWorks for their own personal gain and for the economic benefit of defendants RedRidge and ACAP.

3.      After engaging in a longstanding pattern of misconduct in connection with ExWorks's loan portfolio, defendants Abrahams and LaHaie, while still employed by ExWorks, created a new competitor business named ACAP. Defendants Abrahams and LaHaie exploited their positions of trust within ExWorks and World Trade Finance to steal, misuse, and misappropriate money, resources, and proprietary information from Plaintiffs for the benefit of ACAP and RedRidge. Defendants Abrahams, LaHaie, RedRidge, and ACAP tortiously interfered with both existing business relationships and opportunities due to ExWorks and World Trade Finance.

4.      The damage from defendants' wrongful actions is ongoing and causing irreparable harm. In addition to injunctive relief, Plaintiffs seek compensatory damages.

5.      In support, Plaintiffs ExWorks and World Trade Finance state as follows.

## Nature of the Action

### *Background regarding the ExWorks Loan Portfolio*

6.      ExWorks was formed as a senior secured lender. Its purpose was to make collateralized loans, with limited aggregate exposure on any single loan, to businesses in the United States and abroad. To fund the loans, ExWorks relied on pooled investment vehicles (each a "Fund"), supplemented by its own line of credit with a lender bank ("Lender Bank").

7.      Defendants Abrahams, Hall, and LaHaie were entrusted to manage the ExWorks loan portfolio, and to provide investment advisory services to the Funds.

8.      In ExWorks's early years, the ExWorks loan portfolio provided successful returns on investment for the Funds. That led to increased investments in the Funds, with over $300 million in investor capital committed to the ExWorks loan portfolio. Beginning in 2018, ExWorks obtained additional funding for its loans through a line of credit with the Lender Bank.

*The Fraud Involving the ExWorks Loan Portfolio*

9.      By 2018, defendants Abrahams, Hall, and LaHaie permitted loans in the portfolio to become large with exposures exceeding $20 million each, and with increasing concentration of capital deployed to those large positions. Certain borrowers, including some with these large exposures, were not consistently meeting their loan obligations to ExWorks, which defendants Abrahams, Hall, and LaHaie permitted.

10.     Starting no later than 2018 and continuing through 2020, defendants Abrahams, Hall, and LaHaie engaged in a fraudulent scheme to further fund borrowers who were in distress by making new and unsecured loans to those failing borrowers through other entities ("shell entities") and individuals, so as to conceal the additional funding of those failing loans. Defendants Abrahams, Hall, and LaHaie did this without authorization and in violation of ExWorks's Limited Partnership Agreement ("LPA") and its internal policies. These defendants hid their misconduct from the ExWorks Board, its shareholder-advisor, and the LPAC.

11.     Also in 2018, defendants Abrahams and LaHaie fraudulently overstated ExWorks's income. These defendants claimed ExWorks earned $7 million from the sale of warrants when, in fact, ExWorks collected only $3 million, with the remaining sale funded by ExWorks itself through an unsecured $4 million loan to the entity ostensibly purchasing the warrants from ExWorks. In an email, defendant LaHaie bragged, "I hope all frauds are this lucrative."

12.     As part of the scheme, when a particular borrower defaulted (as discussed below), defendants Abrahams, Hall, and LaHaie fraudulently concealed that default from the ExWorks Board of Directors, its shareholder-advisor, Operating Committee, the LPAC, and the Lender Bank. To conceal the default, defendants Abrahams and LaHaie created misleading documents regarding the borrower's loan history.

13.     These defendants engaged in this fraud and misconduct to foster the false appearance that they were successfully managing the loan portfolio.

14.     Defendants, knowing the damage their fraud with the loan portfolio was causing ExWorks, concealed their fraud as long as possible to give themselves the time and opportunity to secretly form a competitor business, ACAP. To build ACAP, defendants Abrahams and LaHaie abused their positions of trust within Plaintiffs' employment to improperly misappropriate Plaintiffs' proprietary data, business strategy, and resources. As detailed below, in late 2019 and 2020, Defendants then took fees and opportunities due to Plaintiffs for the benefit of ACAP and RedRidge, all with the intent to harm Plaintiffs.

### Abrahams and RedRidge's Theft from ExWorks

15.     Separately, but related to defendant Abrahams's misconduct and fraud with the ExWorks loan portfolio, defendant Abrahams converted millions of dollars due to ExWorks through improper transfers to his other company, defendant RedRidge. RedRidge was hired by ExWorks to perform due diligence services for the loan portfolio.

16.     For years, defendant Abrahams abused his position of trust as the CEO of ExWorks to manipulate the payment of fees to RedRidge from ExWorks through a fraudulent scheme in which RedRidge submitted invoices for diligence never performed ("phantom" invoices), as well as falsely inflated invoices for diligence services. These phantom and falsely inflated invoices permitted RedRidge to improperly misappropriate more than $1.4 million from ExWorks.

17.     Further, when the actions of defendants Abrahams, Hall, and LaHaie caused the ExWorks loan portfolio to experience liquidity issues in 2019, defendant Abrahams knew RedRidge would have less diligence services to perform for ExWorks. Defendant Abrahams devised a new scheme to steal money from ExWorks for RedRidge's faltering operations.

18. To prop up RedRidge's faltering operations in 2019 and 2020, defendants Abrahams, LaHaie, and RedRidge engaged in excessive transfers of ExWorks funds to RedRidge, which totaled approximately $3.7 million from June 2019 to March 2020. Defendant Abrahams caused these transfers to occur on multiple occasions, in large amounts each of which exceeded hundreds of thousands of dollars, often under the guise of "prepaid" diligence fees.

19. As of February 2020, excessive transfers to defendant RedRidge totaled approximately $2.66 million. As defendant Abrahams knew, depleting ExWorks of $2.66 million caused ExWorks to be unable to meet payroll in the spring of 2020. Delaying payroll rattled ExWorks employees' confidence in the continued viability of ExWorks, and primed employees to be poached by defendants Abrahams and LaHaie to defendant ACAP, all unbeknownst to the ExWorks Board, its shareholder-advisor, the LPAC, and the Lender Bank.

20. By March 2020, the liquidity and capitalization issues that ExWorks faced—which unbeknownst to ExWorks were caused in large part by defendants Abrahams's, Hall's, and LaHaie's misconduct—and discovery of the prepaid diligence balance to defendant RedRidge led the ExWorks Board of Directors to form an Operating Committee. The Operating Committee was tasked with oversight of management of ExWorks and World Trade Finance. With the creation of the Operating Committee, all material decisions impacting ExWorks and World Trade Finance required the express approval and authorization of the Operating Committee.

21. The formation of the Operating Committee upset defendants Abrahams and LaHaie, with defendant LaHaie disparaging the Operating Committee as "Hitler's Youth." Defendants Abrahams and LaHaie not only disregarded the Operating Committee's oversight, they began to look for more opportunities to steal from ExWorks and World Trade Finance, and they secretly accelerated their plans to leave.

*Fraud and Theft from Plaintiffs with the Paycheck Protection Program ("PPP")*

22.     In March 2020, the U.S. Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which included the Paycheck Protection Program ("PPP"). The PPP was designed to assist small businesses negatively impacted by the pandemic conditions wrought by COVID-19. The SBA has been operating the PPP, through which SBA-licensed entities are permitted to fund and process PPP loans for qualified businesses.

23.     The PPP presented an opportunity for ExWorks and World Trade Finance because World Trade Finance held an SBA license. As an SBA-licensed entity, World Trade Finance could fund and process PPP loan applications on its own, or partner with SBA-licensed banks to process and service their PPP loan applications, or both.

24.     Defendants Abrahams and LaHaie, while still employed by ExWorks, saw the PPP as an opportunity to further misappropriate resources, proprietary information, and business relations of World Trade Finance and ExWorks for defendants' own benefit. Defendants Abrahams and LaHaie commandeered Plaintiffs' personnel, resources, and proprietary information to process thousands of PPP loan applications for three banks.

25.     This PPP work generated millions of dollars in SBA fees due to World Trade Finance. Defendants Abrahams, LaHaie, and RedRidge unlawfully converted those SBA fees to defendant RedRidge, including approximately $3.7 million in SBA fees from The Northern Trust, and approximately $1.5 million in SBA fees from Franklin Synergy Bank. Defendants Abrahams and LaHaie, then used their alter ego ACAP to improperly diminish World Trade Finance's fees from Northeast Bank.

26.     Defendants Abrahams, LaHaie, and RedRidge also used the SBA fees to falsely pay down RedRidge's "prepaid diligence" balance in June 2020, calling a $695,000 payment of SBA to World Trade Finance a paydown on the outstanding balance.

27.     Defendants Abrahams and LaHaie breached their fiduciary duties to ExWorks and World Trade Finance by concealing the PPP work performed and concealing the diversion of the PPP fees to defendant RedRidge. Defendants Abrahams and LaHaie gave explicit instructions to ExWorks and World Trade Finance employees to conceal their PPP loan application processing work from the ExWorks Board of Directors and its Operating Committee.

### Diversion of PPP Work and Business Opportunities to ACAP

28.     In the spring of 2020, defendants Abrahams and LaHaie, by virtue of their positions within ExWorks, saw how World Trade Finance was positioned to generate millions of dollars in SBA fees through the PPP. Contrary to their fiduciary obligations to ExWorks and World Trade Finance, defendants Abrahams and LaHaie took for themselves, RedRidge, and ACAP further opportunities to profit from the PPP.

29.     While still employed by ExWorks and owing ExWorks fiduciary duties, defendants Abrahams and LaHaie: (a) caused ACAP to enter contracts with two of the three banks already under contract with World Trade Finance to provide PPP loan services; (b) stole the opportunity to acquire The Loan Source, after the opportunity was identified and developed internally at ExWorks and World Trade Finance; and (c) diverted further PPP loan processing work to ACAP—work that rightfully belonged to Plaintiffs.

30.     For instance, during the summer of 2020, defendants Abrahams and LaHaie manipulated World Trade Finance's PPP loan processing contract with Northeast Bank to permit defendant ACAP to assume responsibility for further PPP loan work with Northeast Bank. Also during the summer of 2020, defendants Abrahams and LaHaie diverted to defendant ACAP approximately $1.3 million worth of PPP loan forgiveness work with Northeast Bank.

31.     Only after fully exploiting ExWorks's and World Trade Finance's names, personnel, proprietary information, and business models did defendants Abrahams and LaHaie leave their

positions of trust, loyalty, and care at ExWorks and World Trade Finance. Defendant LaHaie resigned effective June 30, 2020, and defendant Abrahams resigned on August 7, 2020, shortly after being confronted with his malfeasance.

32.     Even though defendant Abrahams founded defendant ACAP, has directed its development, and led its business, defendant Abrahams has sought to publicly conceal his involvement in the company. For instance, ACAP's website lists defendant LaHaie and another individual as founders, with this other individual as the CEO/Founder of ACAP. Defendant Abrahams is nowhere mentioned on ACAP's website.

### Fraud, Misappropriation and Tortious Interference by and through ACAP

33.     While defendants Abrahams and LaHaie were still employed by ExWorks and World Trade Finance and continuing to the present, defendants ACAP, Abrahams, and LaHaie have been working with The Loan Source to service PPP loans. With assistance from defendants Abrahams, LaHaie, and ACAP, The Loan Source has purchased over $4 billion worth of PPP loans. ACAP's relationship and revenue opportunity with The Loan Source was stolen from Plaintiffs and is a direct consequence of defendants' improper use of ExWorks and World Trade Finance personnel, resources, proprietary data, and assets.

34.     Plaintiffs' loss of ongoing business and business opportunities due to defendants Abrahams and LaHaie breaching their fiduciary duties has put Plaintiffs at a severe competitive disadvantage. Without the injunctive relief requested by Plaintiffs, both ExWorks's and World Trade Finance's businesses face the loss of millions of dollars in potential revenue, and the dissipation of revenue properly due to them by defendants Abrahams and LaHaie.

### Plaintiffs' Claims and Relief Requested

35.     Plaintiffs seek injunctive, compensatory and equitable relief. Defendants committed fraud, fiduciary breach, and theft among other illegal acts. Defendant ACAP should be enjoined

from acquiring The Loan Source to prevent further irreparable harm to Plaintiffs. Defendants should further be enjoined from engaging in PPP loan servicing work for The Loan Source, which was a business opportunity defendants Abrahams and LaHaie, while employed by ExWorks and World Trade Finance, diverted and misappropriated contrary to their fiduciary duties.

36.     Plaintiffs also seek to enjoin defendants ACAP, Abrahams, and LaHaie from engaging in competing loan work that was developed using the confidential and proprietary business information and assets of ExWorks and World Trade Finance, which defendants stole from ExWorks and World Trade Finance during their employment.

37.     Plaintiffs further seek equitable relief in the form of control and ownership of ACAP, which is a business opportunity created at ExWorks that defendants Abrahams and LaHaie pursued through the use of ExWorks resources for their own personal gain in violation of their fiduciary duties.

## THE PARTIES

38.     Plaintiff ExWorks Capital, LLC is a Delaware limited liability company, which at times relevant to this litigation had its principal place of business located at 333 West Wacker Drive, 16th Floor, Chicago, Illinois 60606. ExWorks is an investment adviser registered with the U.S. Securities and Exchange Commission. Its advisory clients are pooled investment vehicles (the "Funds").

39.     Plaintiff World Trade Finance, LLC is a California limited liability company. It is a wholly owned subsidiary of ExWorks. World Trade Finance is licensed by the SBA to make, process, and service SBA loans.

40.     Defendant Randolph Abrahams served as the Chief Executive Officer and as a member of the Board of Directors of ExWorks and World Trade Finance between 2013 and August 7, 2020. As the CEO and Board member of ExWorks and World Trade Finance, Abrahams owed

fiduciary duties of candor, care, good faith, and loyalty to ExWorks and World Trade Finance. Abrahams created ACAP while employed by Plaintiffs ExWorks and World Trade Finance, and Abrahams began operating ACAP while employed by Plaintiffs. On information and belief, Abrahams has an ownership interest in defendant ACAP and is responsible for its operation. Abrahams also served as the Chief Executive Officer and member of the Board of Directors of RedRidge at all times relevant to this litigation. Abrahams is a citizen of the State of Illinois, and he resides in Winnetka, Illinois.

41. Defendant Andrew Hall was Chief Credit Officer of ExWorks from 2014 until July 31, 2020. Defendant Hall was a member of the ExWorks Investment Committee at times relevant to this litigation. Defendant Hall owed fiduciary duties of candor, care, good faith, and loyalty to ExWorks. Defendant Hall is a citizen of the State of Illinois, and he resides in Chicago, Illinois.

42. Defendant Luke LaHaie was employed by ExWorks and World Trade Finance beginning in or about June 2015 and continuing until his resignation effective June 30, 2020. Defendant LaHaie previously worked at RedRidge from September 2012 until June 2015. Defendant Abrahams treated defendant LaHaie as his right-hand man. During his employment by ExWorks and World Trade Finance, defendant LaHaie owed fiduciary duties of candor, care, good faith, and loyalty. Defendant LaHaie now serves as ACAP's Chief Investment Officer. LaHaie is a citizen of the State of Illinois, and he resides in Chicago, Illinois.

43. Defendant ACAP SME, LLC ("ACAP SME") is a Delaware limited liability company organized on May 5, 2020, by defendant Abrahams with Abrahams as its sole member. ACAP SME currently lists its principal place of business located at 333 West Wacker Drive, 16th Floor, Chicago, Illinois 60606, which is the actual address and location of ExWorks and World Trade Finance. Defendants Abrahams and LaHaie formed and have used ACAP SME to defraud

plaintiffs ExWorks and World Trade Finance, and to misappropriate and convert their business opportunities and assets.

44.     Defendant ACAP Fund GP, LLC ("ACAP Fund GP") is a Delaware limited liability company organized on December 11, 2019. Defendant ACAP Fund GP was registered as a foreign entity in the State of Illinois, on July 15, 2020. Defendant Luke LaHaie is the registered agent of defendant ACAP Fund GP. Defendants LaHaie and Abrahams are managers of ACAP Fund GP.

45.     Defendant RedRidge Finance Group, LLC ("RedRidge Finance Group") is a Delaware limited liability company formed on December 9, 2008. It was registered as a foreign entity in Illinois on January 29, 2009. Defendant Abrahams is one of two managers, and he has served as its Chief Executive Officer since its inception. RedRidge is in the business of performing financial diligence services. For at least the last several years, its largest client was ExWorks.

46.     Defendant RedRidge Lender Services, LLC ("RedRidge Lender Services") is a Delaware limited liability company, incorporated on September 11, 2009. RedRidge Lender Services is a subsidiary of RedRidge Finance Group; RedRidge Finance Group is the manager of RedRidge Lender Services. RedRidge Diligence Services and RedRidge Due Diligence Services are trade names or divisions of RedRidge Lender Services.

## VENUE

47.     Venue is proper pursuant to 735 ILCS 5/2-101 as defendants' principal residences and offices were at all times relevant to this action and remain located in Cook County, Illinois. Further, most, if not all, of the business relations and disputes at issue occurred in Cook County, Illinois.

## THE FACTS

I.     **Background Regarding ExWorks and World Trade Finance**

A.     **ExWorks**

48.     ExWorks is a senior secured debt fund that provides liquidity to businesses in need of financing. Its loans were to be secured through collateral and were to be subjected to a rigorous underwriting process. Its business model was based on two types of secured loans, as reflected in its Form ADV, which was signed by defendant Abrahams:

a.      Working Capital Loans: "[T]ypical loans involve securing assets and extending a facility or line of credit that either revolves, based on new invoices created, inventory on hand or purchased, or remains static based on overall assets of the borrower. The Adviser [ExWorks] performs ongoing collateral monitoring and analysis of each borrower."

b.      Term Loans: "For term loans, the Funds may lend to companies in similar fashion to that of a working capital loan based on being fully collateralized, having credit insurance or letters of credit on key accounts or customers, property, plant and equipment, intellectual property, brand names/trade styles, other assets and overall enterprise value. Loan positions may also be further secured by additional collateral in excess of primary collateral."

49.     ExWorks funded loans primarily through the resources of four pooled investment vehicles. Specifically, ExWorks Capital Fund I GP, LLC is a Delaware limited liability company formed as of July 21, 2016; it is a wholly owned subsidiary of ExWorks. ExWorks Capital Fund I GP serves as the general partner for four pooled investment vehicles, for which ExWorks provides investment advisory services. These pooled investment vehicles are ExWorks Capital Fund I, L.P., ExWorks Capital Fund I Parallel Vehicle, L.P., ExWorks Capital Fund II Parallel Vehicle, L.P., and ExWorks Capital Fund QP I, L.P. (collectively, the "Funds").

50.     ExWorks provided written quarterly updates to investors in the Funds. The investor letters were prepared under the supervision of defendant Abrahams, and defendant Abrahams was responsible for ensuring the truthfulness, accuracy, and completeness of representations made in the

investor letters. Defendant Abrahams sent the letters to investors on a quarterly basis during the times relevant to this litigation.

51.     For the benefit of the General Partner and the Parallel Vehicles, ExWorks created a LPAC consisting of the ExWorks Board of Directors and representatives from the Limited Partners.

52.     The LPAC and Board of Directors met regularly, frequently on a quarterly basis, at all times relevant to this litigation. Defendant Abrahams led and participated in those meetings, and was responsible for providing truthful, accurate, and complete information to the LPAC and Board of Directors regarding the state of the ExWorks loan portfolio as well as ExWorks's operations.

53.     Under the Limited Partnership Agreement of ExWorks Capital Fund I GP, the purpose of loans made by ExWorks was strictly limited to business and corporate loans. The Agreement stated, "the Partnership's objective is to achieve attractive risk-adjusted returns primarily through purchasing loans, loan assets, and other assets and making and refinancing **private corporate loans** to … **businesses** in the United States and abroad, including … working capital loans and term loans …." (emphasis added)

54.     ExWorks maintained an internal Underwriting and Portfolio Manual (the "Manual") with internal policies and procedures for loans. The Manual established an internal Investment Committee. At times relevant to this litigation, the members of the Investment Committee were defendants Abrahams and Hall. The two were responsible for "recommending uniform portfolio management, underwriting, and investment policies and procedures which, while striving to maximize portfolio performance, will keep the management of the portfolio within the bounds of the Funds' investment objective and satisfy the legal requirements of the Funds' operating agreements."

55.     The Manual provided credit guidelines for borrowers, a risk rating system for the loan portfolio, and credit management procedures, including guidelines for managing problem accounts.

**B.     World Trade Finance**

56.     ExWorks acquired World Trade Finance in 2015 as a wholly owned subsidiary liability company that holds an SBA license.

57.     World Trade Finance has developed expertise and experience over the years as a delegated SBA lender helping small businesses finance their domestic and export growth and operations with loans from $500,000 up to $5,000,000.

58.     World Trade Finance also has had the capability to pair SBA loans with non-SBA loans for financial needs that may not qualify for an SBA loan. With an SBA license and a team who had expertise and experience with SBA lending practices, World Trade Finance was well-qualified to fund and process PPP loans through the CARES Act.

**C.     Defendant RedRidge**

59.     Defendant RedRidge was created and is controlled by defendant Abrahams.[1] RedRidge has been in the business of providing diligence services since 2009. From 2013 through mid-2020, ExWorks was RedRidge's largest client. Defendant Abrahams caused ExWorks to engage RedRidge to provide third-party due diligence services for prospective borrowers and current borrowers, which would include field exams, inventory observations, accounts receivable verification, quarterly earnings reports, and collateral analysis.

---

[1] Two members of the ExWorks Board of Directors have held minority ownership interests in RedRidge, with one ExWorks Director also a member of the RedRidge Board of Directors. When these two ExWorks Directors learned about RedRidge's improper business activity as set forth in this First Amended Complaint, *see infra* ¶¶ X-Y, the ExWorks Director who was also a RedRidge Director promptly resigned from RedRidge's Board of Directors.

60.     RedRidge had an obligation to properly perform field exams, inventory observations, accounts receivable verification, quarterly earnings reports, and collateral analysis at all times relevant to this litigation, and to provide invoices for services rendered as well as written reports documenting its work.

61.     Under the ExWorks Operating Agreement, which identified the services to be performed by RedRidge, RedRidge agreed and warranted to perform its services for ExWorks "in a competent and diligent manner."

**D.     ExWorks's Lender Bank**

62.     In May 2017, ExWorks opened a line of credit to provide it with liquidity as needed for portfolio management. ExWorks's Lender Bank provided ExWorks with an initial loan limit of $35 million, which increased to $50 million in January 2018. By September 2019, defendant Abrahams caused ExWorks's loan limit to be increased to $150 million.

63.     At times relevant to this litigation, ExWorks's loan agreement with its Lender Bank provided that ExWorks had to make representations regarding its loan portfolio on an ongoing basis, and to include eligible borrowers' portfolios in a borrowing base calculation. The borrowing base calculation dictated how much ExWorks could borrow from the Lender Bank.

64.     ExWorks evaluated on a monthly basis each loan in its portfolio for possible default and to assesses whether the loan balance should be adjusted or completely removed from the borrowing base calculation. ExWorks's borrowing base was comprised of 80% of eligible loans to borrowers in ExWorks's portfolio, plus the lesser of 80% of the Eligible Bridge Loan Receivables and $12,000,000. A borrower's eligibility to be included in the borrowing base was dependent on a number of factors including its ability to pay interest and default status. If the borrowing base decreased, there was a corresponding and proportional reduction in the collateral supporting

ExWorks's line of credit. As such, the Lender Bank could require ExWorks to provide additional collateral or repay any collateral shortfall in order to maintain the current line of credit.

65.     Pursuant to ExWorks's agreement with the Lender Bank, a borrower was eligible for inclusion in the borrowing base if, among other things, (a) the borrower rated 5 or lower on a scale of 1 to 10 per ExWorks's internal credit risk rating policies, or (b) the borrower had not experienced an event of default. ExWorks had written credit rating policies which provided that a borrower had a risk rating of 6 if past due on payments, or in workout discussions regarding control asset quality. Consequently, any ExWorks borrower having a 6 risk rating could not be included in ExWorks's borrower's base calculation. ExWorks's written credit rating policies further required ExWorks to re-assess risk ratings every three months or when a borrower experienced a material change in its business.

## II.     Fraud and Misconduct by Defendants Abrahams, Hall, and LaHaie with the ExWorks Loan Portfolio.

66.     Beginning in 2018 and continuing into 2020, defendants Abrahams, Hall, and LaHaie, as well as personnel acting with them and at their direction, failed to properly manage the ExWorks loan portfolio and failed to protect ExWorks's business interests. Their failures contributed to the ExWorks loan portfolio in 2019 becoming challenged by a lack of liquidity, particularly with respect to its largest positions, and default by borrowers.

67.     By 2019, ExWorks had a portfolio of loans with a balance exceeding $422 million. As defendants Abrahams, LaHaie, and Hall knew and concealed from the ExWorks Board of Directors, its shareholder-advisor, and LPAC, certain borrowers were engaging in increasingly risky business activity, and their creditworthiness was becoming increasingly questionable.  Defendants Abrahams, Hall, and LaHaie failed to pursue default options against borrowers, and they failed to accurately portray to the ExWorks Board of Directors, its shareholder-advisor, LPAC, and Fund investors the true state of the portfolio's affairs. Instead, defendants Abrahams, Hall, and LaHaie

caused ExWorks to increase its credit commitments to these borrowers to the harm and detriment of ExWorks. This practice was contrary to the investment objectives of ExWorks, and led ExWorks to be exposed to an unnecessarily high risk of default.

### A. Improperly Extending Credit and Concealing the Credit Through Shell Entities and Individuals

68.     Beginning no later than 2018, some of the largest borrowers in the ExWorks loan portfolio sought extensions of credit beyond the tens of millions of dollars in loans already extended. Despite a clear direction by the ExWorks Board of Directors, its shareholder-advisor, and LPAC to stop funding up these large positions and to decrease their exposure below $20 million, defendants Abrahams, Hall, and LaHaie agreed to extend millions of dollars in additional unsecured credit to these borrowers.

69.     Defendants Abrahams, Hall, and LaHaie hid these additional unsecured loans from the ExWorks Board of Directors, its shareholder-advisor, and LPAC by disguising the additional credit as new lines of credit to shell entities and individuals, with the funds going directly to the existing borrowers. This impeded the ability of the ExWorks Board of Directors, its shareholder-advisor, and LPAC to assess the status of ExWorks's loan portfolio, including the significant concentration of credit risk amongst loans to related borrowers.

70.     The actions of defendants Abrahams, Hall, and LaHaie breached their fiduciary duties to ExWorks by placing the interests of borrowers ahead of ExWorks. Defendants circumvented the controls ExWorks instituted to monitor loan activity, including by failing to perform due diligence before funding loans, extending credit without a loan agreement in place, and falsifying books and records. Defendants also placed ExWorks at significant risk by permitting these additional loans to be unsecured, which was explicitly prohibited by the ExWorks LPA.

71.     Set forth below are clear and egregious examples of this fraudulent misconduct by defendants Abrahams, Hall, and LaHaie.

1.      The ██████ Fraudulent Scheme

a.      Overview of the ██████ Fraud

72.      ██████ Solutions, Inc. ("██████ was in the business of serving as an outsourced call center for large multinational corporations. Companies hired ██████ to provide call center services, which reduced the amount of fixed overhead companies needed to carry on their balance sheet.

73.      ExWorks began extending credit to ██████ in July 2016. By early September 2019, defendants Abrahams and LaHaie allowed ██████ outstanding loan balance with ExWorks to exceed $31.9 million. This made ██████ ExWorks's second largest borrower.

74.      Disregarding the clear instruction from the ExWorks Board of Directors and its shareholder-advisor to stop funding ExWorks's largest credit exposures, defendants Abrahams and LaHaie extended millions of dollars of additional unsecured credit to ██████ beginning in September 2019. To conceal this additional credit, defendants Abrahams and LaHaie initiated a new unsecured line of credit in the name of ██████, but sent the funds directly to ██████.

75.      ██████, as defendants LaHaie and Abrahams knew, was a company organized by the 25-year old daughter of ██████ CEO, who was also a ██████ employee.

76.      Months after defendants Abrahams and LaHaie began funding ██████ through ██████ and after more than $3 million in loans had been extended, defendants Abrahams and LaHaie documented the line of credit to ██████ through a written loan agreement.

77.      Defendants Abrahams and LaHaie concealed the true nature of the ██████ line of credit from the ExWorks Board of Directors, its shareholder-advisor, and LPAC, and concealed that it was unsecured. Defendants Abrahams and LaHaie further concealed the fact that ██████ and ██████ were affiliated, which was a material fact, and concealed that the funds under the ██████ loan were being used to pay ██████ rent, payroll, and insurance.

### b. The [Borrower 1] Fraudulent Scheme

78. By September 4, 2019, defendants Abrahams and LaHaie permitted [Borrower 1] to have an outstanding loan balance of approximately $31,923,895.50, which exceeded its internal loan limit of $31,772,254.

79. On September 4, 2019, [Borrower 1] informed defendants LaHaie and Abrahams that it needed at least $460,000 from ExWorks to cover "rent, insurance and bi-weekly payroll." Defendants Abrahams and LaHaie knew that [Borrower 1] request for payroll funding made it a problem account under ExWorks's internal policies. Nonetheless, defendants Abrahams and LaHaie agreed to extend further credit to [Borrower 1].

80. Continuing on September 4, 2019, defendants LaHaie and Abrahams asked for the name of an entity to whom ExWorks could nominally send the funds. [Borrower 1] gave the name [Shell 1] [Shell 1].

81. On September 5, 2019, defendant LaHaie instructed ExWorks personnel to "**send $460,000 directly to [Borrower 1] today** and note capital lease deposit reimbursement on behalf of [Shell 1] [Shell 1]" (Emphasis in original.) Defendant LaHaie's instruction caused the creation of false books and records at ExWorks because the [Shell 1] funds went directly to [Borrower 1] to pay [Borrower 1] rent, insurance, and payroll.

82. Defendants Abraham and LaHaie failed to conduct due diligence into [Shell 1] before funding the loan. They did not even have a loan agreement in place with [Shell 1] prior to funding, and this additional credit was unsecured.

83. Defendant LaHaie also knew that [Shell 1] was formed in June 2019, approximately three months before ExWorks began sending funds to [Borrower 1] in [Shell 1] name. ExWorks's internal policies, however, required that a company be in business for at least 12 months before credit could be extended to it.

84. One week later, defendant LaHaie had ExWorks provide an additional $225,000 to ████████, which was recorded in ████████ name.

85. On September 19, 2019, ████████ asked defendant LaHaie for $400,000 from ExWorks. Defendant LaHaie agreed and had ExWorks provide $400,000 to ████████ which was recorded in ████████ name.

86. In an internal memorandum dated September 25, 2019, defendant LaHaie falsely described the ████████ loan. Defendant LaHaie claimed that ExWorks's loan to ████████ would be used to "fund the purchase of furniture, fixtures, and equipment ("FF&E") at ████████ new locations in Dallas, TX, and Charlotte, NC[.]" Defendant LaHaie further falsely stated that the "equipment will then be leased by ████████ to ████████ As defendant LaHaie knew, the funds went directly to ████████ for payroll, insurance and rent. Furthermore, as defendant LaHaie knew, ████████—not ████████—had already purchased the furniture and equipment.

87. On October 10, 2019, defendant LaHaie authorized another $325,000 to ████████ "via ████████ [sic]." Then, on October 30, 2019, ████████ requested a weekly draw request of $150,000, which defendant LaHaie authorized as "████████ direct to ████████ account."

88. During a meeting with the ExWorks Board of Directors, its shareholder-advisor, and LPAC on November 22, 2019, defendant Abrahams concealed that ExWorks was extending additional unsecured credit to ████████ in ████████ name. Defendant Abrahams only reported that ████████ had an outstanding loan balance of $33,212,821, which fraudulently omitted approximately $1,990,000 lent to ████████ in ████████ name.

89. In December 2019—months after ExWorks extended millions of additional unsecured credit to ████████ in ████████ name—defendant LaHaie caused ExWorks to enter into an unsecured loan agreement with ████████ for $3,967,193.06.

90. By December 19, 2019, defendants Abrahams and LaHaie caused ExWorks to extend $4,256,196.81 in additional unsecured credit to ██████, which was recorded in ████l ██████ name.

91. During a December 2019 presentation to the ExWorks Board of Directors, its shareholder-advisor, and LPAC, defendant Abrahams continued to conceal the relationship between ██████ and ██████. Defendant Abrahams falsely reported that ExWorks had made "[s]ignificant progress toward exit on key accounts, including ██████ …." Defendant Abrahams also falsely reported that ██████ outstanding loan balance was $32,275,821, and that ExWorks was expecting a "full payoff Jan-20." Defendant Abrahams's statements were false and misleading because they omitted the funds lent to ██████ in ██████ name.

92. Defendants Abrahams and LaHaie knew that they had improperly increased ExWorks's exposure on ██████ through the additional loans to ██████. In correspondence with ██████ CEO on February 10, 2020, defendant LaHaie wrote, "we need to find a way for you to make us whole on ██████, we are open to your thoughts on how to best do this, but given the fact that you will own 51% of a company on its way to a $200 million valuation we need you to make us whole on this piece."

93. In May 2020, defendants Abrahams and LaHaie caused ExWorks to make false and misleading statements to ExWorks's Lender Bank regarding ██████ Specifically, defendants Abrahams and LaHaie had ExWorks personnel remove information regarding ██████ from a discussion of ExWorks's top 20 loan positions (which included ██████. On May 30, 2020, defendant Abrahams sent to the Lender Bank this report, which fraudulently omitted discussion of ██████ and its relationship to ██████.

94. As a result of the fraudulent conduct of defendants Abrahams and LaHaie, ExWorks has suffered a significant financial loss. ExWorks had to write off $2,623,715 in interest, $536,000 in

accrued fees, and $14,142,926 in principal, for a total write off of $17,711,949 in 2020, which includes the [Shell 1] loan used by [Borrower 1].

### 2. The [Borrower 2] Fraudulent Scheme

#### a. Overview of the [Borrower 2] Fraud

95.     On August 7, 2015, ExWorks and [Borrower 2], a software development company, entered into a Senior Secured Convertible Note Purchase Agreement, which provided [Borrower 2] with $3,000,000 in capital.

96.     By the close of 2017, defendants Abrahams and Hall permitted [Borrower 2] loan to grow to nearly $15,000,000 ($14,768,494.98 on December 29, 2017), and then to exceed $20,000,000 in 2018 ($20,145,305.84 on December 31, 2018, with $21,193,085.56 outstanding).

97.     As of September 2018, [Borrower 2] was one of ExWorks's five largest credit exposures. [Borrower 2] borrowing was increasingly perilous for ExWorks because [Borrower 2] was a start-up company without assets sufficient to collateralize its loan.

98.     Beginning in September 2018, defendants Abrahams and Hall fraudulently extended additional credit to [Borrower 2] through a new unsecured line of credit to a [Borrower 2] investor named [Shell 2] [Shell 2]. Defendants Abrahams and Hall created this new unsecured line of credit to hide the fact that they were continuing to fund up [Borrower 2] from the ExWorks Board of Directors, its shareholder-advisor, LPAC, and investors.

99.     Defendants Abrahams and Hall also caused ExWorks to extend an unsecured line of credit to a British Lord who was a personal friend of [Shell 2], which ultimately exceeded $1.5 million. Defendants Abrahams and Hall concealed this related unsecured loan from the ExWorks Board of Directors, its shareholder-advisor, LPAC, and investors.

100.    As defendants Abrahams and Hall knew, issuing personal loans, unsecured loans, and loans without proper due diligence was outside the scope of ExWorks's Limited Partnership Agreement, and these loans contravened ExWorks's internal policies.

**b.    The ███████ Fraudulent Scheme**

101.    In an August 26, 2018 correspondence to the ExWorks Board of Directors, defendant Abrahams painted a rosy picture of the state of ██████. Defendant Abrahams stated, "In July 2018 ExWorks met with ██████ in London to discuss the status of equity investments and ██████ ability to repay ExWorks facility (including interest and fees). During this meeting ██████ indicated they have sourced the equity and debt required to repay the loan and should do so by the end of 2018. ExWorks is currently discussing a sale of the business if a payout is not completed by the end of October 2018."

102.    In fact, ██████ was not in a position to repay its loan by the end of 2018 and instead needed to borrow more money from ExWorks to fund its operations.

103.    In September 2018, defendants Abrahams and Hall agreed to have ExWorks fund a $150,000 unsecured line of credit to ██████ individually, with the ability to "use funds at his discretion." Defendant Hall drafted an internal memorandum in which he acknowledged that ██████ was using the credit to make payroll, which contravened ExWorks's internal policies that borrowers not receive funds to make payroll.

104.    ██████ asked defendants Abrahams and Hall to have this $150,000 sent "direct to ██████," which defendants Abrahams and Hall did.

105.    In an October 25, 2018 correspondence to the ExWorks Board of Directors, LPAC, and Fund investors, defendant Abrahams claimed he employed "a rigorous underwriting process" with "underwriting selectivity" relying on "collateral that it hopes will cover our investment in most cases." Defendant Abrahams's statement was false. Defendant Abrahams failed to engage in any due

diligence before extending credit to [Shell 2], which was an unsecured loan and contrary to the "selectivity" and collateral requirements ExWorks obligated him to employ.

106.    In October 2018, [Shell 2] asked for another extension of credit for $250,000 in his name, with the funds to go to [Borrower 2]. Defendant Abrahams approved [Shell 2] request.

107.    Defendant Hall drafted an internal memorandum in October 2018 regarding the additional $250,000 loan to [Shell 2] Defendant Hall stated the "additional $250,000 loan to [Shell 2] [Shell 2] bring[s] his total loan balance to $400,000. These funds will be used by [Shell 2] to fund payroll for [Borrower 2] for the month of September. [Shell 2] is a shareholder of [Borrower 2] and is funding the payroll to buy the company time to raise equity which they believe will happen by the end of October." Defendants Abrahams and Hall signed the memorandum.

108.    In November 2018, [Shell 2] asked defendants Abrahams and Hall to extend an additional $150,000 worth of unsecured credit in his name for [Borrower 2] "to do payroll[.]" Defendant Abrahams agreed to the request, which increased [Shell 2] unsecured loan balance to $700,000.

109.    In January 2019, [Shell 2] requested an additional $350,000 worth of unsecured credit from ExWorks in his name for [Borrower 2]. Defendants Abrahams and Hall approved the request, which raised [Shell 2] unsecured loan balance to $1,050,000.

110.    During a March 2019 meeting with the ExWorks Board of Directors, its shareholder-advisor, and LPAC, defendants Abrahams and LaHaie concealed that ExWorks was continuing to fund [Borrower 2] and further concealed that this additional credit was unsecured and in the name of an investor in [Borrower 2] Defendant Abrahams thus created the false and misleading impression that ExWorks's aggregate exposure with [Borrower 2] was lower than it actually was.

111.    Over time, defendant Abrahams continued to actively conceal from the ExWorks Board of Directors, its shareholder-advisor, LPAC, and Fund investors that ExWorks was funding [Borrower 2] operations and payroll through an unsecured personal loan to [Shell 2].

112.     In July 2019, defendant Abrahams caused a false and misleading letter to be sent to the ExWorks Board of Directors, its shareholder-advisor, LPAC, and Fund investors. The letter concealed the unsecured personal loan to [Shell 2] and its affiliation to [Borrower 2]. In preparing this letter, defendant Abrahams stated to defendants LaHaie and Hall that he wanted to "check payoff numbers on [Borrower 2] with you guys one more time" and that he "just want[ed] to make sure we have it right without [Shell 2]." Defendant Abrahams then sent his letter, which falsely stated that [Borrower 2] "loan had a principal balance of $17.8 million," intentionally omitting the related unsecured loan to [Shell 2] that would have increased the loan balance to $20.5 million.

113.     Defendants Abrahams and Hall continued to increase [Shell 2] unsecured line of credit. By August 2019, $3,059,985 in ExWorks credit had been sent to [Borrower 2] but recorded as a personal loan to [Shell 2].

114.     In connection with a November 22, 2019 meeting with the ExWorks Board of Directors, its shareholder-advisor, and LPAC, defendant Abrahams falsely reported that [Borrower 2] loan balance was $18,772,099, omitting approximately $3.1 million in funds ExWorks sent to [Borrower 2] in [Shell 2] name.

115.     In December 2019, defendant Abrahams again falsely reported to the ExWorks Board of Directors, its shareholder-advisor, and LPAC that [Borrower 2] loan balance remained $18,772,099, omitting approximately $3.1 million that ExWorks lent to [Shell 2] for [Borrower 2].

116.     By January 2020, the balance of [Shell 2] unsecured line of credit reached $3,318,645, with all of the funds having gone to [Borrower 2] to fund its operations.

117.     By March 2020, defendants Abrahams and Hall permitted [Shell 2] outstanding unsecured loan balance to increase to approximately $3.4 million.

118.     On April 30, 2020, the ExWorks Operating Committee asked defendants Abrahams and Hall about a number of loans that "we have no information on," specifically identifying

███ loan. Defendant Hall forwarded the communication to Abrahams, stating, "the ones on this list plus ███ and [another borrower]." Defendant Abrahams responded, "Ok – good. As the world crumbles they will see this crumble less." As defendant Abrahams acknowledged internally, he had concealed the extensive liability that he had caused ExWorks to incur from the ExWorks Board of Directors, its shareholder-advisor, and Advisory Committee.

### 3.      Fraudulent Lending to a British Lord

119.      Beginning in October 2018, defendants Abrahams and Hall improperly permitted ExWorks to extend an unsecured personal loan to a British Lord, who was ███ personal friend. The loan ultimately exceeded $1.6 million before the British Lord defaulted on the loan. As defendants Abrahams and Hall knew, this unsecured personal loan was prohibited by ExWorks's LPA, and contravened ExWorks's internal policies because it was a personal loan that lacked security and due diligence. Defendants Abrahams and Hall concealed the existence and true nature of this loan from the ExWorks Board of Directors, its shareholder-advisor, and LPAC.

120.      In October 2018, ███ informed defendants Abrahams and Hall that a British Lord, who was then a member of the British Parliament's House of Lords, needed a personal loan. By November 2018, defendants Abrahams and Hall agreed to make a £1 million unsecured personal loan to the British Lord.

121.      In November 2018, defendants Abrahams and Hall were aware of serious and alarming red flags regarding this loan. Despite those red flags, defendants Hall and Abrahams proceeded to fund the £1 million unsecured loan to the British Lord.

122.      In November 2018, ExWorks funded approximately $1,276,721 to the British Lord. By August 2020, the loan balance reached approximately $1,646,853.

123.      In written correspondence to the ExWorks Board of Directors, its shareholder-advisor, LPAC, and Limited Partner investors dated January 29, 2019, defendant Abrahams

described investment activity for the fourth quarter of 2018. In describing the new loan activity, defendant Abrahams claimed that ExWorks "clos[ed] eight new credits, at an average commitment size of $3.7 million." Defendant Abrahams further claimed that ExWorks "continue[s] to be conservative in our new credit decisions and pricing." Defendant Abrahams then stated, "we will not chase poor risk and lower pricing as the margins we create also protect you, our investors, from the downside of potential losses." These statements by defendant Abrahams were intentionally false and misleading, given that defendant Abrahams caused ExWorks to make a very risky unsecured personal loan to a British Lord.

> **B.**      **Lies about the ExWorks Loan Portfolio**

124.      Beginning in 2018 and continuing into 2020, defendants Abrahams and LaHaie made and caused to be made materially false statements to the ExWorks Board of Directors, its shareholder-advisor, and LPAC about the state of the loan portfolio. These defendants' misleading statements created the false impression that they were successfully managing the loan portfolio and generating income.

> **1.**      **Fraud in Connection with Income from the "Sale" of Warrants.**

125.      In 2018, defendants Abrahams and LaHaie fraudulently overstated ExWorks's income. These defendants claimed ExWorks earned $7 million from the sale of warrants when, in fact, ExWorks collected only $3 million, with the remaining sale funded by ExWorks itself through an unsecured $4 million loan to the entity ostensibly purchasing the warrants from ExWorks. In an email, defendant LaHaie bragged, "I hope all frauds are this lucrative."

126.      More specifically, in 2018, defendants Abrahams and LaHaie were looking to sell a portion of ExWorks's warrant position in Borrower 2, which position ExWorks had built up during the life of the Borrower 2 loan, to generate income for ExWorks. These defendants began negotiations with another ExWorks borrower, Borrower 3 for sale of the warrants. These defendants ultimately

negotiated an agreement whereby [Borrower 3] paid $3 million cash in 2018, with the remaining $4 million payable March 31, 2019, under a promissory note.

127.    Defendant LaHaie caused ExWorks to book the entire $7 million as income for the third quarter of 2018. As defendant LaHaie stated, "We are getting $3.0 million today or Monday from [Borrower 3]. This is payment for shares in [Borrower 2] we sold them yesterday. This is income to the fund but NOT a paydown on either loan facility. Our first major realization of warrant income!!! … The $7.0mm should be considered warrant income for Q3." As defendant LaHaie knew, $4 million was contingent on [Borrower 3] paying off the promissory note in 2019.

128.    Beginning in the third quarter of 2018, defendant Abrahams touted the $7 million sale as income offsetting a decline in fee income that the loan portfolio experienced. In a letter to Fund investors dated October 24, 2018, defendant Abrahams stated ExWorks had "$7.0 million of realized warrant income," which "gave us an additional 2.16% of additional gross income on the entire portfolio and represented 36.7% of total yield composition for the quarter." Abrahams knew and concealed that $4 million of the $7 million sale was subject to [Borrower 3], already a borrower, paying off the promissory note.

129.    In January 2019, defendant LaHaie bragged to an ExWorks employee about the warrant fraud. Specifically, the ExWorks employee was impressed by defendant LaHaie's "portfolio managing on [Borrower 3]" Defendant LaHaie responded, "I hope all frauds are this lucrative."

130.    On March 31, 2019, the [Borrower 3] promissory note came due. [Borrower 3] did not timely pay. Defendants Abrahams and LaHaie then fraudulently schemed to lend money to [Borrower 3] for it to pay down the remaining $4 million.

131.    Specifically, on April 4, 2019, defendants Abrahams and LaHaie caused ExWorks to execute an unsecured loan agreement with a [Borrower 3] subsidiary named [Borrower 3-Sub] for $4 million. Four days later, ExWorks received a $4 million payment from [Borrower 3] to pay down the promissory

28

note on the warrants. Defendants Abrahams and LaHaie thus funded ███ Borrower 3 ███ payoff of its promissory note in order to maintain the false impression, given to the Board, investors and others, that ExWorks had realized $7 million in revenue from the 2018 sale of its ███ Borrower 2 ███ warrants.

132.     Defendants Abrahams and LaHaie concealed this fraudulent transaction from the ExWorks Board, its shareholder-advisor, and LPAC. On or about June 23, 2019, defendant Abrahams continued to tout his so-called success in ███ Borrower 2 ███, highlighting that ExWorks "sold 22% warrant in the Company for $7 million (which has been fully collected)[.]" Defendant Abrahams knew this was false because $4 million of the warrant "sale" was funded only after ExWorks made a new $4 million unsecured loan to a ███ Borrower 3 ███ subsidiary.

133.     Defendant Abrahams repeated his false and misleading assertion that ExWorks collected $7 million in income to the ExWorks Board, its shareholder-advisor, and LPAC on November 21, 2019, when he stated, "Collected $7mm from partial sale of warrant – we still have 29% warrant[.]"

134.     The $4 million ███ Borrower 3-Sub ███ promissory note that defendants Abrahams and LaHaie caused ExWorks to extend remains outstanding, and thus is a significant liability that defendants Abrahams and LaHaie improperly imposed upon ExWorks.

### 2.     Concealing a Borrower's Default

135.     ███████ Borrower 4 ███████ is in the business of investing in medical receivables. In October 2018, ExWorks initiated a $7,500,000 line of credit to ███ Borrower 4 ███, which increased to $9,971,205 by September 2019, and then increased to an outstanding loan balance of $9,940,030 by November 2019.

136.     In September 2019, ███ Borrower 4 ███ failed to timely pay ExWorks its August interest of $199,422.32. In October 2019, ███ Borrower 4 ███ failed to timely pay September 2019 interest of $199,532.86.

137. In November 2019, ▮ asked defendants Abrahams, LaHaie, and Hall for a further advance of $181,000. Defendant Hall approved the advance. Defendant Hall informed defendants Abrahams and LaHaie that it was "a long story but February will be the earliest we will be taken out here ▮."

138. In December 2019, ▮ failed to make its October and November 2019 interest payments.

139. On December 17, 2019, defendant LaHaie instructed ExWorks personnel, "Need ▮ to pay us current on interest today. Please advise to the amount they owe us. Send them a default notice if they refuse." ▮ did not make its interest payments to ExWorks.

140. As a result of ▮ failure to make its interest payments, on December 27, 2019, defendant Abrahams instructed ExWorks personnel to notice ▮ for default.

141. On January 2, 2020, ExWorks sent ▮ written notice of default. The letter was "formal notice that Events of Default have occurred under the Loan Agreement," including the "fail[ure] to make interest payments due for the months of October, November, December 2019 … total[ing] $568,621.95." As stated in the letter, ExWorks was "hereby accelerating and demanding payment" of $10,853,405.47 under the loan agreement, as well as payment from ▮ guarantor.

142. ▮ acknowledged the notice of default, which ExWorks personnel documented in the file as "default notice acknowledged …. payoff anticipated by end of March [2020]."

143. But defendants Abrahams and LaHaie did not pursue acceleration and default remedies against ▮ Instead, they permitted ▮ to accrue further interest, which triggered a penalty of $500 per day late fee for interest.

144. Beginning in December 2019 and continuing into March 2020, defendants Abrahams and LaHaie failed to disclose to the ExWorks Board of Directors and its Lender Bank that ▮ defaulted on its loan, which was one of ExWorks's top 20 loans by dollar amount.

145.     On February 4, 2020, the Lender Bank asked defendant Abrahams, "Did ▮▮ pay their interest?" On February 5, 2020, defendant Abrahams falsely stated to ExWorks's Lender Bank that there were "no exceptions on … ▮▮." This statement was false and misleading because ExWorks issued written notice of default to ▮▮ on January 2, 2020. Defendant Abrahams also falsely stated, ▮▮ had approximately 360k of open interest converted to PIK at year end." That was false because ▮▮ interest was not converted and had gone unpaid for months.

146.     The Lender Bank then requested that ExWorks "provide the documentation relative to … ▮▮ that indicates the default has not gone on for a period of 60 days as of 12/31/19."

147.     After receiving this documentation request from the Lender Bank, defendants Abrahams and LaHaie created a false document, which stated that ▮▮ interest had been capitalized. Defendant LaHaie created a document, backdated to December 31, 2019, falsely stating that ▮▮ had $363,195 in past due interest and that ExWorks "allow[ed] them to capitalize the interest outstanding as of year-end." Defendant Abrahams signed the false document, which defendants caused to be sent to the Lender Bank on February 5, 2020.

148.     Defendants Abrahams, LaHaie, and Hall then created an internal memorandum, which gave the false appearance that ExWorks permitted ▮▮ to capitalize its interest and which they backdated to January 2, 2020 (before the Lender Bank's request for records).

149.     On June 23, 2020, the ExWorks Operating Committee requested information from defendant Abrahams regarding ▮▮ and its status. Defendant Abrahams did not provide the Operating Committee with truthful and accurate information regarding ▮▮. Defendant Abrahams provided to the Operating Committee a copy of the backdated ▮▮ memorandum, and he failed to disclose that ExWorks already accelerated ▮▮ loan.

150.     In July 2020, the Operating Committee notified the Lending Back that ▮▮ had been in default.

III.     **Defendants Abrahams and RedRidge Stole Money from ExWorks.**

151.     For years, defendant Abrahams caused RedRidge to provide due diligence services to ExWorks and borrowers in its loan portfolio. Defendant Abrahams took advantage of his position of trust within ExWorks to seek out opportunities for RedRidge to profit to the detriment of ExWorks, as set forth below.

A.     **Defendants RedRidge and Abrahams Submitted False and Phantom Invoices to ExWorks.**

152.     Beginning in 2015 and continuing through 2019, defendants Abrahams and RedRidge engaged in a scheme to defraud ExWorks by submitting falsely inflated RedRidge invoices, and by submitting phantom invoices for diligence services RedRidge never performed.

153.     When ExWorks identified prospective borrowers, defendant Abrahams caused ExWorks to pay RedRidge the entire due diligence deposit received from borrowers regardless of the work actually performed by RedRidge. Although defendant Abrahams nominally called these payments a "deposit," defendant Abrahams made it a practice to not permit borrowers to receive money back if RedRidge's initial field exam cost less than the deposit. Instead, defendant Abrahams caused RedRidge to submit invoices for the full deposit regardless of the services RedRidge actually performed.

154.     The invoices to ExWorks from defendant RedRidge for due diligence typically contained no details about the date work was done, who provided the services, the amount of time spent on the work, or a description of what was done. Rather, the invoices typically read "due diligence" or the equivalent. RedRidge's invoices for due diligence often were round numbers, which is highly unusual and atypical as a matter of market practice for diligence services.

155.     Defendants Abrahams and RedRidge perpetrated this fraudulent invoicing scheme for years across borrowers in the ExWorks loan portfolio, generating over a million dollars in improper payments to RedRidge.

156.    Defendant Abrahams concealed from the ExWorks Board of Directors, its shareholder-advisor, and LPAC this improper and fraudulent practice, which caused financial harm to ExWorks and the Limited Partner Funds.

157.    For example, in 2015 defendant Abrahams caused [Borrower 2] entire $60,000 loan deposit to be sent to RedRidge, with no pro rata share to ExWorks. Defendant RedRidge did not perform any work that might justify a $60,000 payment to it.

158.    In 2016, as ExWorks amended its loan agreement with [Borrower 2], additional due diligence fees were charged, including a $75,000 fee in June 2016, and a $75,000 fee in December 2016. Defendant Abrahams caused RedRidge to be paid those due diligence fees even though RedRidge performed no work and failed to provide ExWorks any due diligence reports.

159.    In October 2019, defendant Abrahams caused defendant RedRidge to issue an invoice for $5,600 to ExWorks for due diligence performed. As defendant Abrahams knew, defendant RedRidge did not perform any due diligence services for [Borrower 2] related to that invoice.

160.    Defendant Abrahams knew full well that defendant RedRidge was not performing due diligence services as indicated and invoiced. When ExWorks's Lender Bank requested information regarding diligence performed on [Borrower 2] in late 2019, defendant Abrahams permitted ExWorks personnel to report to ExWorks's Lender Bank that "we haven't recently performed a field exam on [Borrower 2] or formally created a portfolio review[.]"

161.    Defendants Abrahams and RedRidge perpetrated this scheme across at least twelve different borrowers, resulting in at least $1,413,997 stolen from ExWorks.

**B.      Defendants Abrahams and RedRidge Improperly Took Money from ExWorks Under the Guise of "Prepaid Due Diligence."**

162.    In 2019, the ExWorks loan portfolio was not expanding with new borrowers and was suffering due to the actions of defendants Abrahams, Hall, and LaHaie as described in this First Amended Complaint. The lack of new borrowers, as defendant Abrahams knew, negatively

impacted RedRidge's profitability because ExWorks was RedRidge's largest customer for due diligence services.

163. To prop up RedRidge's business, defendant Abrahams caused ExWorks to repeatedly transfer hundreds of thousands of dollars to RedRidge, when, as defendant Abrahams knew, RedRidge was only due modest amounts for actual due diligence performed.

164. Between June 2019 and March 2020, defendant Abrahams abused his position of trust in ExWorks to make excessive transfers to RedRidge totaling approximately $3.7 million. Defendant Abrahams caused these payments to be paid in large amounts frequently and without regard to due diligence services actually performed by RedRidge.

165. For example, defendant Abrahams caused ExWorks to make a $350,000 payment to RedRidge on June 27, 2019, and then another $125,000 payment on August, 2, 2019, and another $425,000 worth of payments on August 27 and 28, 2019. This totaled more than $900,000 over approximately a six-month timeframe. But during this same time period, RedRidge only invoiced ExWorks for two diligence projects worth $22,050.

166. Defendant Abrahams knew about the excessive transfers and the substantial size of the outstanding balance. For instance, on March 9, 2020, defendant Abrahams received an email message from RedRidge's Chief Financial Officer, who stated, "Prepaid diligence (amounts owed to RDS [RedRidge] back to ExWorks LLC) at 12/31/19 is $2.3M." RedRidge's Chief Financial Officer further stated, "The prepaid diligence is a concern – need a more normal level of ExWorks diligence to soften that advance."

167. By improperly transferring approximately $3.7 million from ExWorks to RedRidge, defendant Abrahams created operating cash flow issues for ExWorks, including an inability to meet payroll for ExWorks and World Trade Finance personnel in or about March 2020.

168.     On March 31, 2020, defendant Abrahams communicated to ExWorks and World Trade Finance personnel, "there may be a short delay in payroll for all ExWorks employees this month[.]" Defendant Abrahams blamed the shortfall on the "extreme conditions the viral shutdown has created," and "[c]ash for refinance and cash collections have slowed worldwide and effects [sic] our portfolio[.]" This was a false and misleading statement because the shortfall arose from the approximately $3.7 million defendant Abrahams caused to be improperly transferred to RedRidge.

169.     In or about the spring of 2020, two members of the ExWorks Board of Directors discovered RedRidge's prepaid diligence balance, and they demanded that defendants Abrahams and RedRidge provide an explanation and information regarding the prepaid balance. When the two members of the ExWorks Board of Directors obtained that information, and after hearing defendant Abrahams lacked a business justification for the transfers, both members of the ExWorks Board of Directors expressed to defendant Abrahams their shock and disapproval of his misconduct. The ExWorks Board of Directors formed the Operating Committee to oversee ExWorks's management, and initiated an investigation and evaluation of ExWorks's relationship with RedRidge.

170.     On May 18, 2020, the member of the ExWorks Board of Directors who was also a member of the RedRidge Board of Directors, resigned from the RedRidge Board of Directors effective immediately. Both ExWorks Directors explained to defendant Abrahams that they were shocked and upset to learn for the first time that defendant Abrahams caused ExWorks to pay millions of dollars in the form of prepaid diligence advances to RedRidge. These ExWorks Directors further explained to defendant Abrahams that they would have never, under any circumstances, permitted prepaid funds to an affiliated entity.

171.     In May 2020, defendant Abrahams agreed to promptly return a substantial portion of the transfers. But, as discussed below, *see* ¶¶ 257-63 *infra*, defendant Abrahams improperly used

approximately $695,000 in SBA fees due to World Trade Finance to make part of his "repayment" of the excessive transfers.

## IV. Defendants Abrahams and LaHaie Created ACAP to Steal Existing Business and Business Opportunities from ExWorks and World Trade Finance.

172.    In 2019, defendants Abrahams and LaHaie surreptitiously created ACAP as a rival business to ExWorks, which they concealed from ExWorks. In 2020, defendants Abrahams and LaHaie disregarded the liquidity, capitalization, and other issues facing the ExWorks loan portfolio. They instead ramped up efforts to use ExWorks's and World Trade Finance's personnel, proprietary information, assets, technology, and resources to build ACAP's business, and then stole ExWorks and World Trade Finance business opportunities for ACAP.

173.    More specifically, in August 2019, defendants Abrahams and LaHaie began plans to form a new entity, tentatively called "NewCo," to target the asset-based-loan market. Defendant Abrahams expressed confidence in this "NewCo" because of the experience and reputation ExWorks had in this market.

174.    By December 11, 2019, defendants Abrahams and LaHaie developed a draft limited liability agreement for their new company, named ACAP Fund GP, LLC. Abrahams was the sole member of ACAP, and they planned to have its registered office in Wilmington, Delaware.

175.    By December 18, 2019, defendants Abrahams and LaHaie caused the Internal Revenue Service to issue an Employer Identification Number for ACAP Fund GP, LLC, which Abrahams directed to be sent to ExWorks's business address in Chicago, Illinois.

176.    Defendants Abrahams and LaHaie also began planning to poach ExWorks employees beginning no later than October 2019. In October 2019, defendants Abrahams and LaHaie identified four ExWorks employees whom they planned to bring to "NewCo." By July 2020, defendants Abrahams and LaHaie hired three of those four people for ACAP.

177.     In or about June 2020, defendants Abrahams and LaHaie hired five ExWorks employees—whom they earlier targeted for "NewCo"—after those employees departed ExWorks with severance agreements, which included financial payments. Defendant Abrahams knew the ExWorks Board of Directors, Operating Committee, and Acting Chief Operating Officer would not have permitted continued payments to these employees, nor would they have approved the severance packages, had they known defendant Abrahams intended to hire these people for ACAP.

178.     On July 14, 2020, defendant Abrahams, using his ACAP email address, emailed an ExWorks employee about coming to ACAP: "You are on team if you want to be, [ExWorks IT Director] will be in touch on anything else you need[.] We are : Buying PPP loan pools from banks[;] Big deal/ mega deal debt deals portfolio servicing and purchasing[;] Anything that looks niche oriented in debt." Defendant Abrahams was employed by ExWorks when he sent this email, violating his fiduciary duties to ExWorks by seeking to poach ExWorks employees for ACAP.

179.     Defendants Abrahams and LaHaie also secretly identified potential investors and sources of capital for ACAP throughout 2019 and continuing into 2020, using ExWorks's proprietary and confidential business information. In January 2020, defendants Abrahams and LaHaie identified a potential capital source who was an "optimal lending structure for this [ACAP] relationship" to allow ACAP to originate loans and be the lender of record. Defendant LaHaie introduced a lawyer to the potential source of capital, saying, "Look forward to getting this done!" Defendants Abrahams and LaHaie intentionally concealed this opportunity from the ExWorks Board of Directors.

180.     In or about March 2020, defendants Abrahams and LaHaie actively pursued having ACAP—not ExWorks—purchase a portfolio of loans from a bank with whom World Trade Finance had a contractual relationship. Defendants Abrahams and LaHaie also actively conspired to steal borrowers already serviced by ExWorks. For one ExWorks borrower, in March 2020,

defendants Abrahams and LaHaie plotted to have ACAP pay off the borrower's existing ExWorks loan and take over the borrower's debt needs.

181.     Defendants Abrahams and LaHaie continued to abuse the assets, personnel, and resources of ExWorks and World Trade Finance following the passage of the CARES Act, and the deployment of the PPP funds to small businesses. As further discussed below, defendants Abrahams and LaHaie both abused their positions of trust within ExWorks and World Trade Finance, and stole from them, including by (a) interjecting RedRidge to block World Trade Finance from acquiring The Loan Source; (b) working with RedRidge to transfer the opportunity to ACAP; (c) positioning ACAP to acquire The Loan Source; and (d) using ACAP to service and process more than $4 billion worth of PPP loans—all of which were business opportunities that rightfully belonged to Plaintiffs, but were stolen by these defendants.

## V.     Defendant Abrahams Fraudulently Misled and Concealed from the ExWorks Board of Directors and Operating Committee PPP Work and Opportunities.

182.     In response to the COVID-19 pandemic, the U.S. Congress passed the CARES Act, which was signed into law by President Donald J. Trump on March 27, 2020. The CARES Act provided over $2 trillion in economic relief to help the American people and businesses respond to the public health and economic impacts of COVID-19.

183.     A critical part of the CARES Act was the PPP, which authorized small businesses to apply for SBA loans to make up to eight weeks of payroll costs including benefits. PPP funds were also to be used to pay interest on mortgages, rent, and utilities. PPP loans were 100% government-guaranteed, with individual loans capped at $10 million.

184.     To apply for a PPP loan, a small business needed to provide a completed PPP loan application to a lender. The lender would conduct an eligibility check based on SBA eligibility guidelines and subject to any additional checks required by the lender. Once complete, the lender would send the application to the SBA for approval through the SBA's E-Transaction (E-Tran)

system, the SBA's electronic loan processing system for SBA loans. The SBA would then approve or deny the loan application. If approved, the borrower would be provided with documentation related to the terms of the PPP loan and offered the opportunity to sign the loan documents. Then, ultimately, the borrower would receive the loan distribution.

185. SBA lenders (like World Trade Finance) and federally insured depository institutions were authorized to fund and process PPP loans.

186. Before the CARES Act became law, ExWorks and World Trade Finance personnel with SBA expertise explained to defendants Abrahams and LaHaie the opportunity presented by the PPP to process PPP loans for other institutions. Defendant Abrahams and LaHaie conspired to and did pursue this PPP opportunity, but they concealed this PPP opportunity from the ExWorks Board of Directors and its Operating Committee. Defendants Abrahams and LaHaie also ordered ExWorks and World Trade Finance employees to conceal this activity from the Operating Committee.

187. In March and April 2020, defendant Abrahams discussed with the ExWorks Board of Directors and its Operating Committee having World Trade Finance fund PPP loans. The only opportunity defendant Abrahams presented to the Board of Directors and Operating Committee was for World Trade Finance to raise capital to fund PPP loans, not for World Trade Finance to engage in PPP loan processing and servicing for other financial institutions.

188. The ExWorks Board of Directors and Operating Committee approved the opportunity presented by defendant Abrahams. By mid-April 2020, World Trade Finance obtained approximately $20 million in capital to fund PPP loans. World Trade Finance then funded approximately $16 million worth of PPP loans to 22 borrowers from the ExWorks loan portfolio.

189.    Defendant Abrahams then presented to the ExWorks Board of Directors, its Operating Committee, and its shareholder-advisor, a separate offer from a different entity willing to fund approximately $200 million to World Trade Finance to issue PPP loans.

190.    On April 17, 2020, the ExWorks Board of Directors and its shareholder-advisor declined that opportunity, but expressed interest in other opportunities. Specifically, the ExWorks Board of Directors directed defendant Abrahams via email communication that "the entire ExWorks team should be singularly focused on creating liquidity and meeting the very high and difficult hurdles that the bank syndicate has forced us to accept. The time is inappropriate to be thinking about expanding our offerings." The ExWorks Board of Directors acknowledged that defendant Abrahams had "been approached by many other institutional investors," which the Board of Directors "urge[d] [Abrahams] to pursue and are open to hearing about them if they are less cumbersome and less expensive." Defendant Abrahams responded, "Ok, thanks[.] Understood."

191.    Unbeknownst to the ExWorks Board of Directors and its Operating Committee, throughout March and April 2020, defendants Abrahams and LaHaie were conspiring to use World Trade Finance to enter contracts with three banks to process PPP loan applications. Those contracts, which were signed by defendant LaHaie, were entered on April 5, April 8, and April 28, 2020, respectively, between World Trade Finance and the three banks.

192.    In April 2020, after the ExWorks Board of Directors directed defendant Abrahams to keep ExWorks's employees singularly focused on the loan portfolio, defendant Abrahams made false representations regarding a PPP opportunity he purported to have for RedRidge. Specifically, defendant Abrahams claimed to the ExWorks Board of Directors and a member of the ExWorks Operating Committee that RedRidge had an opportunity to earn a small amount of income doing labor intensive assistance for one or two banks processing of PPP loan applications on a small scale. Defendant Abrahams falsely gave the impression that this project would be small, tedious, and not

profitable to dissuade the ExWorks Board of Directors and its Operating Committee from pursuing the opportunity for ExWorks and World Trade Finance. But defendant Abrahams proceeded to pursue the opportunity using ExWorks and World Trade Finance personnel, resources, assets and expertise behind the back of the ExWorks Board of Directors and its Operating Committee.

> **A.    Defendants Abrahams and LaHaie Concealed PPP Loan Processing by World Trade Finance.**

193.    Beginning in March and continuing through April 2020, defendants Abrahams and LaHaie agreed and planned to have World Trade Finance process and service PPP loans for three banks: (1) The Northern Trust; (2) Franklin Synergy Bank; and (3) Northeast Bank.

194.    As defendants Abrahams and LaHaie knew, it was critical to the three banks that their relationships were with World Trade Finance. World Trade Finance held an SBA license, and the banks wanted to contract with an entity that had an SBA license to perform SBA loan application processing and servicing work. During negotiations with the three banks, defendants Abrahams and LaHaie touted the experience and expertise that World Trade Finance had with SBA lending. Furthermore, World Trade Finance personnel with SBA experience and expertise answered calls and gave confidence to the banks that World Trade Finance had the best platform available for PPP loan processing.

195.    Defendants Abrahams and LaHaie concealed their contract negotiations and execution of the PPP loan processing from the ExWorks Board of Directors and Operating Committee to divert the millions of dollars in SBA fees earned to themselves and defendant RedRidge.

> **1.    Defendants Abrahams and LaHaie Concealed World Trade Finance's PPP Contract with The Northern Trust.**

196.    Beginning in or about March 2020 and continuing until April 8, 2020, defendants Abrahams and LaHaie commandeered and used ExWorks and World Trade Finance personnel, as

well as outside counsel for ExWorks and World Trade Finance, to negotiate a contract with The Northern Trust for World Trade Finance to process PPP loan applications for The Northern Trust's borrowers. Defendants Abrahams and LaHaie agreed to and did conceal this activity from the ExWorks Board of Directors, its shareholder-advisor, and Operating Committee.

197.    Through a contract dated April 8, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing services to The Northern Trust. Defendant LaHaie signed the contract on behalf of World Trade Finance. Defendants Abrahams and LaHaie concealed the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

198.    Defendants Abrahams and LaHaie caused RedRidge to be identified in the contract as an affiliate of World Trade Finance. However, as defendants Abrahams and LaHaie knew, RedRidge had no contractual responsibilities, nor any contractual liabilities. RedRidge was not a signatory to the agreement.

199.    Defendants Abrahams and LaHaie knew World Trade Finance's SBA license was critical to The Northern Trust. The contract stated, "Each Party represents and warrants that it currently possesses, and covenants that it will at all relevant times maintain in good standing, all SBA required authorizations and licenses necessary to perform the Activities. The Parties acknowledge that given the urgent need to commence funding Loans under the Program, as of the Effective Date, SBA may not have formulated all regulations and guidance ('Regulations') that apply or will apply to the Program and Loans made thereunder."

200.    Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for a range of PPP loan application servicing for The Northern Trust, including: (a) supplying a website for prospective borrowers to access a loan application system; (b) answering questions received from prospective borrowers regarding the PPP and use of the system;

(c) providing prospective borrowers with the ability to submit PPP loan applications consistent with SBA guidelines; (d) reviewing information provided by prospective borrowers to confirm eligibility to participate in the PPP; (e) validating prospective borrower-provided information as required by SBA regulations; (f) obtaining electronic versions of all required loan documents (including executed versions); (g) submitting necessary information to the SBA for approval; and (h) providing The Northern Trust with reports on a borrower-by-borrower basis on completed applications and other related information. As defendants Abrahams and LaHaie knew and caused, RedRidge assumed no such responsibilities.

201.    The contract provided that The Northern Trust would "pay World Trade an amount equal to sixty percent (60%) of the processing fees paid by SBA to Northern Trust (or its Affiliates) under the CARES Act and the Regulations for Loans made to Prospective Borrowers that were processed by World Trade under the terms of this Agreement (the 'Charges')." The payment terms were clear that SBA fees earned were to go directly to World Trade Finance—not RedRidge.

### 2. Defendants Abrahams and LaHaie Concealed World Trade Finance's PPP Contract with Franklin Synergy Bank.

202.    Beginning in or about March 2020 and continuing until on or about April 5, 2020, defendants Abrahams and LaHaie commandeered and used ExWorks and World Trade Finance personnel, as well as outside counsel for ExWorks and World Trade Finance, to negotiate a contract with Franklin Synergy Bank to provide PPP loan application processing for Franklin Synergy Bank. Defendants Abrahams and LaHaie agreed to and did conceal this activity from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

203.    Through a contract dated April 5, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing services to Franklin Synergy Bank. Defendant LaHaie signed the contract on behalf of World Trade Finance. Defendants Abrahams

43

and LaHaie agreed to and did conceal the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

204. Defendants Abrahams and LaHaie caused RedRidge Finance Group to be identified in the contract as an affiliate of World Trade Finance. However, as defendants Abrahams and LaHaie knew, RedRidge had no contractual responsibilities, nor any contractual liabilities. RedRidge was not a signatory to the contract.

205. World Trade Finance's SBA license was critical to Franklin Synergy Bank entering into the contract. The contract stated, "Each Party represents and warrants that it currently possesses, and covenants that it will at all relevant times maintain in good standing, all SBA required authorizations and licenses necessary to perform the Activities without the assistance of the other Party. The Parties acknowledge that given the urgent need to commence funding Loans under the Program, as of the Effective Date, SBA may not have formulated all regulations and guidance ('Regulations') that apply or will apply to the Program and Loans made thereunder."

206. Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for a range of PPP loan application servicing for Franklin Synergy Bank, including: (a) supplying a website for prospective borrowers to access a loan application system; (b) answering questions received from prospective borrowers regarding the PPP and use of the system; (c) reviewing information provided by prospective borrowers to confirm eligibility to participate in the PPP; (d) validating prospective borrower-provided information as required by SBA regulations; (e) obtaining electronic versions of all required loan documents (including executed versions); and (f) assisting with requests for loan forgiveness. As defendants Abrahams and LaHaie knew and caused, RedRidge assumed no such responsibilities.

207. Franklin Synergy Bank agreed to "pay World Trade, for itself and on behalf of RedRidge, an amount equal to 50% of the processing fees paid by SBA to Franklin (or its Affiliates)

under the CARES Act and the Regulations for Loans made to Prospective Borrowers under the terms of this Agreement." The contract clearly provided that SBA fees earned were to go directly to World Trade Finance—not RedRidge.

### 3. Defendants Abrahams and LaHaie Concealed World Trade Finance's PPP Contract with Northeast Bank.

208. Beginning in or about March 2020 and continuing until April 28, 2020, defendants Abrahams and LaHaie commandeered ExWorks and World Trade Finance personnel, as well as outside counsel for ExWorks and World Trade Finance, to negotiate a contract with Northeast Bank to provide PPP loan servicing for Northeast Bank.

209. Through a contract dated April 28, 2020, defendants Abrahams and LaHaie caused World Trade Finance to agree to provide PPP loan processing services to Northeast Bank. Defendant LaHaie signed the contract on behalf of World Trade Finance. Defendants Abrahams and LaHaie agreed to and did conceal the negotiation and execution of this contract from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee.

210. Notably—and in contrast to The Northern Trust and Franklin Synergy Bank agreements—RedRidge was not even mentioned in the Northeast Bank contract. World Trade Finance solely assumed all responsibilities and liabilities under the contract to perform loan servicing work for Northeast Bank.

211. World Trade Finance's SBA license was critical to Northeast Bank entering the contract. The contract stated, "Each of Lender and LSP has been duly authorized by the SBA to originate loans ('Loans') under the Paycheck Protection Program ('Program') created under the Coronavirus Aid, Relief, and Economic Security Act of 2020 ('CARES Act')." Further, as stated in the contract, World Trade Finance was acknowledged as "experienced in SBA Lending, including origination, underwriting, closing, and servicing of SBA 7(a) loans, and provides guidance, assistance

and services to lenders that market, underwrite, originate, close, fund, service, manage, and liquidate SBA 7(a) loans."

212. Defendants Abrahams and LaHaie caused World Trade Finance to assume responsibility for two distinct phases of work: (a) processing PPP loan applications and assisting in funding; and (b) loan forgiveness and subsequent servicing. According to Northeast bank, the fee split for World Trade Finance's work was to be approximately 40% for Phase I (loan application processing), and 60% for Phase II (loan forgiveness).

213. With respect to Phase I loan application processing and funding assistance, World Trade Finance agreed to provide a range of PPP loan application services for Northeast Bank, including: (a) creating loan applications and related documents; (b) assisting Northeast in the completion of its portion of the SBA loan application documents; (c) completing, gathering, and obtaining all necessary SBA loan application documents and related borrower and guarantor due diligence items; (d) inputting borrower information into the bank's SBA loan processing software; and (e) submitting materials necessary to obtain PPP loan numbers through the E-Tran system.

214. Under the terms of the parties' agreement, for Phase I (loan processing), Northeast Bank agreed to pay World Trade Finance (a) 1.0% of the loan amount for loans less than or equal to $350,000; (b) 0.5% of the loan amount for loans greater than $350,000 but less than $2 million; and (c) 0.25% of the loan amount for loans of $2 million or more.

215. For Phase II (loan forgiveness), Northeast Bank agreed to pay World Trade Finance (a) 1.5% of the loan amount for loans less than or equal to $350,000; (b) 1% of the loan amount for loans greater than $350,000, but less than $2 million; and (c) .25% of the loan amount for $2 million or more.

**B.**   **Defendants Abrahams and LaHaie Concealed Their Use of ExWorks and World Trade Finance Personnel and Resources for PPP Processing.**

216.    After having World Trade Finance enter contracts to process PPP loans for The Northern Trust, Franklin Synergy Bank, and Northeast Bank, defendants Abrahams and LaHaie concealed from the ExWorks Board of Directors and Operating Committee that they were using World Trade Finance and ExWorks personnel and resources to perform PPP loan processing.

217.    To conceal the use of ExWorks and World Trade Finance personnel and resources, defendants Abrahams and LaHaie took advantage of the work-from-home environment resulting from the COVID-19 pandemic. They gave explicit instructions to ExWorks and World Trade Finance employees to conceal their PPP loan work for the three banks from the ExWorks Operating Committee.

218.    Specifically, and by way of example, on April 22, 2020, defendant LaHaie sent an electronic communication to an ExWorks and World Trade Finance employee saying, "Yo, just a heads up, make sure everyone knows not to disclose our bank partnerships." By "bank partnerships," defendant LaHaie was referring to World Trade Finance's contracts with The Northern Trust and Franklin Synergy Bank.

219.    Defendant LaHaie then disparaged the ExWorks Operating Committee via electronic communication, stating that he "wouldn't trust [Operating Committee Member 1] with the weather forecast." LaHaie further directed personnel via electronic communication not to "openly talk to anyone that isn't Randy [Abrahams], everyone else is not working with us."

220.    On May 11, 2020, ExWorks and World Trade Finance personnel were scheduled to have a conference call with the ExWorks Operating Committee regarding loan activity. Defendants Abrahams and LaHaie became aware of that call. The day before the call occurred, defendants Abrahams and LaHaie directed the ExWorks and World Trade Finance employee to conceal from the Operating Committee the PPP loan processing work being performed. Defendant Abrahams

directed the employee to "keep all commentary to the SBA deals you manage, give them as much information they care to have on those," but to not "make any commentary on PPP activity beyond that funded in WT [World Trade Finance], if asked, and nothing on RFG/RDS [RedRidge] at all or any servicing we are doing there or any of the clients or agreements." Defendant Abrahams concluded, "just want the [Operating] committee to stay in its lane and has nothing to do with our RFG [RedRidge] business at all[.]"

C.     **Defendants Abrahams and LaHaie Used ExWorks and World Trade Finance Personnel and Resources to Process the Three Banks' PPP Loans.**

221.    The personnel and resources of ExWorks and World Trade Finance were critical to the success of the PPP loan application processing and servicing work for The Northern Trust, Franklin Synergy Bank, and Northeast Bank. It was World Trade Finance and ExWorks personnel—not RedRidge—who brought the PPP opportunity to defendants Abrahams and LaHaie, who worked day and night to understand how ExWorks and World Trade Finance could fund and process PPP loans, and who developed a platform to process PPP loans.

222.    Employees from ExWorks and World Trade Finance—not RedRidge—interfaced directly with the SBA to better understand the PPP and its anticipated requirements. ExWorks and World Trade Finance employees then developed a proprietary process to efficiently and quickly determine PPP loan applicants' eligibility, maximum loan amount, and documentation needed.

223.    World Trade Finance and ExWorks employees developed an IT infrastructure to process the thousands of PPP loans, which required significant time, effort, and resources. ExWorks and World Trade Finance employees also developed a program to handle the E-Tran and loan document work for each SBA loan application. ExWorks and World Trade Finance employees then trained RedRidge and ExWorks personnel on the intake of SBA loan applications, the processing of loans through E-Tran and completing and providing loan documentation for the banks, and also trained personnel from the financial institutions including The Northern Trust and Franklin Synergy

48

Bank. ExWorks and World Trade Finance personnel also developed proprietary technology to efficiently gather potential SBA loan borrower information to be aggregated into a database for quicker processing.

224. Defendants Abrahams and LaHaie used ExWorks employees for PPP loan processing. As defendant LaHaie stated on March 27, 2020: "EWC [ExWorks] has capacity and we will ramp that up first."

225. By April 1, 2020, defendants Abrahams and LaHaie were ready to deploy ExWorks and World Trade Finance employees to PPP loan processing work. Core management and responsibilities for the PPP loan processing, including operations, interfacing with the SBA, and addressing legal issues was entrusted to ExWorks and World Trade Finance personnel, not RedRidge.

226. On April 1, 2020, defendant LaHaie laid out the division of responsibilities for ExWorks, World Trade Finance, and RedRidge, and directed that ExWorks and World Trade Finance personnel be responsible for the following: (a) managing PPP loan borrower intake; (b) determining the maximum loan forgiveness amount due to each PPP loan borrower; (c) aggregating on a daily and ongoing basis questions to be handled by ExWorks personnel to be distributed to ExWorks and World Trade Finance personnel with SBA expertise on a daily basis; and (d) developing an internal borrower status listing for use by ExWorks personnel.

227. On April 3, 2020, RedRidge acknowledged that its role would be assisting ExWorks as needed with PPP loan processing, saying RedRidge's role was limited to "an opportunity to assist WTF [World Trade Finance] through their deployment of the PPP program.".

228. Also on April 3, 2020, defendant LaHaie directed ExWorks and World Trade Finance employees "to work this weekend to get all of your borrowers into the SBA system so we are ready to fund them all as soon as the capital posts."

229.     On Saturday, April 4, 2020, defendant LaHaie informed ExWorks employees that they were needed for a mandatory training on a Sunday "regarding the SBA Payroll Protection Program that World Trade (our SBA platform) will be administering." Defendant LaHaie stated that "[t]he volume is going to be significant (1000+loans) that we will process and everyone in the company will be asked to step-up and help, across all of our offices." LaHaie emphasized that "all" ExWorks employees needed to join the Sunday call.

230.     ExWorks and World Trade Finance personnel worked full-time processing PPP loans for the three banks beginning no later than March 2020 and continuing through July 2020. Many ExWorks and World Trade Finance employees worked seven days a week, 12-14 hours per day.

231.     Defendant LaHaie directed that ExWorks employees in the United Kingdom also participate in the PPP loan application processing. Defendant LaHaie demanded that the employees devote "as close to 100% of their time dedicated to this project as possible[.]"

232.     Defendants Abrahams and LaHaie continued to demand that ExWorks and World Trade Finance employees dedicate their full attention and resources to PPP processing for the three banks. Defendant LaHaie stated on April 28, 2020, "Ideally the UK team would spend nearly all of their day on this, especially the AM in London, system should work much better at that time. For the US folks, to the extent you can get up and do a super early morning shift, let's do it!"

233.     Defendant LaHaie promised ExWorks and World Trade Finance employees "production bonuses" with a bonus pool of at least $20,000 per 500 loans funded. But the promises of defendants Abrahams and LaHaie were false. Defendants Abrahams and LaHaie never paid ExWorks and World Trade Finance employees bonuses for the PPP work; instead, defendants Abrahams, LaHaie, and RedRidge took the SBA fees earned for themselves, depriving the ExWorks and World Trade Finance employees of bonuses from the PPP loan work they did. Defendants'

actions created ill will amongst those employees, who were left to feel as if their hard work went uncompensated.

> **D.** **Defendants Abrahams, LaHaie, and RedRidge Stole SBA Fees Contractually Due to World Trade Finance.**

234. ExWorks and World Trade Finance personnel considered contracting with a temporary employment agency to provide additional personnel. Nonetheless, defendant Abrahams directed that idled RedRidge employees—who had free time because defendant Abrahams was no longer able to effectively bring in new business—assist World Trade Finance.

235. Because World Trade Finance was a licensed SBA lender, SBA rules and regulations required World Trade Finance to have a written agreement governing its relationship with a subcontractor like RedRidge. Defendants Abrahams and LaHaie directed and caused to be drafted a sham contract between World Trade Finance and RedRidge. Defendant LaHaie signed the sham contract on behalf of World Trade Finance, while defendant Abrahams directed a RedRidge employee to sign on RedRidge's behalf. The sham contract was signed April 11, 2020, and made effective as of March 20, 2020. Defendants Abrahams and LaHaie concealed this sham contract from the ExWorks Board of Directors and Operating Committee.

236. According to this sham contract, RedRidge "will be assisting Company [World Trade Finance] solely with system and process development and data analysis support." The bulk of the responsibility fell to World Trade Finance, who was responsible for "[a]ll eligibility decisions, developing processing and underwriting guidelines and compliance with SBA rules and regulations, interactions with customers who collaborate with [World Trade Finance] and loan servicing activities will be done exclusively by [World Trade Finance]."

237. Defendants Abrahams and LaHaie intentionally kept the compensation portion of the sham contract vague and ambiguous to manipulate distribution in favor of RedRidge and themselves. Per the agreement, "[a]ll application, servicing and other fees received by [World Trade

Finance] will be shared with [RedRidge]. The proportion shared with [RedRidge] is intended to reflect the resources dedicated to the project as well as the volume of processed applications and will be calculated as follows[.]" The sham contract then provided the following table:

| Component | Fee Weighting | Basis of allocation |
|---|---|---|
| Project Coordinator | 20% | # of personnel involved |
| Lead Managers | 20% | # of personnel involved |
| Managers | 10% | # of personnel involved |
| Foregiveness Calc | 10% | # of personnel involved |
| Operations | 10% | # of personnel involved |
| Processors | 30% | Volume of processed applications |
| Fee | 100% | |

238.    As defendants Abrahams, LaHaie, and RedRidge knew, the sham contract's fee structure was not presented to the ExWorks Board of Directors nor its Operating Committee as required by the ExWorks Board of Directors. Further, as defendants Abrahams, LaHaie, and RedRidge knew, this sham contract did not reflect the reality that ExWorks and World Trade Finance personnel, resources, and proprietary business information were the driving force behind the PPP loan work.

239.    Defendants Abrahams, LaHaie, and RedRidge then executed a plan to divert SBA fees due to World Trade Finance to RedRidge, and to reduce the SBA fees due World Trade Finance from Northeast Bank, for ACAP and The Loan Source to acquire its PPP loans.

### 1.    Defendants Abrahams, LaHaie, and RedRidge Diverted SBA Fees Due to World Trade Finance from The Northern Trust.

240.    World Trade Finance processed more than 1,000 PPP loans for The Northern Trust with assistance from RedRidge. That generated approximately $3.9 million in SBA fees. But World Trade Finance did not receive those fees from The Northern Trust. Instead, defendants Abrahams and LaHaie directed that The Northern Trust make its SBA fee payments to RedRidge.

241.    On May 26, 2020, defendant RedRidge sent an invoice to The Northern Trust for $3,732,805.46, for the processing of PPP loan applications. The invoice instructed The Northern Trust to "make check payable to RedRidge Finance Group."

242.    On June 18, 2020, The Northern Trust informed defendant LaHaie and World Trade Finance personnel that it was ready to "issue payment to ExWorks for their portion [of the SBA fee for PPP loan processing]." Defendant Abrahams then had RedRidge's Chief Financial Officer, "jump on this with invoice now and wire instructions previously sent for RFG [RedRidge]"? Defendant Abrahams removed World Trade Finance personnel from this email, but added defendant LaHaie to the email.

243.    The Northern Trust paid defendant RedRidge a total of $3,735,081.91 in SBA fees rightfully due to World Trade Finance. Defendants never gave any of these fees to World Trade Finance.

244.    The actions of defendants Abrahams, LaHaie, and RedRidge continue to harm ExWorks and World Trade Finance because World Trade Finance remains contractually responsible to perform forgiveness work on the PPP loans issued by The Northern Trust without any compensation. The theft of SBA fees from The Northern Trust by defendants Abrahams, LaHaie, and RedRidge inequitably burdens World Trade Finance with substantial services to perform without compensation.

        **2.     Defendants Abrahams, LaHaie, and RedRidge Diverted SBA Fees Due to World Trade Finance from Franklin Synergy Bank.**

245.    World Trade Finance processed more than 700 PPP loans for Franklin Synergy Bank with assistance from RedRidge. That generated approximately $1.5 million in SBA fees. But World Trade Finance did not receive those fees. Defendants Abrahams and LaHaie instead directed that Franklin Synergy Bank pay defendant RedRidge these SBA fees.

246.     On May 22, 2020, defendant RedRidge invoiced Franklin Synergy Bank for $1,477,191.82, related to the processing of PPP loans. Defendant RedRidge's invoice instructed Franklin Synergy Bank to "make check payable to RedRidge Finance Group." Franklin Synergy Bank paid defendant RedRidge $1,477,191.82 for SBA fees rightfully due to World Trade Finance. Defendants did not give any of this money to World Trade Finance.

247.     On June 8, 2020, Franklin Synergy Bank informed defendant LaHaie by email that the bank intended to make another payment of $605,456.11. Defendant LaHaie forwarded this email to defendant Abrahams, stating, "another $605k today coming to RFG [RedRidge]," and asking, "Can you please pay ACAP the software invoice when the $605k hits?" None of this $605,456.11 was sent to World Trade Finance.

248.     In total, Franklin Synergy Bank paid defendant RedRidge $1,574,372.27 for PPP loan processing work, but none of that was shared or provided to World Trade Finance.

### 3.     Defendants Abrahams, LaHaie, and RedRidge Improperly Diminished and Misused SBA Fees from Northeast Bank.

249.     World Trade Finance, with assistance from defendant RedRidge, managed the processing of more than 1,750 PPP loans for Northeast Bank. World Trade Finance was due to be paid approximately $1.2 million in SBA fees from Northeast Bank.

250.     Rather than allow Northeast Bank to make payment to World Trade Finance, defendant Abrahams entered partial terminations of the contract between Northeast Bank and World Trade Finance. Defendant Abrahams concealed these partial terminations of the contract from the ExWorks Board of Directors, Operating Committee, and Acting Chief Operating Officer.

251.     Defendant Abrahams entered the partial terminations to give defendant ACAP and The Loan Source the opportunity to purchase PPP loans from Northeast Bank.

252.     Defendants Abrahams and LaHaie had been contemplating bringing Northeast Bank's PPP business to ACAP. On May 1, 2020, defendant LaHaie informed defendant Abrahams

via email, "I'm trying to get Northeast to give us all of their PPP to service, which would be another few hundred million." Defendant Abrahams responded, "That would be the massive positive change for RFG [RedRidge] model for the long haul as well[.] Its like all the pieces are laying in front of us[.]" Defendant LaHaie replied, "Yes sir! I just wouldn't want to be in our way at this point."

253.    By contract dated June 26, 2020, signed by defendant Abrahams purporting to act on behalf of World Trade Finance, Northeast Bank agreed to pay World Trade Finance the reduced amount of $695,479.61 for processing certain PPP loans. The contract terminated World Trade Finance's rights to obtain further SBA fees through the provision of Phase II (loan forgiveness) services. Defendant Abrahams concealed this agreement from the ExWorks Board of Directors, its shareholder-advisor, Operating Committee, and Acting Chief Operating Officer.

254.    As discussed below, *see* ¶¶ 257-63 *infra*, on June 29, 2020, defendant Abrahams improperly caused the approximately $695,000 in SBA fees to be improperly applied against RedRidge's outstanding balance for "prepaid" due diligence with ExWorks.

255.    In an agreement dated July 29, 2020, signed by defendant Abrahams on behalf of World Trade Finance, Northeast Bank agreed to pay World Trade Finance a reduced payment of $152,063 for work done processing certain PPP loans, further terminating World Trade Finance's ability to obtain SBA fees associated with Phase II services (loan forgiveness). Defendant Abrahams concealed this agreement from the ExWorks Board of Directors, its shareholder-advisor, Operating Committee, and Acting Chief Operating Officer.

256.    When ExWorks and World Trade Finance employees asked Northeast Bank and about the SBA fees due in July 2020, defendant Abrahams directed ExWorks and World Trade Finance personnel to "stand down" as he would "get any documents RFG [RedRidge] needs from them forward [sic] [.]"

257.     Also unbeknownst to the ExWorks Board of Directors, its shareholder-advisor, its Operating Committee, and its Acting Chief Operating Officer, defendants Abrahams and LaHaie caused a new agreement to be negotiated between defendant ACAP and Northeast Bank for ACAP to purchase PPP loans directly from Northeast Bank. This occurred in or about June 2020, while defendants Abrahams and LaHaie were still employed by ExWorks and while both owed fiduciary duties to the company.

258.     The newly negotiated agreement between ACAP and Northeast Bank diverted both the opportunity for ExWorks and World Trade Finance to purchase PPP loans from Northeast Bank, as well as the opportunity for World Trade Finance to earn SBA fees associated with loan forgiveness. These expected SBA fees were substantial and totaled approximately $1.3 million based on the calculation under the original contract between World Trade Finance and Northeast Bank.

259.     Defendants Abrahams and LaHaie entered into a letter of intent dated June 1, 2020, between ACAP and Northeast Bank, through which ACAP would purchase SBA loans from Northeast Bank. Importantly, as of June 1, 2020, both defendants Abrahams and LaHaie were employed by ExWorks, and owed fiduciary duties of care, candor, good faith, and loyalty to ExWorks.

260.     By intentionally (a) reducing the amount owed to World Trade Finance; (b) misapplying approximately $695,000 in SBA fees against RedRidge's "prepaid" diligence balance with ExWorks; (c) terminating the expectation of future PPP loan processing and forgiveness earnings reasonably expected from Northeast Bank; and (d) hiding the potential business opportunity with Northeast Bank away from World Trade Finance and ExWorks and to themselves, defendants RedRidge, Abrahams, and LaHaie interfered with World Trade Finance's existing business relationship, breached their fiduciary obligations, and defrauded and stole from ExWorks and World Trade Finance.

**E.      Defendants Abrahams and RedRidge Misused SBA Fees to Reduce RedRidge's Balance with ExWorks.**

261.    In addition to stealing SBA fees due World Trade Finance, defendants Abrahams and RedRidge improperly applied approximately $695,000 in SBA fees against RedRidge's outstanding prepaid balance with ExWorks.

262.    As discussed above, *see* ¶¶ 160-68 *supra*, between June 2019 and March 2020, defendants Abrahams and RedRidge caused ExWorks to make excessive transfers totaling approximately $3.7 million to RedRidge.

263.    In May 2020, the ExWorks Board of Directors demanded that defendant Abrahams repay the outstanding balance of approximately $1.8 million to ExWorks. Defendant Abrahams agreed to make the repayment to ExWorks from RedRidge.

264.    Unbeknownst to the ExWorks Board of Directors, its shareholder-advisor, and Operating Committee, defendants Abrahams and RedRidge used SBA fees from Northeast Bank to reduce the outstanding balance by approximately $695,000 in June 2020.

265.    Specifically, on June 29, 2020, defendants Abrahams and RedRidge caused $695,480 in SBA fees received from Northeast Bank to be applied against the balance of excessive transfers.

266.    As defendants Abrahams and RedRidge knew, these amounts were SBA fees due to World Trade Finance for its PPP loan processing work, and these funds were ***not*** appropriately considered repayments of prepaid diligence. Defendant Abrahams concealed this information from ExWorks, its Board of Directors, and its Operating Committee, in order to give the false impression that defendant RedRidge had returned prepaid diligence payments to ExWorks.

267.    In addition to the $695,480 due to ExWorks, defendant RedRidge still has an outstanding balance of $25,633 in excessive transfers to repay.

## VI.    Defendants Abrahams, LaHaie, and RedRidge Stole Opportunities from ExWorks and World Trade Finance to Benefit ACAP.

268.    After seeing the opportunity to earn substantial SBA fees through the PPP, defendants Abrahams and LaHaie accelerated their plans to leave ExWorks, but not before they stole existing business and opportunities from ExWorks and World Trade Finance, and used ExWorks's and World Trade Finance's resources and assets to form and develop ACAP's PPP business, all while still employed by ExWorks.

### A.    Defendants Abrahams and LaHaie Stole ExWorks Records for ACAP.

269.    Beginning no later than March 2020 and continuing through at least May 2020, defendants Abrahams and LaHaie used an IT consulting firm to steal ExWorks data. Defendant Abrahams charged the IT consultant's fees of $5,135 to ExWorks.

270.    Defendants LaHaie and Abrahams had ExWorks pay the IT consulting firm to (a) "Export[] all Contacts with emails and send[] to Julia for email marketing purposes"; (b) "Creat[e] new records in ACAP Org from those created this week in the old EE ExWorks Org"; (c) "Add[] all Contacts, Clients, and Opportunities created in the old RR and Exworks [sic] Orgs into the new ACAP org"; and (d) "Create[] Processes to inform me when any new records were created in the PE Org; tested; created an unmanaged package and moved it to the ExWorks EE Org. Now I will be able to add any new Clients, Contacts, or Opportunities after the data import is done".

271.    Defendants Abrahams and LaHaie knew that ExWorks client information, contacts, and opportunities constituted confidential and proprietary business records belonging solely to ExWorks. None of the defendants—ACAP, Abrahams, or LaHaie—had authorization from the ExWorks Board of Directors and its Operating Committee to transfer this confidential proprietary data for their own use and benefit.

**B.** **Defendants Abrahams, LaHaie, and RedRidge Stole World Trade Finance's Opportunity to Acquire The Loan Source for Defendant ACAP.**

272. Defendants Abrahams, LaHaie, and RedRidge intentionally stole the opportunity to acquire The Loan Source from ExWorks and World Trade Finance. Defendants Abrahams and LaHaie concealed this theft from the ExWorks Board of Directors and Operating Committee, breaching their fiduciary obligations.

273. In April 2020, a World Trade Finance employee identified an opportunity for World Trade Finance to acquire The Loan Source, which was appropriately within the scope of World Trade Finance's business and one in which World Trade Finance had the capacity to engage. Defendants Abrahams and LaHaie stole the opportunity and gave it to their own company, defendant ACAP, to pursue.

274. In April 2020, a World Trade Finance employee was looking to acquire a company that held a Small Business Lending Company License ("SBLC"). World Trade Finance personnel determined that a SBLC would expand World Trade Finance's SBA loan offerings and would permit World Trade Finance to continue operations in the event the SBA changed its rules or regulations.

275. In April 2020, this World Trade Finance employee was in regular communication with a contact who worked with SBLC-licensed companies. That contact informed the World Trade Finance employee that he represented a potential SBLC-licensed company that was for sale.

276. On or about April 22, 2020, the World Trade Finance employee informed defendant LaHaie, who was his supervisor as Managing Director, that the employee "found us an SBLC for sale for $10 mm, getting an nda [non-disclosure agreement] sent over to review to obtain some more info." Defendant LaHaie responded, "haha how did you manage that? in your spare time!?" The World Trade Finance employee replied, "eyes and ears always open[.]"

277. As the employee promised to defendant LaHaie, the World Trade Finance employee requested a non-disclosure agreement to pursue acquisition of the SBLC-license holder. When the

World Trade Finance employee received the non-disclosure agreement, he gave it to defendant LaHaie to sign.

278.    On or about April 24, 2020, defendant LaHaie removed World Trade Finance from the non-disclosure agreement. Defendant LaHaie stated, "Need this changed to RedRidge Finance Group, LLC." Also that same day, defendant LaHaie informed World Trade Finance Personnel, "i want to sign the nda as it will be RFG [RedRidge] and not ewc [ExWorks] signing."

279.    On or about April 26, 2020, defendant LaHaie signed the non-disclosure agreement purporting to be a Managing Director for defendant RedRidge. Importantly, in April and May 2020 when this was occurring, defendant LaHaie was a Managing Director of ExWorks and World Trade Finance. Defendant LaHaie did not resign from ExWorks until June 30, 2020.

280.    Defendants RedRidge and LaHaie blocked World Trade Finance and ExWorks from pursuing the opportunity by signing the non-disclosure because World Trade Finance and ExWorks did not otherwise have an effective means of identifying who the SBLC was, and by signing the non-disclosure agreement and choosing to pursue the opportunity through RedRidge, defendants LaHaie and RedRidge excluded World Trade Finance personnel from all further negotiations.

281.    Following execution of the non-disclosure agreement by defendants RedRidge and LaHaie, defendants Abrahams and LaHaie intentionally did not involve World Trade Finance employees in the pursuit of the acquisition of The Loan Source. Also by signing the non-disclosure agreement and choosing to pursue the opportunity through defendant RedRidge, defendants LaHaie and RedRidge stopped World Trade Finance from pursuing the opportunity because World Trade Finance was unable to identify The Loan Source as the SBLC license holder and prevented World Trade Finance personnel from learning more about the opportunity.

282.    Defendants Abrahams and LaHaie concealed from the ExWorks Board of Directors and Operating Committee the opportunity for World Trade Finance to acquire The Loan Source, in

breach of their fiduciary obligations. This prevented the ExWorks Board of Directors from knowing that World Trade Finance had an opportunity to acquire The Loan Source and thus prevented World Trade Finance from pursuing the acquisition.

283. Defendants Abrahams and LaHaie continued to use defendant RedRidge as their alter ego throughout the negotiation process with The Loan Source, to communicate with counsel for The Loan Source, and to prepare the bid for The Loan Source.

284. On April 26, 2020, defendant LaHaie, using an email address of defendant RedRidge, sent an email communication to defendant Abrahams at his RedRidge email address, which stated, "Small SBLC, they want $10 million, which is crazy[.] If you look at the dates they have been trying to sell for almost a year[.]" Attached to this email, defendant LaHaie sent to defendants Abrahams and RedRidge confidential information regarding The Loan Source, its financial performance, and its loan portfolio. Defendants Abrahams, LaHaie, and RedRidge hid this information from World Trade Finance.

285. On May 2, 2020, defendants Abrahams, LaHaie, and RedRidge provided to counsel for The Loan Source an "outline of what we are thinking for the purchase of Loan Source [sic]" by them and ACAP. Defendant LaHaie sent this email on behalf of RedRidge and ACAP, using an email address from defendant RedRidge.

286. Also in that May 2, 2020 communication to counsel for The Loan Source, defendants LaHaie and RedRidge further stated that the parties were willing to pay "a significant premium" only "because of the PPP business we [defendants Abrahams, LaHaie, RedRidge, and ACAP] can put on the business." Defendant LaHaie further stated, "This is why we have such a short time to close this out, if we wait a few months we would not be willing to pay the premium we have offered here. In addition to the PPP program, we have significant investor capital lined up that we will use to fund [SBA] 7a loans going forward that we will deploy via the SBLC."

287. The term sheet indicated that the buyer would be a "created ACAP vehicle ('NewCo' or 'Buyer'), with ACAP to "control and operate LS [The Loan Source]," through which ACAP would "[p]articipate in PPP via origination of new deals and purchase of pools of PPP Loans from other PPP lenders (mainly community and smaller banks)[.]"

288. On Sunday, May 3, 2020, defendants RedRidge, Abrahams, ACAP, and LaHaie engaged in continued negotiations with counsel for The Loan Source. Defendant LaHaie, using a RedRidge email address, provided to counsel for The Loan Source additional terms to close the deal as soon as Friday, May 8, 2020. Among the terms emphasized by defendant LaHaie was that, "To buy these pools you will need a full dedicated team to service these assets, which we already have and we will bring to NewCo day one. As you can imagine, its an expensive proposition to hire this many qualified CPAs and consultants, but we are setup already to do this by bringing over select members of our 100 person staff to NewCo[.]" As indicated in the email, defendant LaHaie was planning to have defendant RedRidge use its CPAs and consultants work with ACAP and The Loan Source perform PPP work, in addition to the employees that the defendants poached from ExWorks.

289. Defendant ACAP entered into a contract to acquire The Loan Source in or about May 2020. However, while ACAP and The Loan Source entered into that contract, defendant ACAP has not yet completed its acquisition of The Loan Source because it needs SBA approval to acquire The Loan Source, because the The Loan Source is an SBLC license holder.

**C.    Defendants Abrahams and LaHaie Stole World Trade Finance's Opportunity to Perform PPP Loan Servicing Work for The Loan Source.**

290. Until ACAP completes its acquisition of The Loan Source, ACAP is processing and servicing PPP loans for The Loan Source. ACAP is now servicing more than four billion dollars' worth of PPP loans, which The Loan Source began purchasing after ACAP initiated its acquisition.

291. According to publicly available records,[2] on May 13, 2020, defendant ACAP entered into an agreement to service PPP loans purchased by The Loan Source. As of May 13, 2020, both defendants Abrahams and LaHaie were employed by ExWorks; defendant LaHaie's employment did not terminate until June 30, 2020, while defendant Abraham's employment with ExWorks did not terminate until August 7, 2020.

292. The Loan Source since gained access to the PPP Liquidity Facility, created to permit the twelve Federal Reserve Banks to operate liquidity facilities to lenders who made loans to small businesses through the PPP. On information and belief, The Loan Source entered into a letter agreement with the Federal Reserve Bank of Minneapolis.

293. On June 12, 2020, Northeast Bank—which already had a PPP servicing agreement with World Trade Finance—entered into a Paycheck Protection Program Liquidity Facility Correspondent Bank Agreement with The Loan Source and ACAP. Defendant LaHaie signed the agreement on behalf of defendant ACAP. Pursuant to the agreement, Northeast Bank agreed to serve as the correspondent bank for The Loan Source and ACAP, through which Northeast Bank would act as The Loan Source's depository institution for purposes of the PPP Liquidity Facility.

294. Defendants Abrahams and LaHaie caused defendant ACAP to begin touting its PPP experience and expertise while employed by Plaintiffs. Defendant ACAP's website, http://acapgp.com/about, says ACAP "was created exclusively to service PPP loans." The website states, "We are an SBA-approved non-bank servicing partner providing complete PPP loan servicing solutions." As discussed above, *see supra* Section VI.A-VI.C, this is exactly the same PPP work that World Trade Finance and ExWorks were performing for three banks. ACAP's website also says,

---

[2] When Northeast Bank agreed to serve as a correspondent bank for The Loan Source and ACAP, Northeast Bank filed an SEC Form 8-K, which included as an exhibit its Paycheck Protection Program Liquidity Facility Correspondent Agreement, dated June 12, 2020, which referenced ACAP's loan servicing agreement with The Loan Source.

"The Loan Source originates SBA and PPP loans." Publicly available records indicate numerous banks transferred PPP loans to The Loan Source, including Northeast Bank, which already had a contractual relationship with World Trade Finance for PPP processing service.

295.    Banks, particularly smaller and regional banks that issued PPP loans, began packaging and selling their PPP loans to The Loan Source. The sale of the PPP loans enabled the banks to register the profits from the PPP initiative (in exchange for giving up a percentage of the processing fees), while avoiding a potentially long-term and complicated regulatory process that will be imposed by the SBA to certify and approve loan forgiveness or repayment. Banks have been willing to sell their PPP portfolios at a discount to get the loans off their books more quickly.

296.    Beginning in or around May 2020, defendants ACAP and LaHaie, while LaHaie was still employed by ExWorks and World Trade Finance, began discussions with The Loan Source and Franklin Synergy Bank regarding the purchase of PPP loans from Franklin Synergy Bank.

297.    On June 1, 2020, Franklin Synergy Bank received a draft Loan Purchase and Sale Agreement, through which the bank's PPP loans would be sold to The Loan Source. On or about June 17, 2020, The Loan Source purchased the PPP loans from Franklin Synergy Bank for $228,371.78. Franklin Synergy Bank and The Loan Source executed a Custodial and Escrow Agreement on July 20, 2020 and the balance of the PPP loan purchase funds – $207,557.90 – were released by the custodian The Kingdom Trust Company on July 29, 2020.

298.    In June 2020, Northeast Bank entered into an agreement to sell $457.6 million PPP loans to The Loan Source.  By the end of June 2020, The Loan Source was in the process of purchasing approximately $1.27 billion worth of PPP loans, including approximately $815.3 million worth of PPP loans from lenders other than Northeast Bank.

299.    In June 2020, defendants Abrahams and LaHaie caused defendant ACAP to market itself on its website as a loan processing company with an "expert team assembled" that had

"already closed on $1.3B in loan acquisitions to date." Defendant ACAP purported to be an entity to whom banks could "sell your PPP loans with confidence" as "ACAP was created exclusively to service PPP loans."

300.    By mid-October 2020, ACAP's website stated that ACAP and TLS bought $3.3 billion worth of PPP loans, but as of October 25, 2020, ACAP removed that reference.

301.    On October 19, 2020, defendant LaHaie published an article stating that the partnership between The Loan Source and defendant ACAP has "$3.4 billion in purchased PPP loans to date."

## VII.    Defendants Abrahams and LaHaie Concealed ACAP from ExWorks, Its Board of Directors, and Its Operating Committee.

302.    In the midst of the scheme by defendant Abrahams and LaHaie to create ACAP while still employed by ExWorks, defendants Abrahams and LaHaie discussed ways to help themselves to the detriment of ExWorks. For example, on May 12, 2020, defendant LaHaie asked defendant Abrahams, "What do you think about moving me to RFG [RedRidge] and then having a contract back to ExWorks for my time and cost?" According to defendant LaHaie's email communication, defendant LaHaie "would feel more comfortable with this arrangement" because defendant LaHaie disparagingly viewed the ExWorks Board of Directors as "Hitler's Youth."

303.    Only after ACAP was established as a competing business did defendant LaHaie resign from ExWorks and World Trade Finance. On June 30, 2020, defendant LaHaie resigned from ExWorks and World Trade Finance. He immediately began touting himself as ACAP's Chief Investment Officer.

304.    On July 8, 2020, members of the ExWorks Operating Committee and defendant Abrahams had a conference call with a representative from an ExWorks investor. During the call, the representative said that he heard ExWorks started a new company named ACAP. The ExWorks Operating Committee members responded in substance that they were unfamiliar with ACAP and

that ACAP was not an ExWorks entity. Even though defendant Abrahams had otherwise been an active participant during the call, defendant Abrahams said nothing about ACAP, nor did he respond to the representative.

305. Later in July 2020, a member of the ExWorks Operating Committee confronted defendant Abrahams about ACAP. Defendant Abrahams admitted that he owned ACAP. Defendant Abrahams then falsely claimed that he told the investor's representative after the July 8, 2020 conference call that defendant Abrahams was involved in ACAP without the knowledge of the ExWorks Operating Committee. However, as defendant Abrahams knew, he never informed the investor's representative that he held an ownership interest in ACAP.

306. Defendants Abrahams and LaHaie violated their fiduciary duties to ExWorks by concealing ACAP from the ExWorks Board of Directors, its shareholder-advisor, and its Operating Committee. Defendants Abrahams and LaHaie further committed fraud by concealing their activities on behalf of and in the interest of ACAP from the ExWorks's Chief Compliance Officer.

307. At all times relevant to this complaint, ExWorks has maintained a Regulatory Compliance Manual (the "Compliance Manual") that directly addresses outside business activities by employees, including defendants Abrahams and LaHaie.

308. The Compliance Manual provides a blanket prohibition on outside business activities without consent. More specifically, the Compliance Manual has specific pre-clearance and disclosure policies regarding outside business activities. The Compliance Manual provides in pertinent part as follows:

- Supervised Persons are prohibited from engaging in outside business activities, serving on boards of directors, making investment decisions on behalf of non-Clients … without the prior written approval of the Compliance Officer.

- No Supervised Persons may utilize property of ExWorks, or utilize the services of ExWorks or its Employees, for his or her personal benefit or the benefit of another person or entity, without approval of the Compliance Officer. For this purpose, "property" means both tangible and intangible property, including funds, premises, equipment, supplies, information, business plans, business opportunities, confidential research, intellectual property, proprietary processes, and ideas for new research or services.

- A Supervised Person may not participate in any business opportunity that comes to his or her attention as a result of his or her association with ExWorks and in which he or she knows that ExWorks might be expected to participate or have an interest, without:

  o Disclosing in writing all necessary facts to the Compliance Officer;

  o Offering the particular opportunity to ExWorks; and

  o Obtaining written authorization to participate from the Compliance Officer.

309. The Compliance Manual provides that any violations warrant sanctions up to and including the suspension of employment, a referral to the SEC, a criminal referral, termination of employment for cause, and/or a combination of the foregoing.

310. On January 24, 2020, ExWorks hosted its annual internal compliance training meeting, which defendants Abrahams and LaHaie attended. During the meeting, employees' compliance obligations regarding outside business activities were among the topics addressed, and employees were reminded that Supervised Persons were prohibited from engaging in outside business activities without the approval of Compliance.

311. In January 2020, defendants Abrahams and LaHaie attested in writing that they received and reviewed the Compliance Manual. They also completed a required questionnaire, which asked: "Have you complied with ExWorks' requirements regarding the disclosure and

approval of outside business activities?" Both defendants Abrahams and LaHaie falsely responded "Yes" to the question. As both defendants knew at the time, they were intentionally concealing and failing to disclose their outside business activities associated with the formation and use of ACAP to divert opportunities from ExWorks to themselves.

312.     Additionally, on February 28, 2020, in response to a request for information regarding any "side investments or entities that you [Abrahams] may have an interest in" from the ExWorks Chief Compliance Officer, defendant Abrahams disclosed his interest in Kenilworth Property Holdings, LLC, and his son's trust, which had ownership interests in ExWorks as the "only related entities." Abrahams also disclosed his ownership interest in Big Palm, LLC, a purported music production business, stating, "nothing else active." Defendant Abrahams intentionally concealed from the ExWorks Chief Compliance Officer his outside business activities associated with the formation and use of ACAP to divert opportunities from ExWorks and to himself.

313.     The same day defendant Abrahams made these materially false representations to the ExWorks Chief Compliance Officer, defendant Abrahams discussed with defendant LaHaie funding models for ACAP, as well as marketing materials for ACAP. They also discussed with a third party a proposed ACAP fund brochure, which described ACAP as a "new entity formed in 2020 … to fund industry agnostic senior secured credit facilities, collateralized by operating company assets such as accounts receivable, inventories, machinery and equipment and intellectual property."

314.     On June 22, 2020, the ExWorks Chief Compliance Officer questioned defendant Abrahams about ACAP after observing defendant Abrahams's use of an ACAP email address during routine surveillance. Defendant Abrahams falsely stated that ACAP was in the process of being set up to provide special servicing to PPP loans in lieu of RedRidge providing such services in the future, but it was not yet fully operational. ExWorks's Chief Compliance Officer informed

defendant Abrahams of ExWorks's policies regarding outside business activities, and Abrahams responded that a disclosure would be forthcoming.

315. On July 9, 2020, the Chief Compliance Officer asked defendant Abrahams to disclose any new outside business activities. Defendant Abrahams responded via email communication, "I have previously disclosed the new LLC that is RedRidge related, to do niche market loan servicing, per our last call[.]" Defendant Abrahams intentionally failed to seek pre-approval from the Chief Compliance Officer as required to engage in this business, and defendant Abrahams also intentionally failed to provide accurate information regarding the true nature and extent of ACAP's business to the ExWorks Chief Compliance Officer, which went well beyond "niche" market loan servicing as defendant Abrahams knew.

## VIII. Defendant Abrahams Improperly Converted an ExWorks Loan.

316. On or about April 15, 2019, ExWorks agreed to make a loan in the amount of $785,000 to defendant Abrahams, and on or about April 16, 2019, funds in the amount of $785,000 were transferred by ExWorks to defendant Abrahams for the loan.

317. Defendant Abrahams had an obligation to repay the loan per the terms of his contract with ExWorks. Defendant Abrahams had this obligation, and the funds were not otherwise authorized to be convertible into a bonus or made in lieu of compensation to defendant Abrahams.

318. On or about April 15, 2019, the ExWorks Board of Directors and its shareholder-advisor explicitly stated to defendant Abrahams via email communication: "[W]e are fine with your borrowing $785,000 today from ExWorks. However, we are not agreeing to an additional $785,000 bonus for your 2018 compensation. While we will certainly take into consideration the outcome of the [creditors'] situation, any additional bonus will be determined by us in our sole discretion."

319. This statement from the ExWorks Board of Directors and its shareholder-advisor came in response to an email communication from defendant Abrahams discussing options whereby

the loan could be considered compensation if certain performance goals are met; however,

defendant Abrahams ended his email communication by stating, "[t]he [loan] amount is now

considered a loan to me."

320.     At all times, the $785,000 rightfully belonged to ExWorks and was only intended to

be a temporary loan to defendant Abrahams, with full expectation by all parties that the loan amount

would be repaid in full to ExWorks.

321.     After Defendant Abrahams received the email response identified above from the

ExWorks Board of Directors, Abrahams forwarded it to the Chief Financial Officer of ExWorks.

322.     ExWorks issued the $785,000 loan to defendant Abrahams and carried the loan on

its accounting books and records as a note receivable.

323.     Defendant Abrahams failed to repay the $785,000 loan prior to the termination of

his employment in August 2020, breaching his contract with Plaintiffs Exworks Capital, and

defendant Abrahams has failed to repay the $785,000 to this date even after demands for repayment

have been made.

## COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT
### (Defendants Abrahams, LaHaie, RedRidge, and ACAP)

324.     Paragraphs 1 through 323 are incorporated by reference.

325.     Plaintiff World Trade Finance has valid and enforceable agreements with three banks

to perform PPP loan application processing and servicing.

326.     At all times relevant to the litigation, defendants Abrahams, LaHaie, RedRidge, and

ACAP were aware of these agreements and contractual relationships.

327.     With that knowledge, defendants Abrahams, LaHaie, RedRidge, and ACAP

misappropriated the funds owed under the contracts to plaintiff World Trade Finance and funneled

the funds to defendants for their own personal use.

328.     In misappropriating the funds owed to plaintiff World Trade Finance, defendants Abrahams, LaHaie, RedRidge, and ACAP intentionally and unjustifiably interfered with World Trade Finance's contractual relationships with the three banks.

329.     The actions of defendants Abrahams, LaHaie, RedRidge, and ACAP caused a breach of the contracts by the banks.

330.     Defendants Abrahams, LaHaie, RedRidge, and ACAP interfered with World Trade Finance's contractual relationships in an attempt to gain a competitive advantage in the PPP loan application processing and servicing market, and with the malicious intent to cause harm to plaintiff World Trade Finance.

331.     As a direct and proximate result of the willful and intentional interference of defendants Abrahams, LaHaie, RedRidge, and ACAP with these contractual relationships, the three banks have breached their contracts with plaintiff World Trade Finance by failing to pay plaintiff World Trade Finance amounts due under their contracts.

332.     As a direct result of the actions by defendants Abrahams, LaHaie, RedRidge, and ACAP, plaintiff World Trade Finance suffered damages.

333.     The interference by defendants Abrahams, LaHaie, RedRidge, and ACAP was willful and intentional.

### COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
#### (Defendants Abrahams, LaHaie, RedRidge, and ACAP)

334.     Paragraphs 1 through 323 are incorporated by reference.

335.     Plaintiffs ExWorks and World Trade Finance sought to acquire an entity holding an SBLC license, through which Plaintiffs would have derived the potential business opportunity to increase its business and obtain substantial economic benefit.

336.    Plaintiffs had a reasonable expectation of entering in a valid business relationship with The Loan Source for its SBLC license.

337.    Defendants Abrahams, LaHaie, RedRidge, and ACAP were aware of this business opportunity, and they interfered with and are continuing to interfere with the business opportunity by, among other things, taking the business opportunity to acquire The Loan Source for themselves with the malicious and purposeful intent to injure Plaintiffs and to defeat Plaintiffs' reasonable business expectancy using wrongful means.

338.    Such interference has resulted in and continues to result in irreparable injury to Plaintiffs' goodwill, reputation, and business interests.

339.    Such interference has also resulted in harm in the form of lost profits for which Plaintiffs are entitled to compensation and other relief as deemed necessary.

340.    As a direct and proximate result of defendants' willful and intentional interference with this relationship, potential business and opportunities have been steered away from Plaintiffs.

### COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Defendants Abrahams, LaHaie, and ACAP)

341.    Paragraphs 1 through 323 are incorporated by reference.

342.    Because of its superior loan servicing reputation, Plaintiffs ExWorks and World Trade Finance have developed business relationships with Franklin Synergy Bank and Northeast Bank, through which Plaintiffs have derived or have the potential to derive substantial economic benefit.

343.    Plaintiffs had a reasonable expectation of entering in a valid business relationship with the banks for further PPP loan work, including further loan application processing and servicing.

344.     Defendants Abrahams, LaHaie, and ACAP were aware of these relationships and have interfered with and are continuing to interfere with the relationships, with the malicious and purposeful intent to injure Plaintiffs and defeat Plaintiffs' reasonable business expectancy using wrongful means.

345.     Such interference has resulted in and continues to result in irreparable injury to Plaintiffs' goodwill, reputation, and business interests.

346.     Such interference has also resulted in harm in the form of lost profits for which Plaintiffs are entitled to compensation and other relief as deemed necessary.

347.     As a direct and proximate result of the willful and intentional interference with these relationships by defendants Abrahams, LaHaie, and ACAP, current and potential customers have been steered away from Plaintiffs.

## COUNT IV: CIVIL CONSPIRACY
### (Defendants Abrahams, LaHaie, RedRidge, and ACAP)

348.     Paragraphs 1 through 323 are incorporated by reference.

349.     Beginning as early as August 3, 2019, defendants Abrahams, LaHaie, RedRidge, and ACAP did knowingly and willfully conspire and agree among themselves to: (a) conceal their plan for the development of a new entity, which became ACAP; (b) fraudulently divert opportunities owed to Plaintiff for ACAP and its new ill-gotten partnership with The Loan Source; (c) entice Plaintiffs to believe defendants Abrahams and LaHaie would continue to work diligently and effectively as fiduciaries for ExWorks, while unbeknownst to Plaintiffs, these defendants conspired and agreed to develop ACAP, partner with The Loan Source, and poach employees from ExWorks to come work for ACAP; and (d) convert monies owed to Plaintiffs ExWorks and World Trade Finance from the banks for these defendants' own use and benefit, including to provide capital to ACAP, as set forth herein.

350. In furtherance of this conspiracy and agreement, defendants Abrahams, LaHaie, RedRidge, and ACAP engaged in fraudulent misrepresentations, omissions, and concealment of facts, as described herein, all in a calculated attempt to obtain Plaintiffs' funds owed from the banks for the benefit of these defendants. Such overt acts were committed in furtherance of the conspiracy and agreement, and with the knowledge that such fraudulent misrepresentations and omissions were necessary to steal the funds owed to Plaintiffs for the benefit of these defendants.

351. Defendants Abrahams, LaHaie, RedRidge, and ACAP were willing and intentional participants in the joint activity.

352. These actions by these defendants as set forth herein were in violation of the rights of Plaintiffs and committed in furtherance of the conspiracy and agreement.

353. As a direct and proximate result of the conspiracy and agreement to steal from and defraud Plaintiffs, Plaintiffs have suffered significant damage.

354. Defendants Abrahams, LaHaie, RedRidge, and ACAP's conduct was undertaken with malicious and willful intent.

## COUNT V: BREACH OF FIDUCIARY DUTIES
### (Defendants Abrahams, LaHaie, and Hall)

355. Paragraphs 1 through 323 are incorporated by reference.

356. At all times relevant to this litigation, defendant Abrahams, as CEO and member of the Board of Directors for Plaintiffs ExWorks and World Trade Finance, and defendant LaHaie, as Managing Director of Plaintiffs ExWorks and World Trade Finance, owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs; and defendant Hall, as Chief Credit Officer of ExWorks and a member of the ExWorks Investment Committee, owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiff ExWorks.

357. Defendants Abrahams and LaHaie willfully, intentionally, knowingly, recklessly, and in bad faith violated their fiduciary duties of candor, care, loyalty, and good faith owed to Plaintiffs. Defendants Abrahams and LaHaie put their personal interests ahead of the interests of Plaintiffs, their employers. Defendant Hall willfully, intentionally, knowingly, recklessly, and in bad faith violated his fiduciary duties of candor, care, loyalty, and good faith owed to Plaintiff ExWorks. Defendant Hall put his personal interests ahead of the interests of Plaintiff ExWorks.

358. Defendants Abrahams and LaHaie stole money from ExWorks and World Trade Finance, seized for themselves and defendants RedRidge and ACAP business opportunities that rightfully belonged to Plaintiffs, actively concealed and intentionally misrepresented matters to the ExWorks Board of Directors and its Operating Committee, and abused assets and resources of ExWorks and World Trade Finance for their own benefit and for the benefit of RedRidge and ACAP.

359. Defendants Abrahams, LaHaie, and Hall also: (a) actively concealed and intentionally misrepresented matters regarding the ExWorks Loan Portfolio to the ExWorks Board of Directors, its shareholder-advisor, the LPAC, and the Funds' investors; and (b) intentionally and wrongfully extended unsecured loans to borrowers through shell entities and individuals.

360. As a result of the breach of the fiduciary duties by defendants Abrahams, LaHaie, and Hall, Plaintiffs have been injured, face continued irreparable injury, and have no adequate remedy at law.

a. Plaintiffs are threatened with losing an opportunity to partner with banks to perform PPP loan servicing work, the opportunity to acquire The Loan Source, and the work performed by defendant ACAP; all of which rightfully belong to Plaintiffs but were stolen by defendants Abrahams and LaHaie. Plaintiffs' inability to pursue the rights to these business

opportunities makes it difficult to determine the financial damages owed. The benefits of granting injunctive and equitable relief far outweigh any possible injury to Defendants.

        b.      Defendants Abrahams, LaHaie, and Hall's breach of their fiduciary duties has caused significant monetary damages and irreparable harm to Plaintiff ExWorks. Plaintiff ExWorks and the Funds' investors suffered losses as a result of the misdeeds of defendants Abrahams, Hall, and LaHaie.

### COUNT VI: CONSTRUCTIVE FRAUD
### (Defendants Abrahams, LaHaie, Hall, and ACAP)

361.      Paragraphs 1 through 323 are incorporated by reference.

362.      At all times relevant to this litigation, defendant Abrahams, as CEO and member of the Board of Directors for Plaintiffs ExWorks and World Trade Finance, and defendant LaHaie, as Managing Director of Plaintiffs ExWorks and World Trade Finance, owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs; and defendant Hall, as Chief Credit Officer of ExWorks and a member of the ExWorks Investment Committee, owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiff ExWorks. Defendant ACAP was formed by defendants Abrahams and LaHaie while they were employed by Plaintiffs, and defendant ACAP was operated and used by defendants Abrahams and LaHaie as their alter ego while employed by Plaintiffs.

363.      Defendants Abrahams and LaHaie personally, and through their alter ego defendant ACAP, knowingly, recklessly, and in bad faith violated their fiduciary duties of candor, care, loyalty, and good faith owed to Plaintiffs. Defendants Abrahams and LaHaie put their personal interests ahead of the interests of Plaintiffs.

364.      Defendant Hall knowingly, recklessly, and in bad faith violated his fiduciary duties of candor, care, loyalty, and good faith owed to Plaintiff ExWorks. Defendant Hall put his personal interests ahead of the interests of Plaintiff ExWorks.

365.     Defendants Abrahams and LaHaie personally, and through their alter ego defendant ACAP, engaged in conduct that was calculated to deceive Plaintiffs ExWorks and World Trade Finance, including acts, omissions, and concealments by defendants Abrahams and LaHaie in breach of their legal and equitable duties, as well as the trust and confidence placed in them by Plaintiffs.

366.     Defendant Hall engaged in conduct that was calculated to deceive Plaintiff ExWorks, including acts, omissions, and concealments by defendant Hall in breach of his legal and equitable duties, as well as the trust and confidence placed in them by Plaintiff ExWorks.

367.     As a result of the constructive fraud committed by defendants Abrahams and LaHaie, and their alter ego defendant ACAP, along with defendant Hall, Plaintiffs suffered damages and irreparable harm.

368.     The acts, omissions, and concealments by defendants Abrahams and LaHaie, and their alter ego defendant ACAP, and defendant Hall, were willful and intentional.

## COUNT VII: FRAUDULENT CONCEALMENT
### (Defendants Abrahams, LaHaie, and Hall)

369.     Paragraphs 1 through 323 are incorporated by reference.

370.     Defendants Abrahams and LaHaie failed to disclose material facts about their actions, including: (a) their failures to disclose ACAP's existence and true purpose to ExWorks, including to the Board of Directors, the Operating Committee, and as required by the Chief Compliance Officer and Compliance Manual; (b) the full extent and nature of the PPP loan application processing work conducted by World Trade Finance and RedRidge for The Northern Trust, Franklin Synergy Bank, and Northeast Bank; (c) the fee-sharing arrangement between World Trade Finance and RedRidge for PPP loan application processing; (d) the opportunity to acquire The Loan Source; and (e) the opportunity to engage in PPP loan servicing work with The Loan Source.

371. Defendants Abrahams, Hall, and LaHaie concealed and failed to disclose to plaintiff ExWorks material facts about their actions, including: (a) falsely claiming that they had earned $7 million for ExWorks in connection with the sale of warrants when, in fact, they only collected $3 million and incurred a new $4 million liability; (b) causing ExWorks to overextend credit to borrowers through the use of shell entities and individuals in order to hide and conceal failing loans; and (c) concealing when certain borrowers defaulted on their loan obligations.

372. Defendant Abrahams, Hall, and LaHaie also mispresented the true size and magnitude of loans made to certain borrowers to the ExWorks Board of Directors and Advisory Committee. For example, defendants Abrahams and Hall caused ExWorks to provide millions of dollars' worth of funds to █Borrower 2█ through a line of credit to █Shell 2█, but misrepresented to the ExWorks Board of Directors and Advisory Committee the outstanding loan balance to █Borrower 2█ Also by way of example, defendants Abrahams and LaHaie caused ExWorks to provide millions of dollars' worth of funds to █Borrower 1█ through a line of credit to █Shell 1█, but misrepresented to the ExWorks Board of Directors and Advisory Committee the outstanding loan balance to █Borrower 1█. Defendants Abrahams, Hall, and LaHaie caused these statements to be made with full knowledge of their falsehood.

373. Defendants Abrahams, LaHaie, and Hall actively concealed these facts and made these omissions with knowledge of the false impression created thereby.

374. Plaintiffs reasonably relied upon defendants Abrahams's and LaHaie's and Hall's omissions, which were intended to induce and actually did induce Plaintiffs to entrust defendants Abrahams, LaHaie and Hall with company resources, financial benefits, and other benefits to the detriment of Plaintiffs.

375.     Defendants Abrahams's and LaHaie's and Hall's fraudulent concealments caused Plaintiffs to suffer injuries and irreparable harm, for which they are entitled to damages and other legal and equitable relief.

376.     Defendants Abrahams's and LaHaie's and Hall's violations were willful and intentional.

## COUNT VIII: FRAUDULENT MISREPRESENTATION
### (Defendants Abrahams and LaHaie)

377.     Paragraphs 1 through 323 are incorporated by reference.

378.     Defendant Abrahams made multiple intentionally false statements and misrepresentations, including: (a) his false statement to the ExWorks Board of Directors and its Operating Committee in April 2020 that RedRidge would be processing PPP loan applications; (b) his false statement to a member of the ExWorks Operating Committee in July 2020 that he followed up with the representative for the ExWorks investor following the investor call involving the Operating Committee to make clear ACAP was distinct from ExWorks; and (c) his false and misleading disclosures to ExWorks's Chief Compliance Officer relating to his outside business activities, including ACAP.

379.     Defendant LaHaie made multiple intentionally false statements and misrepresentations, including his false disclosures to ExWorks's Chief Compliance Officer relating to his outside business activities, including the development of ACAP.

380.     Defendants Abrahams and LaHaie made these statements with full knowledge of their falsehood.

381.     Plaintiffs reasonably relied upon the statements by defendants Abrahams and LaHaie, which were intended to induce and actually did induce Plaintiffs to entrust defendant

Abrahams and LaHaie with company resources, financial benefits, and other benefits to the detriment of Plaintiffs.

382.     The fraudulent misrepresentations of defendants Abrahams and LaHaie caused Plaintiffs to suffer injuries, for which they are entitled to damages and other legal and equitable relief.

383.     The violations by defendants Abrahams and LaHaie were willful and intentional.

## COUNT IX: EMBEZZLEMENT
### (Defendants Abrahams and LaHaie)

384.     Paragraphs 1 through 323 are incorporated by reference.

385.     Defendants Abrahams and LaHaie owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiffs by virtue of defendant Abrahams's role as Chief Executive Officer and member of the Board of Directors of Plaintiffs ExWorks and World Trade Finance, and defendant Luke LaHaie as Managing Director of Plaintiffs ExWorks and World Trade Finance, respectively.

386.     Plaintiffs had an absolute and unconditional right to the immediate possession of the fees generated from the PPP loan application processing work performed under contracts with Franklin Synergy Bank, The Northern Trust, and Northeast Bank.

387.     With the intent to embezzle, defendants Abrahams and LaHaie embezzled the funds due to World Trade Finance for the use of defendants Abrahams, LaHaie, and RedRidge.

388.     Plaintiffs did not consent in any manner to defendants Abrahams and LaHaie taking the funds at issue for their own personal use.

389.     Defendants Abrahams and LaHaie have not returned the funds to Plaintiffs, and defendants Abrahams and LaHaie continue to maintain control, dominion, and ownership over the funds.

390.     The embezzlement of funds by defendants Abrahams and LaHaie was willful and intentional.

## COUNT X: EMBEZZLEMENT
### (Defendant Abrahams and RedRidge)

391.     Paragraphs 1 through 323 are incorporated by reference.

392.     Defendant Abrahams owed fiduciary duties of candor, care, good faith, and loyalty to Plaintiff ExWorks by virtue of defendant's roles as Chief Executive Officer. Also during this same relevant time period, defendant RedRidge had an arrangement with Plaintiff ExWorks to provide due diligence services in good faith and with honesty and fair dealing.

393.     Plaintiff ExWorks had an absolute and unconditional right to the immediate possession of its money properly earned.

394.     With the intent to embezzle, defendants Abrahams and RedRidge converted Plaintiff ExWorks's funds to defendant RedRidge often under the guise of "prepaid" due diligence fees.

395.     Defendants Abrahams and RedRidge also stole diligence fees related to the Borrower 2 account, causing deposits that were supposed to be provided to plaintiff ExWorks to be re-directed to RedRidge, even though RedRidge did not perform any work that would justify payment of such amounts.

396.     Plaintiff ExWorks did not consent in any manner to defendants Abrahams and RedRidge taking the funds at issue for their own use.

397.     Defendants Abrahams and RedRidge have not returned Plaintiff's funds, and defendants Abrahams and RedRidge continue to maintain control, dominion, and ownership over the funds.

398.     The embezzlement of funds by defendants Abrahams and RedRidge was willful and intentional.

## COUNT XI: CONVERSION
### (Defendants Abrahams, LaHaie, and RedRidge)

399.     Paragraphs 1 through 323 are incorporated by reference.

400.     At all times relevant to this litigation, Plaintiffs had an absolute and unconditional right to the immediate possession of the fees generated from PPP loan processing and servicing performed under contracts with Franklin Synergy Bank, The Northern Trust, and Northeast Bank.

401.     Defendants Abrahams, LaHaie, and RedRidge intentionally and substantially interfered with those funds by taking the funds and misappropriating the funds for their own personal use and enjoyment.

402.     At all times relevant to this litigation, plaintiff ExWorks also had an absolute and unconditional right to the fees and deposits associated with borrowers, except to pay RedRidge for work actually performed by RedRidge.

403.     Defendant RedRidge intentionally and substantially interfered with those funds by causing ExWorks to pay RedRidge the entire due diligence deposits and fees regardless of the work actually performed by RedRidge, thereby taking the funds and misappropriating the funds for its own use and enjoyment.

404.     Plaintiffs did not consent in any manner to defendants Abrahams, LaHaie, and RedRidge taking the funds at issue for their own personal use.

405.     Defendants Abrahams, LaHaie, and RedRidge have not returned the funds to Plaintiffs, and defendants Abrahams, LaHaie, and RedRidge continue to maintain control, dominion, and ownership over the funds.

406.     Plaintiffs made demands to defendants Abrahams, LaHaie, and RedRidge for the return of those funds to no avail. Furthermore, demand would be futile and no demand is necessary

because defendants Abrahams, LaHaie, and RedRidge engaged in direct conversion of the funds at issue.

407.    The misappropriation of the funds by defendants Abrahams, LaHaie, and RedRidge was willful and intentional.

## COUNT XII: CONVERSION
### (Defendants Abrahams)

408.    Paragraphs 1 through 323 are incorporated by reference.

409.    At all times relevant to this litigation, Plaintiff ExWorks had an absolute and unconditional right to receive repayment from defendant Abrahams for the $785,000 loan issued to him in April 2019.

410.    Defendant Abrahams intentionally and substantially interfered with Plaintiff ExWorks's receipt of those funds by taking the funds and misappropriating the funds for his own personal use and enjoyment.

411.    Plaintiff ExWorks did not consent in any manner to defendant Abrahams taking the funds at issue for his own unauthorized personal use.

412.    Defendant Abrahams has not returned the funds to Plaintiff ExWorks, and defendant Abrahams continues to maintain unauthorized use, control, dominion, and ownership over the funds.

413.    Plaintiff ExWorks made demands to defendant Abrahams for the return of those funds to no avail. Furthermore, demand would be futile and no demand is necessary because defendant Abrahams engaged in direct conversion of the funds.

414.    Defendant Abrahams's misappropriation of the funds was willful and intentional.

## COUNT XIII: BREACH OF CONTRACT
### (Defendants Abrahams)

415.    Paragraphs 1 through 323 are incorporated by reference.

416.     At all times relevant to this litigation, defendant Abrahams was party to a valid and enforceable contract for a loan in the amount of $785,000 with Plaintiff ExWorks.

417.     Defendant Abrahams breached the contract by not repaying the $785,000 loan through his acts and omissions described above.

418.     As a direct result of defendant Abrahams's actions, plaintiff ExWorks suffered damages in the amount of $785,000.

## COUNT XIV: BREACH OF CONTRACT
### (Defendant Abrahams)

419.     Paragraphs 1 through 323 are incorporated by reference.

420.     At all times relevant to this litigation, defendant Abrahams was party to a valid and enforceable contract, namely, the Operating Agreement, with Plaintiff ExWorks.

421.     At all relevant times, Section 3.4(b) of the Operating Agreement provided, "Notwithstanding Section 18-402 of the Act, except as expressly authorized in writing by the Board or this Agreement, no Member, nor any officer, employee or agent of any Member, as such, shall have the authority or power, directly or indirectly, to act as agent of the Company for any purpose, or to engage in any transaction, make any commitment, enter into any contract or incur any obligation (whether as principal, surety or agent) in the name of the Company, or in any other way to bind the Company or to hold itself out as acting for or on behalf of the Company."

422.     At all relevant times, Section 7.8 of the Operating Agreement provided, "Except as may be otherwise expressly provided in this Agreement, a Director may engage in other commercial activities; provided, however, that the majority vote of the Directors shall be required for a Director to use property belonging to the Company, including confidential or proprietary information or other matters entrusted to a Director as a result of the status of being a Director."

423. At all relevant times, Section 7.11 of the Operating Agreement provided that the Chief Executive Officer **shall not** "acquire any assets, business, securities or properties of any other Person other than in the ordinary course of business," nor, "sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of the Company's assets, business or properties with a value in excess of $200,000 other than in the ordinary course of business."

424. Defendant Abrahams breached the Operating Agreement, specifically Sections 3.4, 7.8, and 7.11, through his acts and omissions described above.

425. As a direct result of defendant Abrahams's actions, plaintiff ExWorks suffered damages.

## COUNT XV: BREACH OF CONTRACT
### (Defendant RedRidge)

426. Paragraphs 1 through 323 are incorporated by reference.

427. At all times relevant to this litigation, defendant RedRidge was party to a valid and enforceable contract, namely, the Operating Agreement, with Plaintiff ExWorks.

428. At all relevant times, Section 4.8(a)(ii) of the Operating Agreement provided, "The RedRidge Services shall be performed by RedRidge, as applicable, in a competent and diligent manner (the 'Services Warranty')."

429. Defendant RedRidge breached the Operating Agreement, specifically Section 4.8(a)(ii), through his acts and omissions described above.

430. As a direct result of defendant RedRidge's actions, plaintiff ExWorks suffered damages.

## COUNT XVI: UNJUST ENRICHMENT
### (All Defendants)

431. Paragraphs 1 through 323 are incorporated by reference.

432. All named defendants unjustly retained benefits owed to the Plaintiffs to the detriment of Plaintiffs.

433. All named defendants' retention of the benefits violates the fundamental principles of justice, equity, and good conscience.

434. In reliance on the bad faith and intentionally wrongful actions taken by all named defendants, all named defendants received financial benefits owed to Plaintiffs.

435. All named defendants except for defendant Hall further appreciate and have knowledge of the benefits conferred directly upon them by Plaintiffs, including through SBA fees paid by third parties for PPP loan servicing, the business opportunities rightfully due to ExWorks and World Trade Finance, and $785,000 provided by ExWorks.

436. All named defendants except for ACAP also appreciate and have knowledge of the benefits conferred directly upon them by Plaintiffs, including by concealing millions of dollars made to borrowers in the portfolio, stealing diligence fees that were properly owed to ExWorks through false and phantom invoices, and fraudulently concealing the true state of the ExWorks loan portfolio in order to enrich themselves.

437. Under principles of justice, equity, and good conscience, all named defendants should not be permitted to retain the money belonging to Plaintiffs. The financial benefits derived by all named defendants rightfully belong to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court:

438. Enter an order enjoining defendants ACAP, Abrahams, and LaHaie from acquiring The Loan Source and directing defendants ACAP, Abrahams, and LaHaie to deposit any and all profits as a result of defendant ACAP's partnership with The Loan Source into a special escrow account;

439. Enter an order enjoining defendants ACAP, Abrahams, and LaHaie from engaging in business that is competitive with ExWorks and World Trade Finance, including but not limited to the servicing of PPP loans;

440. Enter an order enjoining defendants Abrahams, LaHaie, Hall, and RedRidge from using the confidential business information of Plaintiffs;

441. Award judgment in Plaintiffs' favor and against defendants Abrahams, LaHaie, RedRidge, and ACAP as appropriate on Counts I-IV & VIII-XVI of this First Amended Complaint;

442. Award judgment in Plaintiffs' favor and against defendants Abrahams, LaHaie, Hall, and RedRidge as appropriate on Counts V, VI, VII, & XVI of this First Amended Complaint;

443. Award damages in favor of Plaintiffs against defendants sufficient to compensate Plaintiffs for the economic and non-economic damages sustained by Plaintiffs as a result of defendants' actions as alleged herein, including but not limited to defendants' ill-gotten profits from the bank loan fees and purchase of The Loan Source and/or defendants' lost profits;

444. Require defendants to submit to the Court an equitable accounting of the use and disposition of all moneys, assets, and corporate resources of Plaintiffs as described more specifically above;

445. Impose a constructive trust over all moneys, assets, and corporate resources under the control of defendants and equitably belonging to Plaintiffs as described more specifically above;

446. Award punitive damages against defendants;

447. Award attorney's fees and costs to Plaintiffs; and

448. Award such other relief the Court considers appropriate.

## Jury Trial Demand

449. Plaintiffs hereby demand a jury trial on all issues so triable.

/s/ Zachary T. Fardon
Zachary T. Fardon

KING & SPALDING LLP
Zachary T. Fardon
Patrick M. Otlewski
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Phone: 312.995.6333
zfardon@kslaw.com
potlewski@kslaw.com

*Attorneys for Plaintiffs*

Dated: February 9, 2021